IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

O CENTRO ESPIRITA BENEFICIENTE
UNAIO DO VEGETAL,  et al.,

        Plaintiffs,

vs.                      No. Civ. 00-1647 JP/RLP

JOHN ASHCROFT,  et al.,

        Defendants.

**BRIEF IN SUPPORT OF MOTION OF THE NATIVE AMERICAN CHURCH OF OKLAHOMA, THE NATIVE AMERICAN CHURCH OF NORTH AMERICA, AND THE NATIVE AMERICAN CHURCH OF THE KIOWA TRIBE OF THE STATE OF OKLAHOMA
TO FILE AN *AMICUS CURIAE* BRIEF IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

C. BRYANT ROGERS
DAVID GOMEZ
ROTH, VanAMBERG, ROGERS, ORTIZ,
FAIRBANKS &YEPA, LLP
Post Office Box 1447
Santa Fe, New Mexico  87501
(505)988-8979

Counsel for the Native American Church of Oklahoma, the Native American Church of North America, and the Native American Church of the Kiowa Tribe of the State of Oklahoma



## TABLE OF CONTENTS

**Page No.**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.  By Asserting That the Issue of the Ethnic Composition of the
    Native American Church Is Moot Plaintiffs Have Implicitly Withdrawn,
    or This Court Should Dismiss *Sua Sponte*, Their Equal Protection
    Claim Against the United States, Which Was Based in Large Part
    upon Their Assertion That the Membership of the Native American
    Church Is Multi-Ethnic and Thus Not Entitled to the Protection
    of the Federal-Indian Trust Relationship. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.  Requiring Neutrality in Matters of Religion Does Not Compel this Court
     to Grant  Plaintiffs a Religious Exemption under Equal Protection Principles . . . 9

III.  The New Mexico District Court's Decision in *United States v. Boyll*
      Is Not Binding Precedent in this Jurisdiction on the Subjects Relevant to Plaintiffs'
      Equal Protection Challenge – Namely, the Ethnic Composition
      and the Asserted Christian Nature of the Native American Church, and the
      Overarching Indian Equal Protection Principles Espoused in the Supreme
      Court Decision of *Morton v. Mancari*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IV.  The United States' Trust Relationship with Indian Tribes Obligates the Government
     to Protect Indian Religion and Culture, and the Government's Statutory and
     Regulatory Plan for Protecting the Religious Use of Peyote by Indian Tribal Members
     Is Rationally Related to That Obligation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

-i-

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Barney v. Pulsipher*, 143 F.3d 1299 (10th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Campbell v. Buckley*, 203 F.3d 738 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Cherokee Nation v. Georgia*, [30 U.S. (5 Pet.) 1 (1831)] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993) . . . . . . . . . . . . . . . . . 10

*City of Albuquerque v Browner*, 97 F.3d 415 (10th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . 25

*Combs v. Corrections Corp. of America*, 977 F. Supp. 799 (W.D.La. 1997) . . . . . . . . . . . . . . 12

*Cree v. Flores*, 157 F.3d 762 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Delaware Tribal Business Comm. v. Weeks,* 430 U.S. 73, 84-85, 97 S.Ct. 91,
   51 L.Ed.2d 173 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Cruz v. Beto*, 405 U.S. 319 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Fisher v. District Court of Sixteenth Judicial Dist. of Montana,* 424 U.S. 382,
   390-391, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Gillette v. United States*, 401 U.S. 437 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,10

*Kennedy v. Bureau of Narcotics and Dangerous Drugs*, 459 F.2d 415 (9th Cir. 1972) . . . . . . . . 7

*Larsen v. Valente*, 456 U.S. 228 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Leary v. United States*, 383 F.2d 851 (5th Cir. 1967), *rehearing denied,*
   392 F.2d 220 (1968), *rev'd on other grounds*, 395 U.S. 6 (1969) . . . . . . . . . . . . . . . . . . . . . 7

*Livingston v. Ewing*, 601 F.2d 1100 (10th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Lynch v. Donnelly*, 465 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988) . . . . . . . . . . 24

*McBride v. Shawnee County, Kansas Court Services,* 71 F. Supp. 2d 1098, (D. Kan. 1999) . . 6, 8

*Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation,*
   425 U.S. 463, 479- 480, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) . . . . . . . . . . . . . . . . . . . . . . 22

*Morrison v. Garraghty*, 239 F.3d 648, (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Morton v. Mancari*, 417 U.S. 535 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Native American Church of New York v. United States*, 468 F. Supp. 1247
(S.D.N.Y. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Olsen v. Drug Enforcement Administration*, 878 F.2d 1458 (D.C. Cir. 1989) . . . . . . . . . . . . . 7

*Olsen v. Iowa*, 808 F.2d 652 (8th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,23

*Petitioner v. Wyrick*, 441 F. Supp. 312 (W.D.Mo. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Peyote Way Church of God v. Thornburgh*, 922 F.2d 1210 (5th Cir. 1991),
*citing Bolling v. Sharpe*, 347 U.S. 497 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Quick Bear v. Leupp*, 210 U.S. 50 (1908) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Rice v. Cayetano*, 528 U.S. 495 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Rupert v. Director*, 957 F.2d 32 (1st Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23,26

*Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*State of Washington V. Washington State Commercial Passenger
Fishing Vessel Association*, 443 U.S. 658, (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 24

*Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481 (10th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Tulee v. Washington*, 315 U.S. 681, 684 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Unemployment Division Department Human Resources of
Oregon v. Smith*, 494 U.S. 872 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Antelope,* 430 U.S. 641, 645-647, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977) . 22, 23

*United States v. Boyll, 774 F. Supp. 1333 (D.N.M.1991)* . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Claypox*, 35 F. 575 (D. Or. 1888) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Kuch*, 288 F. Supp. 439 (D.D.C. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 13

*United States v. Middleton*, 690 F.2d 820 (11th Cir.1982), *cert. denied,* 460 U.S. 1051(1983) . 7

*United States v. Rush*, 738 F.2d 497 (1st Cir. 1984), *cert denied*, 470 U.S. 1004 (1985) . . . . 7, 23

*United States v. Warner*, 595 F. Supp. 595 (D.N.D. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 7,14

*Walz v. Tax Commission*, 397 U.S. 664 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Williams v. Babbitt*, 115 F.3d 657 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Worchester v. Georgia*, 31 U.S. (6 Pet.) 515 (1832) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

## STATE CASES

*Offerdahl v. District Court*, 481 P.2d 338 (Mont. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*State of California v. Woody*, 394 P.2d 813 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*State of Wisconsin v. Matteson*, 530 N.W.2d 69 (Ct. App. Wis. 1995) . . . . . . . . . . . . . . . . . . 8

*State v. Big Sheep*, 243 P. 1067 (Mont. 1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*State v. Bullard*, 148 S.E.2d 565 (N.C. 1966), *cert denied*, 386 U.S. 917 (1967) . . . . . . . . . . . 8

*State v. Olsen*, 315 N.W.2d 1 (Iowa 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*State v. Peck*, 422 N.W.2d 160 (Ct. App. Wis. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*State v. Soto*, 537 P.2d 142 (Ct. App. Or. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*State v. Whittingham*, 504 P.2d 950 (Ariz. App. 1973), *cert denied*,
   417 U.S. 946 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Whitehorn v. State*, 561 P.2d 539 (Okla. Crim. App. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Whyte v. United States*, 471 A.2d 1018 (Dis. Col. Ct. App. 1984) . . . . . . . . . . . . . . . . . . . . . 8

## DOCKETED CASES

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, Civil No. 00-1647 (Nov. 21, 2000)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*State of Arizona v. Attakai*, Criminal No. 4098, Coconino County, Arizona
   (unreported, July 26, 1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

# FEDERAL STATUTES

103rd Cong., 2nd Sess. (1994), *reprinted in* 1994 U.S.C.C.A.N. 2404 . . . . . . . . . . . . . . . . . . . 26

16 U.S.C. §228i(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

16 U.S.C. §410ii-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

16 U.S.C. §410pp-6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

16 U.S.C. §445c(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

16 U.S.C. §460uu-47 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

16 U.S.C. §470a(d)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

16 U.S.C. §470cc(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

16 U.S.C. §543f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

16 U.S.C. §668a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

25 U.S.C. §640 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

25 U.S.C. § 1302(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

25 U.S.C. §§§§2901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

25 U.S.C. §3001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

42 U.S.C. 1996 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24,25

42 U.S.C. §§2000bb . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

50 U.S.C. §456(j)(1964 ed. Supp. V.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

21 C.F.R. §1307.31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

41 Stat. 305, 307 (1919) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

84 Stat. 1437 (Dec. 14, 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

92 Stat. 1672, (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

92 Stat. 1679, (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Executive Order No. 13,007 (Indian Sacred Sites) (1996) . . . . . . . . . . . . . . . . . . . . . . . . . 26

## MISCELLANEOUS

*Blacks Law Dictionary* 1286 (5th ed.1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Felix Cohen's *Handbook of Federal Indian Law* (1982 ed.) . . . . . . . . . . . . . . . . . . . . . . . 20

Hoxie, Fred, *A Final Promise: The Campaign to Assimilate the Indians,*
  *188-1920* (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Mary C. Wood, *Protecting the Attributes of Native Sovereignty:*
  *A New Trust Paradigm for Federal Actions Affecting Tribal Lands*
  *and Resources*, 110 Utah L. Rev. 109 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Prucha, Fr. Francis Paul, *The Churches and the Indian Schools, 1888-1912* (1979) . . . . . . . . 18

Prucha, *The Great Father* (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Stewart, Omer C., *Peyote Religion: A History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Wounded Knee, South Dakota, see Mooney, James, *The Ghost Dance*
  *Religion and Wounded Knee* (reprint ed. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## INTRODUCTION

On November 21, 2000, the O Centro Espirita Beneficiente Uniao Do Vegetal (the "UDV"), a religious organization in New Mexico, filed suit against the Attorney General of the United States. The UDV challenged the confiscation by the United States under the Controlled Substances Act ("CSA") of its religious sacrament *hoasca*. The UDV alleges the United States does not have a compelling interest in prohibiting its religious use of *hoasca*, and thus it seeks a declaration from this Court that the government's interpretation of the CSA violates the Religious Freedom Restoration Act, 42 U.S.C. §§2000bb *et seq*. ("RFRA"). The UDV also seeks a declaration that if its members are not allowed access to hoasca for religious uses, the United States' exemption for the religious use of peyote by Indians who are members of the Native American Church denies UDV's members' constitutional right to Equal Protection of the laws under the Fifth and Fourteenth Amendments to the United States Constitution.

*Amici*, the Native American Church of Oklahoma, and the Native American Church of North America, and the Native American Church of the Kiowa Tribe of the State of Oklahoma (collectively, hereinafter, "the NAC"), are organizations which represent approximately 35 local NAC chapters in Oklahoma and various other states in the western and midwestern United States. NAC takes no position on the merits of the UDV's RFRA claims against the government, other than to state that they agree that as a legal principle the government must prove under RFRA that its interests in prohibiting the UDV's use of *hoasca* are compelling and its means for achieving same the least restrictive possible. The *amici* NAC, however, oppose UDV's argument that it has been deprived of its right to equal protection unless given the same treatment as the NAC, and especially the UDV's effort to strengthen its Equal Protection claim by badly distorting and misrepresenting to this Court the nature, legal history and status of the Native

American Church. This is but the most recent in a long line of efforts by various individuals or religious groups to make such an Equal Protection challenge, as this brief will discuss. *Amici* sincerely hope that this Court will, as numerous courts have in the past, lay to rest the false notion that groups such as the UDV are similarly situated with the NAC for purposes of Equal Protection analysis.[1]

Doing so is critical, for irrespective of the merits of plaintiffs' claims under RFRA, what this case is *not* about is the government "extending preferential religious freedom to American Indians," or "hoarding religious freedom and doling it out to preferred groups," or American Indians possessing "a superior right of religious freedom." Plaintiffs' Trial Memorandum (copy undated) at 5-6. Additionally, this Court ought not be swayed by Plaintiffs' mischaracterization of how the government's trust responsibility to Indians informs an analysis of Indians' rights under either the First Amendment or RFRA. Plaintiffs' Trial Memorandum at 2. Contrary to Plaintiffs' assertion, the federal peyote exemption for the NAC is a reflection of *both* the rights of Indians under the First Amendment, and under the federal trust responsibility. Additionally, the trust relationship and the historical foundation on which it is built serves as a basis in part for the NAC's *sui generis* legal and historical status, which defeats the Equal Protection claim in this case.

---

[1] The UDV also has asserted in earlier briefing to the Court that *hoasca* is not a controlled substance under the CSA. *See* Plaintiffs' November 21, 2000 Complaint at ¶ 75, and Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction at pp. 27-36. If that assertion is correct, that fact presents an additional reason for why the UDV and the NAC not being similarly situated, since the NAC admits that its sacrament, peyote, is a controlled substance under the federal CSA.

## ARGUMENT

I.     **By Asserting That the Issue of the Ethnic Composition of the Native American Church Is Moot Plaintiffs Have Implicitly Withdrawn, or This Court Should Dismiss *Sua Sponte*, Their Equal Protection Claim Against the United States, Which Was Based in Large Part upon Their Assertion That the Membership of the Native American Church Is Multi-Ethnic and Thus Not Entitled to the Protection of the Federal-Indian Trust Relationship.**

Plaintiffs initiated this litigation with a claim that the Native American Church is a

Christian church[2] and a multi-ethnic congregation and is, thus, similarly situated to the UDV.

See Plaintiffs' November 21, 2000 Complaint at ¶¶ 48, 57-59, 64-65, and Prayer for Relief at ¶ 1.

And because of the claimed NAC Christian nature and multi-ethnic congregation, the Plaintiffs'

asserted, the United States could not rely on the federal-Indian trust relationship and the

principles espoused in *Morton v. Mancari*, 417 U.S. 535 (1974), to apply a rational basis test to

defeat the Equal Protection claims in this case, as numerous other courts have done in the past.

*See* Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary

Injunction, at pp. 25-27: "although Native American tribes and tribal lands have a special status

under the Constitution and other American law, that status is irrelevant to the NAC's peyote

exemption . . .. Therefore, although the UDV and its members are similarly situated to the NAC

and its members, defendants have failed and refused to treat them similarly." *See also* Plaintiffs'

Reply Brief in Support of Motion for Preliminary Injunction, at pp. 40-42: "The government's

reliance on . . . *Morton v. Mancari*, 417 U.S. 535 (1974), . . . is also misplaced in this context. . .

---

[2] Although the issue of whether the NAC is a Christian church was not technically before the Court in the preliminary injunction hearing, the UDV also made this allegation as part of the factual basis for its Equal Protection claim. Like the multi-ethnic fact allegations, however, the UDV was unable to sustain its burden of proof on the Christian issue, and this failure provides additional grounds for dismissing the UDV's Equal Protection claim against the United States.

3

. The membership in the NAC is <u>not</u> confined to Indians. . . .  As plaintiffs have demonstrated in the instant case, many non-Indians are members of the NAC.  Accordingly, the refusal to accord Equal Protection to the similarly-situated UDV is doubly discriminatory . . .."

Now that the preliminary injunction hearing and all discovery attendant thereto have concluded, Plaintiffs have not met their burden of establishing on the record put before this Court by the parties that the NAC has a multi-ethnic congregation.  In pre-hearing discovery activities Plaintiffs placed great emphasis on their contention that the NAC was multi-ethnic Christian religion, only to find at trial that they had little if any credible evidence to support such contentions.  Lay witnesses Naranjo and Harrington only could identify a very few actual non-Indian "members" of the Church, as opposed to occasional participants in Church ceremonies.  Indeed, their one expert witness who took the position initially that the NAC is multi-ethnic, Dr. Fikes, was not able to sustain his position in his deposition and his testimony at the preliminary injunction hearing was withdrawn by Plaintiffs.  On Defendant's side, the weight of the evidence, both from expert and lay testimony and supporting documentary evidence, concludes that the Church is neither Christian nor multi-ethnic, but overwhelmingly Indian in nature, origin, and composition.

After failing to meet their burden on this issue, Plaintiffs now assert the issue is moot.  *See* Plaintiffs' Supplemental Trial Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction at 12-13.  Plaintiffs' failure to prove what it initially claimed – that the NAC has a multi-ethnic congregation – defeats entirely their Equal Protection claim.

The principle of constitutional Equal Protection mandates similar treatment under the law for those similarly situated.  *Peyote Way Church of God v. Thornburgh*, 922 F.2d 1210, 1214 (5th

4

Cir. 1991), *citing Bolling v. Sharpe*, 347 U.S. 497, 498-99 (1954). "The Equal Protection Clause directs that all persons similarly circumstanced shall be treated alike. But so too, the Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same. In order to assert a viable Equal Protection claim, plaintiffs must first make a threshold showing that they were treated differently from others who were similarly situated to them." *Campbell v. Buckley*, 203 F.3d 738, 747 (10th Cir. 2000), *quoting Plyler v. Doe*, 457 U.S. 202, 216 (1982); and *Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir.1998)(citation, brackets, internal quotation marks omitted).

In *Peyote Way* the Fifth Circuit concluded that the "record conclusively demonstrates that NAC membership is limited to Native American members of federally recognized tribes . . .," *id.* at 1216. On that basis, and on the authority of the Supreme Court decision in *Morton v. Mancari*, 417 U.S. 535 (1974), the Court held that "Peyote Way's members are not similarly situated to those of the NAC for purposes of cultural preservation and thus, the federal government may exempt NAC members from statutes prohibiting peyote possession without extending the exemption to Peyote Way's membership." *Id.* at 1216.

Just as in *Peyote Way*, the plaintiffs here were unable to prove that the UDV and the NAC are similarly situated *factually*. As a factual matter, the two religions are different in several fundamental ways. The peyote religion practiced by the NAC is an indigenous North American religion which traces its roots back at least 10,000 years in the region now designated as northern Mexico and southern United States. The NAC is overwhelmingly comprised of tribal Native Americans. The peyote religion is also not a Christian religion. It is indigenous in its origins and practices, while incorporating some elements of Christianity and local traditional Indian elements. The UDV, in contrast, is not indigenous to the United States, or for that matter North

5

America, having arrived here very recently from Brazil. Members of the UDV in the United States are persons of many races and ethnic backgrounds; few if any are Native American. By the admission of its president in the United States, Jeffrey Bronfman, the UDV is a Christian religion.

Critically, most NAC members are members of federally recognized tribes. As such they have a unique legal and political relationship with the United States, described by the Supreme Court as *sui generis* – the "*only* one of its kind."[3] The fact that a few participants in NAC ceremonies may be non-Indian does not alter the political relationship upon which any constitutional analysis must depend.[4] In sharp contrast, the UDV possesses no such unique legal-political relationship with the United States government.

Equally critical for the Equal Protection analysis, the NAC and other religions such as the UDV [and, for that matter, the American Church of God] are not similarly situated as a matter of law. Legally, the Native American Church's use of peyote, and since 1965 its religious exemption from the federal drug laws for peyote, has been the subject of numerous legal challenges – some direct but most indirect – over the past century. The reported court decisions

---

[3] *See Blacks Law Dictionary* 1286 (5th ed.1979), defining *sui generis* as "Of its own kind or class; i.e., the *only* one of its own kind."

[4] *See McBride v. Shawnee County, Kansas Court Services*, 71 F. Supp.2d 1098, 1103 (D. Kan. 1999), where non-Indian Rastafarians raised an Equal Protection claim asserting, as here, that non-Indians are members of the NAC. The district court held that "[re]gardless of the racial classification of its members, the NAC plays a central role in Native American culture. The state has chosen to protect that culture by allowing the NAC to use peyote in its religious ceremonies. The fact that non-Indians can become members does not change the *sui generis* and political status of the NAC."

fall into four categories. First, prosecutions of Indians for possession and/or use of peyote.[5]

Second, prosecutions of non-Indians claiming some association with the NAC, for possession

and/or use of peyote.[6] Third, non-Indian individuals or religious-clone groups claiming to revere

peyote as a sacrament, and asserting a constitutional entitlement to the same legal status as the

NAC.[7] Fourth, and finally, non-Indian individuals or religious groups such as the UDV claiming

to revere some controlled substance other than peyote as a sacrament, and likewise asserting a

constitutional entitlement to the same legal status as the NAC.[8]

_____

[5] The first group of cases includes *State v. Big Sheep*, 243 P. 1067 (Mont. 1926); *State of California v. Woody*, 394 P.2d 813 (1964); *Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481 (10th Cir. 1989), *State v. Soto*, 537 P.2d 142 (Ct. App. Or. 1975); *Whitehorn v. State*, 561 P.2d 539 (Okla. Crim. App. 1977); *State of Arizona v. Attakai*, Criminal No. 4098, Coconino County, Arizona (unreported, July 26, 1960). Because of the nature of these individual cases, constitutional Equal Protection issues were not raised and thus they provide no illumination *per se* on that issue for this Court.

[6] The second group of cases includes *United States v. Boyll*, 774 F. Supp. 1333 (D. N.M. 1991), discussed in detail, *infra*; *United States v. Warner*, 595 F. Supp. 595 (D.N.D. 1984)(Free Exercise, Establishment and Equal Protection claims all rejected by court); *State v. Whittingham*, 504 P.2d 950 (Ariz. App. 1973), *cert denied*, 417 U.S. 946 (1974)(use of peyote protected by Free Exercise Clause; no Equal Protection challenge).

[7] The third group of cases includes *Peyote Way Church of God v. Thornburgh*, 922 F.2d 1210 (5th Cir. 1991)(non-Indian peyote church's First Amendment Free Exercise and Establishment Clause and Equal Protection claims rejected); *Kennedy v. Bureau of Narcotics and Dangerous Drugs*, 459 F.2d 415 (9th Cir. 1972)(Church of the Awakening denied petitioned amendment to federal peyote regulation affording expansive protection); *Offerdahl v. District Court*, 481 P.2d 338 (Mont. 1971)(state peyote statutory exemption reasonable and not arbitrary, and thus Equal Protection claim rejected).

[8] The fourth group of cases includes the instant *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, Civil No. 00-1647 (Nov. 21, 2000); *Leary v. United States*, 383 F.2d 851 (5th Cir. 1967), *rehearing denied*, 392 F.2d 220 (1968), *rev'd on other grounds*, 395 U.S. 6 (1969)(claim that the government's exemption for the religious use of peyote by members of the Native American Church amounted to religious discrimination rejected on grounds that Leary's use of marijuana not part of religious ceremony, thus not similarly situated for Equal Protection purpose); *Olsen v. Drug Enforcement Administration*, 878 F.2d 1458 (D.C. Cir. 1989)(Ruth

It is illuminating and instructive that *no* court has ever held that, as to groups in the fourth category such as the UDV, there is an entitlement under constitutional Equal Protection principles to the same kind of protection afforded the NAC by the federal peyote exemption. Not even in instances where, as in the third category, groups such as the Peyote Way Church of God and other NAC-clone organizations have sought protection has a court recognized such a request under constitutional Equal Protection. Only in the rare instance where non-Indians have claimed "membership" in *bona fide* NAC organizations have courts extended protection, and for the reasons obvious in *Boyll* and *Whittingham* (*see* discussion, *infra*), the courts never conducted a searching examination of the "membership" issue, and thus the Equal Protection issue was never fully addressed. Quite simply, the NAC is what these numerous courts have all found it to be as a matter of law – *sui generis* – truly one of a kind.

---

Bader Ginsburg)(Establishment Clause-Equal Protection claims of Ethiopian Zion Coptic Church rejected as not similarly situated with American Indians and the NAC); *cf. Olsen v. Iowa*, 808 F.2d 652 (8th Cir. 1986) and *State v. Olsen*, 315 N.W.2d 1 (Iowa 1982); *United States v. Rush*, 738 F.2d 497 (1st Cir. 1984), *cert. denied*, 470 U.S. 1004 (1985)(Equal Protection claim of Ethiopian Zion Coptic Church rejected on basis of the *sui generis* legal status of American Indians and the NAC); *cf. United States v. Middleton*, 690 F.2d 820, 825-26 (11th Cir.1982), *cert. denied*, 460 U.S. 1051(1983); *State v. Peck*, 422 N.W.2d 160 (Ct. App. Wis. 1988)(Israel Zion Coptic Church not similarly situated with NAC for Equal Protection purposes); *State of Wisconsin v. Matteson*, 530 N.W.2d 69 (Ct. App. Wis. 1995)(unpublished – same result as *Peck*); *McBride v. Shawnee County, Kansas Court Services*, 71 F. Supp.2d 1098 (D. Kan. 1999)(non-Indian Rastafarians Equal Protection claim rejected, given the *sui generis* and political status of the NAC); *Whyte v. United States*, 471 A.2d 1018 (Rastafarian Equal Protection claim against NAC rejected); *Native American Church of New York v. United States*, 468 F. Supp. 1247 (S.D.N.Y. 1979)(White NAC-clone organization sought to expand the protection afforded by the government's peyote exemption to the use of *all* psychedelics; court ordered a trial on the issue of whether it was in fact a *bona fide* religion and its use of peyote was for sincere religious purposes); *United States v. Kuch*, 288 F. Supp. 439 (D.D.C. 1968)(Neo-American Church not similarly situated with NAC; marijuana harmful to public health); *State v. Bullard*, 148 S.E.2d 565 (N.C. 1966), *cert denied*, 386 U.S. 917 (1967)(Neo-American Church member Free Exercise claim rejected).

8

In sum, it is plain that Plaintiffs' Equal Protection challenge must fail for having not made a *prima facie* showing that the UDV and the NAC are similarly situated as a matter of fact and of law.

## II.   Requiring Neutrality in Matters of Religion Does Not Compel this Court to Grant Plaintiffs a Religious Exemption under Equal Protection Principles.

Plaintiffs' assert the maxim that "the law requires neutrality in matters of religion." Plaintiffs Trial Mem. at 4. Reliance on that maxim alone, however, does not *ipso facto* require this Court to grant Plaintiffs the relief they request under principles of Equal Protection. Religious faiths are entitled to an equality of rights, *Larsen v. Valente*, 456 U.S. 228 (1982), but at the same time accommodations to religious belief and practice are not *per se* suspect because they favor only one religion. Most accommodations are of this sort; when the legislative branch enacts a law and is aware of an infringement, it often carves out an exception. Prohibition and the exception for the sacramental use of wine is a well-known example. *See* National Prohibition Act, Title II, §3, 41 Stat. 305, 307 (1919). Military conscription and the exception for conscientious objection is another. *See* 50 U.S.C. §456(j)(1964 ed. Supp. V.). The exemption for the NAC's use of peyote is another.

It cannot be an objection to these laws that they work to the benefit only of those religious groups whose practices are inconsistent with the law in question. The Supreme Court has held that it is not necessary for the government to accommodate all religious claims equally, even if of the same general nature, if there are reasonable justifications not based on religious favoritism for making distinctions. *Cruz v. Beto*, 405 U.S. 319 (1972)(lone Buddhist prisoner denied equal treatment in terms of chapel access, religious instruction, and religious materials); *Gillette v. United States*, 401 U.S. 437 (1970)(court upheld law exempting religious conscientious objectors

from all war but not objectors to particular wars). The Supreme Court has observed that because of the religious diversity in America, religious accommodations must vary in kind and degree. *Lynch v. Donnelly*, 465 U.S. 668 (1984). "The course of constitutional neutrality in [First Amendment jurisprudence] cannot be an absolutely straight line; rigidity could well defeat the basic purpose of these provisions." *Walz v. Tax Commission*, 397 U.S. 664, 669 (1970), *quoted in Peyote Way Church of God v. Thornburgh, supra*, 922 F.2d at 1217 (5th Cir. 1991).

The test is that accommodations need not be equal if there are "neutral, secular reasons," not based on religious favoritism, for distinguishing among religions. *Gillette, id.*, 401 U.S. at 458; *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 534 (1993). The NAC exemption for the religious use of peyote has already met this test. The exemption has been found to advance the neutral, secular objective of preserving Native American culture, and thus the NAC peyote exemption is not based on religious favoritism. In *Peyote Way Church of God v. Thornburgh*, 922 F.2d 1210 (5th Cir. 1991), the Fifth Circuit upheld the exclusion of a non-Indian "peyote" group from Protection under the exemption, reasoning that the differential treatment is attributable to the federal government's "constitutional role as protector of tribal Native Americans" and that an exemption for non-Indians is not entitled to any such justification. *Id.* at 1217. The Court there emphasized that "the federal NAC exemption allowing tribal Native Americans to continue their centuries-old tradition of peyote use is rationally related to the legitimate governmental objective of preserving Native American culture. Such preservation is fundamental to the federal government's trust relationship with tribal Native Americans." *Id.* at

1216; quoting *Mancari,* 417 U.S. at 535, 554-55.[9]

In sum, then, because there are indeed valid, neutral and secular reasons for Congress' and the Executive Branch's accommodation of the religious use of peyote by the Native American Church, the singling out of Indians for special treatment, in addition to being proper under the United States' responsibility to protect Indian culture and self-determination, is lawful under constitutional Equal Protection analysis, and does not deprive the UDV or its members of any constitutional right.

**III.    The New Mexico District Court's Decision in *United States v. Boyll* Is Not Binding Precedent in this Jurisdiction on the Subjects Relevant to Plaintiffs' Equal Protection Challenge – Namely, the Ethnic Composition and the Asserted Christian Nature  of the Native American Church, and the Overarching Indian Equal Protection Principles Espoused in the Supreme Court Decision of *Morton v. Mancari.***

Plaintiffs' Equal Protection argument – or what is left of it, given their failure to establish both factually and legally that the NAC and the UDV are similarly situated – rests on a general assertion that in matters of religion the federal government must treat all religions equally, and on this Court's prior decision in *United States v. Boyll*, 774 F. Supp. 1333 (D.N.M.1991), that the government cannot impose a racial restriction on membership in the NAC. *Amici* have addressed the neutrality argument above.  As to *Boyll,* it is important to understand the limitations of the decision on factual and legal issues central to the Court's inquiry here.  Legally, the Court in *Boyll* was simply incorrect in its conclusion that the federal peyote regulation was intended to protect more than Indians.  Because the Court reached the wrong conclusion on that issue, however, it did not reach the *Mancari* Equal Protection principles that control the disposition of

---

[9] *See also* the cases cited in footnotes 7 and 8, *supra*, for an affirmation of this finding of legitimate governmental purpose and resulting constitutional neutrality.

UDV's claim. Factually, Defendants have shown on the record now before this Court that *Boyll's* references to the NAC as a Christian religion with an open-door policy or a multi-ethnic congregation are wrong and, hence, should not be accepted by this Court as to UDV's claims.

Directly at issue in *Boyll* was the interpretation and constitutionality of the DEA's regulation on the religious use of peyote, 21 C.F.R. §1307.31, which exempts from federal prosecution persons who use peyote in "bona fide religious ceremonies of the Native American Church." Boyll claimed to be a member of the Native American Church,[10] so he was not challenging the express terms of the regulation, *per se*, but the government's interpretation and application of the regulation so as to exclude him. The Court ruled that the government could not exclude Boyll from protection under the peyote regulation; to do so, it held, would be "racially" restrictive and violative of both First Amendment Free Exercise and Fifth and Fourteenth amendment Equal Protection principles.

Though unnecessary to support it's holding, the Court's characterization of the peyote exemption – if applied only to protect Indians – as *racially* restrictive, is seriously flawed. It is primarily attributable to the failure of the parties to fully and effectively brief and argue the history of the exemption and the federal-Indian trust relationship principles underpinning the

---

[10] His "membership" in the Native American Church was not challenged by the government, though *Amicus* asserts that it should have been the subject of greater scrutiny. As discussed in the context of the decision in *State v. Whittingham,* 504 P.2d 950 (Ariz. App. 1973), *cert denied*, 417 U.S. 946 (1974), *infra*, the decision in *Boyll* lacks a complete discussion of whether *bona fide* NAC roadmen and other members of local NAC chapters considered Mr. Boyll to be a legitimate "member" of the NAC. It is one thing for a non-Indian to claim "membership" in the NAC; it is quite another to be regarded as a legitimate member by the community of Indian NAC members in a given locality. This is one among several issues which the government failed to fully litigate in *Boyll*, and is another reason not to consider the *Boyll* decision binding or even persuasive precedent on the issues central to the UDV's Equal Protection claim.

12

Indian-only interpretation of the regulation.[11]

Critically, the Court erred in its reading of the legislative history of the drug law. It quoted from the testimony of an official from the Bureau of Narcotics and Dangerous Drugs at a hearing in 1970, but omitted the most important and elucidating portion of the official's testimony. The Court quoted the following passage, curiously, in support of its interpretation of the government's intent: "We consider the Native American Church to be *sui generis*. The *history and tradition of the church* is such that there is no question but that they regard peyote as a deity as it were, and we will continue the exemption." (Emphasis by court.)

Actually, the full testimony by Mr. Sonnenreich of the Bureau of Narcotics and Dangerous Drugs ("BNDD"), and the original question posed by Congressman Satterfield of Virginia, reveals just the *opposite* intent than that reached by the Court in Boyll:

> [By] Mr. Satterfield. I have one other question. I recall when we were discussing dangerous drugs a few years ago, *the question came up about the Native American Church involving Indians in the west who use and have for centuries used peyote in connection with religious services.* It is my understanding that they enjoy an exemption under the current law.
>
> [By] Mr. Sonnenreich. In the first instance, Mr. Satterfield, the Native American Church did ask us by letter as to whether or not the regulation, exempting them by regulation, would be continued and we assured them it would be because of the history of the church. *We presently are involved in another hearing regarding*

---

[11] Plaintiffs' reliance on the decisions in *Morrison v. Garraghty*, 239 F.3d 648, 2001 WL 101507 (4th Cir. 2001); and *Combs v. Corrections Corp. of America*, 977 F. Supp. 799 (W.D.La. 1997) suffers from the same defect. *See* Plaintiffs' Reply Brief in Support of Motion for Preliminary Injunction at pp. 41-2. In those cases none of the parties were Native American, and the courts did not have the issues of the federal-Indian trust relationship, and *Mancari* Equal Protection principles, fully briefed and before them for consideration. Moreover, it is not uncommon for claims to be made of following *"the Native American Religion"* in the prison context. "A religion [cannot be] established by adopting religious nomenclature and using it as a shield to protect antisocial conduct." *Petitioner v. Wyrick*, 441 F. Supp. 312, 315 (W.D.Mo. 1977), *quoting United States v. Kuch, supra*, 288 F. Supp. at 443.

*another church that is a non-Indian church that is seeking the exemption and the order is going to be published. I believe, either today or tomorrow denying them the same exemption as the Native American Church. We consider the Native American Church to be sui generis. The history and tradition of the church is such that there is no question but that they regard peyote as a deity as it were, and we will continue the exemption.*

[By] Mr. Satterfield. You do not see anything in the Senate bill that would make this impossible?

[By] Mr. Sonnenreich. No. Under the existing law originally the Congress was going to write in a specific exemption but it was then decided that it would be handled by regulation and we intend to do it the same way under this law.

[By] Mr. Satterfield. Thank you. I have no other questions.

Drug Abuse Control Amendments of 1970, Hearings before the Subcommittee on Public Health

& Welfare of the Committee on Interstate and Foreign Commerce, House of Representatives, 91st

Cong., 2d Sess. 117-18 (1970)(emphasis added).

Thus, contrary to the Court's interpretation in *Boyll*, the regulation is *not* plainly intended

to include non-Indians within its protection. Just the opposite is true. The regulation, as

originally conceived and implemented in 1965, and as represented to Congress in 1970, was

intended to apply only to the bone fide religious use of peyote *by Indians*. The history of the

BNDD regulation, and Congress' decision not to put the exemption into statutory form, makes

clear that both the Executive and Legislative branches of government intended its peyote

exemption to protect *Indians* alone. Indeed, the above quoted colloquy evinces a clear intent on

the part of the government to deny protective status to non-Indians who attempt to use peyote for

religious reasons.[12]

---

[12] The United States District Court in North Dakota agreed with this analysis of the original intent of the government to restrict the NAC exemption to Indians. *See United States v. Warner*, 595 F. Supp. 595, 598 (D.N.D. 1984). Inexplicably, the Court in *Boyll* did not cite to

14

As a result of its erroneous conclusion that the peyote regulation was intended to apply to both Indians *and* non-Indians, the Court in *Boyll* did not have to engage in a full analysis of the Equal Protection issue before it. The Court, therefore, did not have to consider the arguments which are central to the issues before the Court in the present case; i.e., whether non-Indian churches such as the UDV (or the American Church of God) are similarly situated as a matter of fact and law to the Native American Church. The Court instead summarily concluded, without any discussion of *Mancari* and related Indian Equal Protection principles, that permitting non-drug use of peyote in *bona fide* religious ceremonies by Indian members of the Native American Church, but prohibiting the same use by non-Indians, would violate the principles of Free Exercise and Equal Protection.[13]

On the factual side, contrary to the sketchy record in *Boyll*, the United States has established here through uncontroverted evidence that the Native American Church is *not* a Christian Church. At most the record indicates that a few attributes of Christian ritual have been

---

the *Warner* decision or discuss its contrary interpretation of the history of the NAC exemption.

[13] Further evidence that the Court in *Boyll* did not have before it a full record on the ethnic composition-membership issues in the NAC is the *Boyll* Court's citation to *State v. Whittingham*, 504 P.2d 950 (Ariz. App. 1973), *cert denied*, 417 U.S. 946 (1974), for the proposition that membership in the NAC is usually not refused. *See Boyll*, *supra*, 774 F. Supp. 1333, at 1336. Yet a careful reading of *Whittingham* shows that the court there used the term "participants" to describe the defendants' relationship to the NAC. *See* 504 P.2d at 954: ". . . the defendants were sincere *participants* in what appeared to be a meeting of the Native American Church." Recall that in *Whittingham* the defendants were non-Indians having their marriage blessed in a NAC ceremony. *Id.* at 950. Whether the Indian roadman running the ceremony and other Indians present at the ceremony considered the Whittinghams *members* of that NAC chapter is a factual matter on which the court apparently had no record.

The Court in the present UDV litigation is, by now, on the record before, it very mindful of the enormous and important distinctions to be drawn between terms such as "member," "participant," and "observer" to describe one's relationship to a local NAC chapter and the peyote ceremonies it conducts.

adopted by a very few NAC roadmen and chapters, and that a few references to Christianity have been engrafted into boilerplate NAC bylaws, principally for the purpose of protecting the NAC from political oppression over time.[14]  In the present case Plaintiffs' put on no evidence – fact or expert – to establish that the NAC is a Christian religion.  Indeed, Plaintiffs' own witnesses (fact and expert) – Naranjo and Omer Stewart – testified that the NAC is a Native American, not a Christian, religion.  The United States' witnesses (fact and expert) – Walker, Deloria, Dayish and Whitehorse – all testified that the NAC is a Native American and not a Christian religion.  Omer Stewart testified in Boyll – and his testimony was accepted in the case at bar – that he does not consider the American Church of God to be a Native American Church.

Moreover, the United States has established unequivocally in this case that the NAC does not even remotely have an "open door" policy of permitting membership by persons of any race. The documentary evidence in the record indicates overwhelmingly that virtually all NAC chapters require at least Native American heritage as a prerequisite to membership, and most require at least 25% Indian blood.  At most the record allows the finding, based on statements in the record by NAC leaders such as Mr. Dayish,  that from time to time some few non-Indians have been permitted entry into NAC ceremonies as participants if they are either spouses of Indian members, or close friends who have demonstrated a sincere need for prayer to heal some physical ailment, or emotional problem.  Others such as Mr. Whitehorse have only seen non-

---

[14]  The United States failed to put on any evidence in *Boyll* to refute the assertion that the Native American Church is a Christian religion.  The fact that a select few members of the church who testified in Boyll believe it to be Christian religion is not controlling against the weight of uncontroverted evidence in the present case.  The United States in *Boyll* did not put on any expert or fact witnesses on the religious character of the NAC, nor did it cross examine any of Mr. Boyll's witnesses on the subject of the religious character of the NAC.

Indians in a NAC ceremony on two occasions, and both times those were scientists simply observing the ceremony. It was in this context that Dr. Walker testified that "there is no lock on the teepee for persons with a sincere need." Professor Deloria also verified that such an accommodation for persons in need is a universal principle among world religions.

In sum, the *Boyll* decision has very limited precedential value to the UDV litigation before the Court; and, its principle holding–erroneously interpreting the federal peyote regulatory exemption to encompass more than Indians–was clearly erroneous. Moreover, unlike the instant UDV litigation, *Boyll* did not involve a legal challenge to the government's asserted unequal treatment of two different religious groups. Plaintiff Jeffrey Bronfman and his followers are not attempting to establish their constitutional right to membership in the NAC, or to the legal possession and use of peyote for religious purposes, though the Plaintiffs' briefs would make it seem so by their over-reliance on the *Boyll* decision. From this perspective, then, it does not matter whether the United States permits non-Indians to be members of the NAC, or for that matter, occasional participants or observers of NAC ceremonies. The decision in *Boyll* does not inform in any helpful manner the decision this Court must now make on Plaintiffs' Equal Protection claim. The merits of that claim must succeed or fail based solely upon whether plaintiffs can establish that *both* factually and legally they are similarly situated to the NAC and, as the record clearly shows, they are not.

**IV.    The United States' Trust Relationship with Indian Tribes Obligates the Government to Protect Indian Religion and Culture, and the Government's Statutory and Regulatory Plan for Protecting the Religious Use of Peyote by Indian Tribal Members Is Rationally Related to That Obligation.**

Tremendous damage was done in the 18th, 19th and early 20th centuries to the strong sense

17

of political and social cohesion, and the rich and varied cultural and ceremonial life traditionally

celebrated by the nation's Indian tribes and other Native communities. The federal policy of

attempting to civilize and Christianize Indian people formed early in the 19th century.[15] It was

implemented through such practices as cooperation and subsidizing Christian missions, support

of sectarian schools,[16] and the apportionment of federal Indian agencies among Christian church

groups.[17] And it was accompanied by active efforts to eradicate traditional Indian religions and

religious practices. Such active aggression took various forms. In 1883 it took judicial form

when Courts of Indian Offenses were established for the specific purpose of suppressing

religious practices such as "the sun dance, all so-called religious ceremonies and the practices of

---

[15] Churches debated whether they should civilize or Christianize first. This was "largely a theoretical squabble, for the two processes, civilizing and Christianizing, were inextricably mixed. ... it would be difficult to tell where on activity ended and the other began. Nor did it matter to the government, which came to depend upon the church societies for civilizing work among the Indians without intending to promote any particular religion. . . . It was quietly understood, by government officials as well as by church leaders, that the American civilization offered to the Indians was *Christian* civilization, that Christianity was a component of civilization and could not and should not be separated from it." Prucha, *The Great Father* at 145-6 (1984).

[16] At the time, the Supreme Court was fully supportive of this federal assault on traditional Indian religious and ceremonial life. In *Quick Bear v. Leupp*, 210 U.S. 50 (1908), the Court held the government could legally expend Indian trust funds, derived from the Rosebud Sioux tribal members' own land resources, to operate the Bureau of Catholic Missions parochial school located on the Rosebud Sioux Reservation in South Dakota.

[17] *See* Prucha, *The Great Father, supra*, at 29-31, 141-47, 286-92, 398, 482-519. BIA operated Indian boarding schools in which Indian children systematically physically taken away from, and denied the cultural influences of, parents, extended families, and religious clans and societies. Hair was cut, punishment meted out for speaking native tongues, for possessing medicine bundles, eagle feathers, and other religious articles. *See, also,* Hoxie, Fred, *A Final Promise: The Campaign to Assimilate the Indians, 188-1920*, at pp. 189-211 (1984); and Prucha, Fr. Francis Paul, *The Churches and the Indian Schools, 1888-1912* (1979).

medicine men."[18] The 1890 Massacre at Wounded Knee was precipitated by effort to suppress the Ghost Dance.[19]

Indian culture and religion are central to tribal community cohesion and the Indian sense of tribal identity, political autonomy, and, therefore, the very sovereignty of Indian tribes as a separate people. The practices of Indian tribes and communities adhering to their traditional religions are often inseparable from their political institutions, culture and history, indeed from their very identities as distinct peoples. As a consequence, the historical government interference with and aggression toward Indian peoples' ability to freely exercise their religious beliefs threatened not only the viability of their self-government but also their very political, cultural and communal existence. Now, as then, there is a unique linkage between the religious, cultural and ceremonial life of Indian peoples and the survival of their communities as separate self-governing peoples. The federal policy of fostering Indian self-government and sovereignty already promoted by Congress is therefore integrally intertwined with the need to protect the religious, ceremonial and cultural lives of Indian peoples. As such, Indian religious classifications are not merely distinctions drawn to further religious objectives. Rather, to many Indian tribes, federal protection of religious traditions, ceremonies, sites, and practices, involves protection of the social fabric of the Indian community that holds together the tribal sense of

---

[18] See Prucha, *The Great Father, supra*, at 646-49, and Regulations of the Interior Department Indian Office at 102-03 (1904), banning the Sun Dance and all other similar dances and the practices of medicine men. For discussion of the Code of Indian Offenses see *United States v. Claypox*, 35 F. 575 (D. Or. 1888).

[19] For a history of the prohibition on ceremonial dances, the calling up of the Seventh Cavalry to suppress the Ghost Dance among the Sioux, and the resulting massacre at Wounded Knee, South Dakota, see Mooney, James, *The Ghost Dance Religion and Wounded Knee* (reprint ed. 1973).

sovereignty and community as a self-governing people.

It is difficult to compress into a few sentences the history of the United States government's and various state attempts to suppress and criminalize the religious use of peyote by Native Americans, and the tribes' efforts to combat this oppression. Beginning in 1883, the Indian administration in the federal government began a deliberate and concerted effort to eradicate the use of peyote among the tribes, invoking penalties such as revoking food rations and other treaty payments, and sometimes imposing imprisonment. Tribes also had to fight between 1900 and, as late as 1963, repeated efforts to pass federal legislation outlawing the ceremonial use of peyote. Not once was the Congress successful in enacting such legislation, though for many years between 1900 and the mid-1930's Congress authorized appropriations to the Bureau of Indian Affairs to actively suppress peyote. On the state front the tribes were not as successful, and between 1917 and 1933 the states of Utah, Nevada, Colorado, Arizona, Kansas, Montana, North Dakota, South Dakota, Iowa, New Mexico, Wyoming and Idaho successfully enacted peyote prohibition legislation. Many of these state laws were later repealed. *See generally*, Stewart, Omer C., *Peyote Religion: A History*, (U. Okla. 1987) at pages 21-75, 131-147, 215-238.

When viewed in this context, Congress' actions respecting Indian religion and culture are intended to be remedial in effect, correcting the more than two centuries of active and intentional efforts by federal law and policy makers to destroy Indian culture and religion as a means of "civilizing" Indian people. Indeed, it would be a cruel joke to anyone familiar with the history of 18th, 19th and early 20th century assaults by the federal government on the religious, ceremonial and cultural practices of Indian tribes to suggest that Congress has not the power to legislate to

20

protect those same ceremonial practices. Obviously, the UDV shares no similar history.

Generally, Congress has the authority under the Indian Commerce Clause of the United States Constitution, art. I, §2, cl. 3, to legislate on behalf of and for the benefit of Indian tribes. In the seminal case of *Worchester v. Georgia*, 31 US (6 Pet.) 515, 559 (1832), the Court described Indian tribes as "distinct, ... political communities, ... retaining their natural rights, ...." Since *Worchester*, the body of federal Indian law has singled out Indian tribes and their members for *sui generis* legal treatment, and has established a political and trust relationship between tribes and the federal government that is not shared by any other segment of the population. As stated in Felix Cohen's *Handbook of Federal Indian Law* at 207(1982 ed.):

> Chief Justice John Marshall observed in *Cherokee Nation v. Georgia* [30 U.S. (5 Pet.) 1 (1831)] that "[t]he condition of the Indians in relation to the United States is perhaps unlike that of any other two people in existence...[T]he relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist no where else." [Footnote omitted.] The federal-tribal relationship is premised upon broad but not unlimited federal constitutional power over Indian affairs, often described as "plenary." The relationship is also distinguished by special trust obligations requiring the United States to adhere strictly to fiduciary standards in its dealings with Indians. The inherent tension between broad federal authority and special federal trust obligations has produced a unique body of law.

From Justice Marshall's first characterization of Indian nations in *Worchester* and *Cherokee Nation*, courts and Congress repeatedly note that Indian tribes are distinct political and cultural entities with unique religious and cultural customs that form the basis of tribal sovereignty. For example, because many tribal governments do not share the American tradition of separation of church and state, but rather function along traditional religious lines, Congress did not impose Establishment Clause limitations on these governments in the Indian Civil Rights Act of 1968, 25 U.S.C. § 1302(1), due to the "unique political, cultural, and economic needs of tribal

21

governments." *Santa Clara Pueblo v Martinez*, 436 U.S. 49, 61 (1978).[20]

In fulfilling its obligation the Congress has exercised this authority on numerous

occasions and in numerous contexts.  In *Rice v. Cayetano*, 528 U.S. 495, 519 (2000), the

Supreme Court recently acknowledged this black letter principle of Indian law.  "Of course, as

we have established in a series of cases, Congress may fulfill its treaty obligations *and its*

*responsibilities to the Indian tribes* by enacting legislation dedicated to their circumstances and

needs.[21]  As we have observed, 'every piece of legislation dealing with Indian tribes and

reservations ... single[s] out for special treatment a constituency of tribal Indians.' *[Morton v.]*

*Mancari, supra,* at 552, 94 S.Ct. 2474." *Rice, id.,* 528 U.S. at 519 (emphasis added).

In *Morton v. Mancari,* 417 U.S. 535 (1974), the Supreme Court relied upon federal Indian

law and trust principles to hold that strict scrutiny does not apply to federal employment

preferences for members of federally recognized Indian tribes, but that a rational basis test is

more appropriate.  The Court specifically recognized the unique legal status of Indian tribes in

federal law and the power of the federal government to act as a trustee.  *Mancari* upheld the

---

[20] *See generally* Mary C. Wood, *Protecting the Attributes of Native Sovereignty: A New Trust Paradigm for Federal Actions Affecting Tribal Lands and Resources,* 110 Utah L. Rev. 109, 192-95 (1995).

[21] "See *State of Washington v. Washington State Commercial Passenger Fishing Vessel Assn.,* 443 U.S. 658, 673, n. 20, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (treaties securing preferential fishing rights); *United States v. Antelope,* 430 U.S. 641, 645-647, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977) (exclusive federal jurisdiction over crimes committed by Indians in Indian country); *Delaware Tribal Business Comm. v. Weeks,* 430 U.S. 73, 84-85, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977) (distribution of tribal property); *Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation,* 425 U.S. 463, 479-480, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) (Indian immunity from state taxes); *Fisher v. District Court of Sixteenth Judicial Dist. of Montana,* 424 U.S. 382, 390-391, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976) *(per curiam)* (exclusive tribal court jurisdiction over tribal adoptions)." *Rice, id.,* 528 U.S. at 519 .

hiring preference for Indian people in selected agencies of government service, including the Bureau of Indian Affairs, on the basis that "[t]he preference, as applied, is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities whose lives and activities are governed by the BIA in a unique fashion." *Id.* at 554. Accordingly, *Morton* held that where legislation singles out Indians for special treatment and that "special treatment can be tied rationally to the fulfillment of Congress' unique obligations toward the Indians, such legislative judgments will not be disturbed." *Id.* at 555.

Several United States Circuit Courts of Appeals have extended the holding and logic of *Morton* to Establishment Clause challenges to the federal peyote regulation, holding that the regulation was "rationally related to the legitimate governmental objective of preserving Native American culture." *See Peyote Way Church of God v. Thornburgh*, 922 F.2d 1210, 1216-7 (5th Cir. 1991)("Such preservation is fundamental to the federal government's trust relationship with tribal Native Americans."); *accord, United States v. Rush*, 738 F.2d 497, 513 (1ˢᵗ Cir. 1984) (same result for Equal Protection claim); *Olsen v. Iowa*, 808 F.2d 652 (8ᵗʰ Cir. 1986) (same result for Equal Protection claim); *Rupert v. Director*, 957 F.2d 32, 35 (1ˢᵗ Cir. 1992).

The vitality of the unique political relationship between the United States and Indian tribes remains unquestioned today, even in contexts other than challenges to the peyote exemption, so long as uniquely Indian interests are implicated. For instance, in *Williams v. Babbitt*, 115 F.3d 657 (9ᵗʰ Cir. 1997), a decision challenging Alaska Native-only reindeer herding, the Ninth Circuit Court of Appeals held that it reads *Mancari* as "shielding only those statutes that affect uniquely Indian interests." 115 F.3d at 665. "Legislation that relates to Indian land, tribal status, self-government or culture passes *Mancari's* rational relation test 'because

23

such regulation is rooted in the unique status of Indians as a separate people' with their own

political institutions." *United States v. Antelope*, 430 U.S. 461 (1977). "As a separate people

they have a right to expect some special protection for their land, political institutions and

culture." 115 F.3d at 664.

In the context of the allocation of the fishery resources of the Pacific Northwest between

Indians and non-Indians, Congress has the authority to confer "enforceable special benefits" on

Indian fishermen. The Supreme Court in *State of Washington v. Washington State Commercial

Passenger Fishing Vessel Assn.*, 443 U.S. 658, 673, n.20 (1979), squarely addressed the

allocation issue, and held that because the treaties confer "enforceable special benefits" on

Indians, treaty fishers comprise a distinct class with respect to equal protection analysis. *See

Cree v. Flores*, 157 F.3d 762, 771 (9th Cir. 1998)(held that the phrase "in common with" from the

Stevens treaties, confers continuing rights in Indians "beyond those which other citizens may

enjoy, to fish at usual and accustomed fishing places," *quoting Tulee v. Washington*, 315 U.S.

681, 684 (1942)).

Congress and the Executive Branch have recognized that the trust obligation toward

Indian tribes extends to the areas of cultural and religious expression. This recognition has taken

the form of numerous statutes, executive orders and administrative regulations. Recognizing that

traditional culture and religion are inseparable in Native American life, Congress enacted the

American Indian Religious Freedom Act (42 U.S.C 1996) (hereinafter "AIRFA") in 1978, which

establishes a government-wide:

> policy of the United States to protect and preserve for American Indians their
> inherent right of freedom to believe, express, and exercise the traditional religions
> of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not

24

limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.[22]

In furtherance of the AIRFA policy, Congress has passed numerous laws.[23]  Of direct relevance here, Congress in 1994 amended the American Indian Religious Freedom Act, 42 U.S.C. §1996a, protecting Indian use of peyote for traditional, *bona fide* Indian religious purposes, since such protection is tied rationally to the United States' obligation to protect Indian religion, culture, and self-determination.  Congress said so expressly, in its finding that "for many Indian people, the traditional ceremonial use of the peyote cactus as a religious sacrament has for centuries been integral to a way of life, and significant in perpetuating Indian tribes and cultures."  42 U.S.C.

_____

[22]  One finding in the preamble of AIRFA relied upon by Congress to establish this federal Indian policy states that:

> the religious practices of the American Indian (as well as Native Alaskans and Hawaiians) are an integral part of their culture, traditions and heritage, such practices forming the basis of Indian identity and value systems.

*See also Lyng v. Northwest Indian Cemetery Protective Ass'n.*, 485 U.S. 439, 454-55 (1988), where the Supreme Court expressly invited congressional action accommodating Indian religious values:  "The government's rights to the use of its own land ... need not and should not discourage it from accommodating religious practices like those engaged in by the Indian respondents."


[23]  The Tenth Circuit Court of Appeals recognized the importance of AIRFA in *City of Albuquerque v Browner*, 97 F.3d 415, 428 n.20 (10th Cir.1996) when it stated that, far from establishing a religion, the EPA's approval of a "ceremonial use standard" in order to accommodate Isleta Pueblo religious practices actually furthered the free exercise of religion and was consistent with AIRFA.  That same court also recognized that *states* have a trust obligation to protect uniquely Indian interests. *See Livingston v. Ewing*, 601 F.2d 1100 (10th Cir. 1979)(New Mexico state museum rule permitting only Indians to sell handmade goods in the portal of the Palace of the Governors in Santa Fe upheld as a legitimate classification intended to serve the ends of cultural authenticity and historical accuracy, not merely the advancement of one racial group).

§1996a(a)(1).[24]  In AIRFA's legislative history, Congress viewed this legislation as falling

squarely within the United States' special relationship and trust responsibility toward Indians.

*See* H.R. Rep. No. 675.  103rd Cong., 2nd Sess. at 8-9 (1994), *reprinted in* 1994 U.S.C.C.A.N.

2404.  In assessing its constitutionality, the Committee on Natural Resources determined that the

law was "rationally related" to the government's objective to preserve Indian culture, applying

the *Morton* test.[25]

   The Executive Branch has also acted to protect Native culture and religion in furtherance

of the United States' special obligations toward Indians through a number of executive orders

---

   [24]  Other examples of Congress enacting legislation to protect Indian cultures and religions include the Native American Graves Protection and Repatriation Act of 1990 (25 U.S.C. 3001 et seq.).  NAGPRA was enacted to protect Indian burials and property interests in religious objects, specifically pursuant to "the unique relationship between the Federal Government and Indian tribes...." 25 U.S.C. §3010 (1996).  *See also* the Native American Languages Act, 25 U.S.C. §§2901 et seq. ("the cultures and languages of Native Americans is unique and the United States has a trust responsibility to act together with Native Americans to ensure the survival of these unique cultures and languages").  *And see* the Archeological Resources Protection Act of 1979 (16 U.S.C. §470cc(c)) which requires federal land managers to notify Indian tribes if permit application to excavate archeological resources may harm a tribal religious or cultural site located on federal lands.  *And see* the National Historic Preservation Act Amendments of 1992, which state that "[p]roperties of traditional religious and cultural importance to an Indian tribe may be determined to be eligible for inclusion on the National Register," and directing federal agencies to "consult with any Indian tribe that attaches religious and cultural significance to [such] properties..." 16 U.S.C. §470a(d)6)(A)-(B).  *And see* 16 U.S.C. §668a, which allows religious use of federally protected eagle feathers by Indians for religious purposes. This law is based upon "Congress' historical obligation to respect native American sovereignty and to protect Native American culture," and "is uniquely supported by the legislative history and congressional findings underlying [the United States' AIRFA policy]." *Rupert v. Director*, 957 F.2d 32, 35 (1st Cir. 1992).

   [25]  Indeed, the Supreme Court has specifically noted that the federal government has broad legal authority to protect Indian culture and religion, including Indian use of peyote for religious purposes, via legislation and related implementing executive action. *See Unemployment Div. Dep't. Human Resources of Oregon v. Smith*, 494 U.S. 872, 890 (1990)(government accommodation of free exercise values not otherwise mandated by the Free Exercise Clause is a proper subject for the legislative and executive branches).

and administrative regulations. The peyote regulation, in existence since 1965, is of course directly relevant to the present case. Additionally, Executive Order No. 13,007 (Indian Sacred Sites) (1996), expressly directs all federal land managers to accommodate Native American access and ceremonial use of sacred sites located on federal lands.[26] *See also*, President Clinton's Memorandum for Heads of Executive Departments and Agencies (Policy Concerning Distribution of Eagle Feathers for Native American Religious Purposes) (April 29, 1994), directing, "executive departments and agencies ... to work cooperatively with tribal governments and to reexamine broadly their practices and procedures to seek opportunities to accommodate Native American religious practices to the fullest extent of the law."

The above statutes, executive orders and administrative actions evince a federal trust relationship that specifically includes protection of Native American cultural and religious practices. It is appropriate that the government act in ways which protect Indian culture and religion, since these traditional cultures and religions play a critical role in the sovereignty and self-determination of Indian nations. Cultural vitality profoundly influences tribal governance

---

[26] This Executive Order continues a long tradition of Congress to protect Indian access to sacred areas on public lands. Congress has enacted numerous site specific laws addressing ownership of, access to, and temporary closure of Native American sacred sites located on federal lands. *See* Pub.L. 91-550, 84 Stat. 1437 (Dec. 14, 1970), transfer of Blue Lake to the Taos Pueblo; 16 U.S.C. §445c(c) (Indian access to Pipestone National Monument to quarry rock for religious purposes), 25 U.S.C. §640d-19 (Indian ceremonial use granted); 16 U.S.C. §228i(c) (right of access to Grand Canyon National Park for Indian religious purposes granted); 16 U.S.C. §410ii-4 (Indian religious practices at site on federal land protected); 16 U.S.C. §543f (Indian access to Mono Basin National Forest Scenic Area for traditional cultural and religious purposes); 16 U.S.C. §460uu-47 (access to El Malpais National Monument for traditional cultural and religious purposes); 16 U.S.C. §410pp-6 (temporary closure of Cibola Historical Park for Indian religious activities); Act of Oct. 21. 1978, PL 95-499, §9, 92 Stat. 1679, (1978) (Indian religious sites protected) and Act of Oct. 21, 1978, PL 95-498. §8, 92 Stat. 1672, (1978) (tribal religious sites protected).

and is essential to the internal functioning and social relations of Indian tribes.  Hence, federal action protecting Indian culture and religion is rationally related to legitimate governmental objectives undertaken pursuant to the federal trust relationship to the Indian tribe.  In contrast, the United States has no comparable trust relationship with or special obligations to the UDV or its members.

## CONCLUSION

For the foregoing reasons, the undersigned *amici* Native American Church organizations and their member chapters respectfully request that this Court deny Plaintiffs' motion for preliminary injunctive relief and, furthermore, dismiss entirely Plaintiffs' Equal Protection claim against the United States.

Respectfully submitted this 7th day of January, 2002.

ROTH, VanAMBERG, ROGERS, ORTIZ,
FAIRBANKS &YEPA, LLP

C. Bryant Rogers

David Gomez
Post Office Box 1447
Santa Fe, New Mexico  87501
(505)988-8979

Counsel for the Native American Church of Oklahoma, the Native American Church of North America, and the Native American Church of the Kiowa Tribe of the State of Oklahoma

28