## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

_____

**O CENTRO ESPIRITA BENEFICIENTE
UNIAO DO VEGETAL (a.k.a. Uniao do
Vegetal) (USA) ("UDV-USA"), a New Mexico
Corporation on its own behalf and on behalf
od all its members in the United States,
JEFFREY BRONFMAN, individually and as
President of UDV-USA, CHRISTINA
BARRETO, individually and as Secretary of
UDV-USA, FERNANDO BARRETO,
individually and as Treasurer of UDV-USA,
CHRISTINE BERMAN, MITCHEL
BERMAN, JUSSARA de ALMEIDA DIAS,
PATRICIA DOMINGO, DAVID
LENDERTS, DAVID MARTIN, MARIA
EUGENIA PELAEZ, BRYAN REA, DON
ST. JOHN, CARMEN TUCKER, and
SOLAR LAW, individually and as members
of UDV-USA,**

     **Plaintiffs,**

**v.**             **CIV. No. 00-1647 JP/RLP**

**JOHN ASHCROFT, Attorney General of the
United States, DONNIE R. MARSHALL,
Administrator of the United States Drug
Enforcement Administration, PAUL H.
O'NEILL, Secretary of the Department of
Treasury of the United States, DAVID
IGLESIAS, United States Attorney for the
District of New Mexico, and JOHN
O'TOOLE, Resident Special Agent in
Charge of the United States Customs Service
Office of Criminal Investigation in
Albuquerque, New Mexico, all in their official
capacities,**

     **Defendants.**

## MEMORANDUM OPINION AND ORDER

The Plaintiffs seek a preliminary injunction on a number of grounds, including Equal Protection under the Fifth Amendment to the United States Constitution.  On January 7, 2002, the Native American Church of Oklahoma, the Native American Church of North America, and the Native American Church of the Kiowa Tribe of the State of Oklahoma filed a Motion to File an *Amicus Curiae* Brief in Opposition to Plaintiffs' Application for a Preliminary Injunction (Doc. No. 82).  These Native American Church organizations request leave to participate in the briefing of this case with respect to the Plaintiffs' Equal Protection claim.

After carefully considering the parties' briefs, the arguments and evidence presented by the Plaintiffs and Defendants during the evidentiary hearing that took place from October 22, 2001 to November 2, 2001, and the relevant law, this Court has concluded 1) that the Motion to File an *Amicus Curiae* brief should be denied; and 2) that the Plaintiffs' Motion for Preliminary Injunction (Doc. No. 10) should be denied as to their Equal Protection claim.

## I.    BACKGROUND

The Plaintiffs in this case are a church, O Centro Espirita Beneficiente Uniao do Vegetal (UDV), and several officials and members of the UDV in the United States.  José Gabriel Da Costa, known as Mestre Gabriel within the UDV, founded the church in Brazil in 1961.  Although the UDV is a Christian denomination, the church draws on traditional indigenous beliefs and practices in Brazil.  Religious ceremonies in the UDV largely center around the consumption of hoasca, a tea brewed from two plants native to the Amazon River Basin.  Adherents to the UDV consider hoasca a sacrament.  The UDV officially established a branch in the United States in

1993.  Plaintiff Jeffrey Bronfman, as representative mestre and president of the UDV in the United States, leads the church within this country.  The U.S. branch of the UDV now numbers about 130 members, and its headquarters are in Santa Fe, New Mexico.

This case arises from the United States Customs Service's seizure in the United States, on May 21, 1999, of a substantial quantity of hoasca tea from the UDV.  The United States government has maintained that possession and use of hoasca is illegal under the Controlled Substances Act (CSA), 21 U.S.C. § 801, *et seq*.  Hoasca contains dimethyltryptamine (DMT), a hallucinogenic chemical.  The CSA classifies DMT as a "Schedule I" substance and generally bars its use and possession.  The government has not filed criminal charges against any UDV members for possessing DMT, but it has threatened prosecution for future possession of hoasca.  In response to the government's position, the UDV has suspended its use of hoasca in the United States.  The government concedes, at this stage of litigation, that prohibitions on hoasca use in the United States substantially burden the Plaintiffs' exercise of their religion.

On November 21, 2000, the Plaintiffs filed a Complaint for Declaratory and Injunctive Relief (Doc. No. 1).  The Complaint alleges violations of the Religious Freedom Restoration Act, the First Amendment to the United States Constitution, Equal Protection principles, the Fourth Amendment, the Fifth Amendment, the Administrative Procedure Act, and international laws and treaties.  The Complaint also asserts that the Controlled Substances Act should not be construed to apply to hoasca.  On December 22, 2000, the Plaintiffs filed a Motion for Preliminary Injunction (Doc. No. 10).  On October 22 through November 2, 2001, this Court held a hearing on the Plaintiffs' Motion for Preliminary Injunction.  During this hearing, the parties presented arguments and evidence on a number of the issues raised by the Plaintiffs' motion.

3

## II.    *AMICI CURIAE*

This Memorandum Opinion and Order, the first opinion entered concerning the Plaintiffs'

Motion for Preliminary Injunction, primarily addresses the Plaintiffs' Equal Protection claim.  The

Court's decision to begin with this issue stems in part from the efforts of a group of Native

American Church organizations to enter this case as *amici curiae*.  On January 7, 2002, the

Native American Church of Oklahoma, the Native American Church of North America, and the

Native American Church of the Kiowa Tribe of the State of Oklahoma submitted a Motion to File

an Amicus Curiae Brief in Opposition to Plaintiffs' Application for a Preliminary Injunction (Doc.

No. 82).  These NAC organizations contend that their participation as *amici* "would assist the

Court in making its decision regarding Plaintiffs' Motion for Preliminary Injunction with respect

to Plaintiffs' constitutional Equal Protection claim."  (See NAC Motion at 1).  The Plaintiffs

maintain that the federal government violates Equal Protection principles by granting members of

the Native American Church an exemption from prosecution for their ceremonial use of peyote

without granting UDV members a comparable exemption for their ceremonial use of hoasca.

This Court has decided that the NAC organizations' motion to file an *amicus* brief should

be denied.  First, as the Plaintiffs point out in their Response in Opposition to the NAC

organizations' motion (Doc. No. 84), the request to enter as *amici* is not timely.  Not only have

the Plaintiffs and Defendants prepared numerous briefs on the Plaintiffs' Motion for Preliminary

Injunction, over a period of more than a year, the parties also presented evidence and arguments

at a lengthy hearing.  Allowing *amici* to step in at this late point would not be appropriate.

Second, the Court does not believe that the participation of the NAC organizations in this case

would be helpful to the Court.  This Court has reached a decision regarding the Plaintiffs' Motion

for Preliminary Injunction, as to the Equal Protection claim, without reliance on the NAC

organizations' brief.  That decision is set out below.

## III.   PLAINTIFFS' EQUAL PROTECTION CLAIM

### A.   STANDARD

The Tenth Circuit has stated that "[a] movant is entitled to a preliminary injunction if he

can establish the following:  (1) a substantial likelihood of success on the merits of the case; (2)

irreparable injury to the movant if the preliminary injunction is denied; (3) the threatened injury to

the movant outweighs the injury to the other party under the preliminary injunction; and (4) the

injunction is not adverse to the public interest." *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th

Cir. 2001).  This Memorandum Opinion and Order considers the Plaintiffs' likelihood of success

on the merits of their Equal Protection claim.

This Court recognizes that "[i]f the party seeking the preliminary injunction can establish

the last three factors . . . then the first factor becomes less strict--i.e., instead of showing a

substantial likelihood of success, the party need only prove that there are 'questions going to the

merits ... so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and

deserving of more deliberate investigation.'" *Prairie Band of Potawatomi Indians v. Pierce*, 253

F.3d 1234, 1246-1247 (10th Cir. 2001), quoting *Federal Lands Legal Consortium v. United

States*, 195 F.3d 1190, 1194 (10th Cir.1999).  However, even assuming that the Plaintiffs have

met the last three elements, it seems appropriate to examine the first element at this time.  The

Court has conducted an extended evidentiary hearing on the Equal Protection issue, and the

parties have indicated that they would present little additional evidence about the issue if a trial on

the merits is held.  (Tr. at 2034-2035.)  In other words, "deliberate investigation" has already

taken place.

**B.    DISCUSSION**

The Fourteenth Amendment declares that no state may "deny to any person within its jurisdiction the equal protection of the laws."  Equal Protection standards apply to federal laws through the Fifth Amendment's due process guarantee.  See, e.g., *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638, n. 2 (1975).  The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985), citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982).  The United States Supreme Court has explained that "equal protection analysis requires strict scrutiny of a legislative classification . . . when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class."  *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312 (1976).

In this case, the Plaintiffs contend that the federal government is violating Equal Protection principles by selectively enforcing the Controlled Substances Act (CSA), 21 U.S.C. § 812.  The Plaintiffs' argument relies on a comparison between the government's treatment of the UDV and its treatment of the Native American Church (NAC).  The Plaintiffs point out that in both the UDV and the NAC, ingestion of a controlled substance is crucial to the practice of the religion.  However, under federal law, members of the NAC receive an exemption from prosecution for their ceremonial use of peyote.  UDV members receive no such exemption for their ceremonial use of hoasca.  The Plaintiffs maintain that the contrast in federal policies toward the NAC and the UDV represents an impermissible classification on the basis of religion.

In discussing the federal peyote exemption, the Plaintiffs focus on the regulatory provision

addressing peyote use in the NAC.  The Drug Enforcement Administration (DEA), promulgates

regulations to implement the CSA.  The CSA, enacted in 1970, lists peyote as a "Schedule I"

drug.  21 U.S.C. § 812(c).  Under the framework of the CSA, the placement of peyote in

Schedule I reflects findings that peyote "has a high potential for abuse," that peyote "has no

currently accepted medical use in treatment in the United States," and that "[t]here is a lack of

accepted safety for use of [peyote] under medical supervision."  18 U.S.C. § 812(b)(1).

However, 21 C.F.R. § 1307.31, the regulatory peyote exemption, states that "[t]he listing of

peyote as a controlled substance in Schedule I does not apply to the nondrug use of peyote in

bona fide religious ceremonies of the Native American Church . . . ."[1]

As the Government observes, in addition to this regulation, a federal statute also addresses

ceremonial use of peyote among Native Americans.  Congress enacted the American Indian

Religious Freedom Act Amendments (AIRFAA) in 1994.  42 U.S.C. § 1996a.  AIRFAA provides

that "[n]otwithstanding any other provision of law, the use, possession, or transportation of

peyote by an Indian for bona fide traditional ceremonial purposes in connection with the practice

of a traditional Indian religion is lawful, and shall not be prohibited by the United States or any

State."  42 U.S.C. § 1996a(b)(1).  In AIRFAA, "the term 'Indian' means a member of an Indian

tribe."  42 U.S.C. § 1996a(c)(1).

---

[1]     Peyote became classified as a Schedule I controlled substance in 1966, through
regulations implementing the Drug Abuse Control Amendments of 1965.  When peyote was
scheduled, the Food and Drug Administration adopted the first federal regulatory peyote
exemption.  Congress "enacted Schedule I into law" through the Controlled Substance Act of
1970.  H.R. Rep. 103-675, 1994 U.S.C.C.A.N. 2404, 2405.  The Bureau of Narcotics and
Dangerous Drugs, the predecessor agency to the DEA, published regulations to implement the
CSA in 1971, and these regulations included the exemption now contained in 21 C.F.R. §
1307.31.

The Plaintiffs point to federal peyote policy in order to argue that because the Government does not provide comparable exemptions for the UDV's ceremonial use of hoasca, the Government is violating the Plaintiffs' right to equal protection under the law.  The Government disputes this contention, maintaining that the UDV and the NAC are not similarly situated for purposes of an equal protection analysis.  According to the Government, one "crucial difference between Plaintiffs' situation and that of Native American peyote users lies in the unique relationship between the federal government and Indian tribes."  (Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction (Doc. No. 15), at 42.)

In support of its position, the Government cites *Morton v. Mancari*, 417 U.S. 535 (1974).  In *Morton*, a group of non-Indian employees of the Bureau of Indian Affairs (BIA) raised a Fifth-Amendment challenge to the agency's hiring preference for Indian employees.  The United States Supreme Court rejected the *Morton* plaintiffs' clam that the preference amounted to "invidious racial discrimination."  Id. at 551.  In explaining its decision, the Court took note of "the unique legal status of Indian tribes under federal law" and of "the plenary power of Congress, based on a history of treaties and the assumption of a 'guardian-ward' status, to legislate on behalf of federally recognized Indian tribes."  Id.

The Court listed numerous examples of instances in which it "specifically has upheld legislation that singles out Indians for particular and special treatment," and it stated that "[a]s long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed."  Id. at 554-55.  The *Morton* Court emphasized that it was not sanctioning a "racial" preference through its holding.  Because the BIA hiring "preference is not directed towards a 'racial' group consisting of

'Indians,'" but rather "only to members of 'federally recognized' tribes," the Court characterized the preference as "political rather than racial in nature."  Id. at 553, n. 24.

The Government argues that the federal peyote exemption does not violate Equal Protection guarantees, because any special treatment that the exemption extends toward members of the Native American Church stems from the federal government's responsibility to protect Indian cultures and traditions.  There seems to be little question that Congress drew on the trust responsibility described  in *Morton* when it enacted AIRFAA.  Stating its findings in the statute, Congress observed that "for many Indian people, the traditional use of the peyote cactus as a religious sacrament has for centuries been integral to a way of life, and significant in perpetuating Indian tribes and cultures."  42 U.S.C. § 1996a(a)(1).  The Congressional declarations indicate that Congress acted because "the lack of adequate and clear legal protection for the religious use of peyote by Indians may serve to stigmatize and marginalize Indian tribes and cultures, and increase the risk that they will be exposed to discriminatory treatment."  42 U.S.C. § 1996(a)(5).

The House Report prepared for AIRFAA confirms that Congress grounded its efforts to protect the ceremonial use of peyote by Indians in the reasoning of *Morton*.  H.R. Report 103-675, 1994 U.S.C.C.A.N. 2404.  In a section discussing the constitutionality of the proposed bill, the Report notes that "[b]ecause Indians and Indian tribes occupy a sui generis legal status in Federal law under the U.S. Constitution and enjoy a special political relationship with the United States Government, separate Indian legislation has consistently been upheld by the U.S. Supreme Court under the legal principles set forth in *Morton v. Mancari*, 417 U.S. 535, 551-55 (1974)." Id. at 2410.

The Report also quotes extensively from the Fifth Circuit's opinion in *Peyote Way Church*

*of God v. Thornburgh*, 922 F.2d 1210 (5th Cir. 1991).  In *Peyote Way*, the plaintiff was a church

that "subscribes to many tenets similar to those of the NAC."  Id. at 1213.  Most members of the

church were not of Native American descent.  The church argued that the federal peyote

regulation violated Equal Protection Principles by exempting only Native American Church

members, and not others, from laws prohibiting peyote use.  The Fifth Circuit declined to accept

this argument, instead holding that:

> the federal NAC exemption allowing tribal Native Americans to continue their
> centuries-old tradition of peyote use is rationally related to the legitimate
> governmental objective of preserving Native American culture.  Such preservation
> is fundamental to the federal government's trust relationship with tribal Native
> Americans.  Under *Morton*, Peyote Way's members are not similarly situated to
> those of the NAC for purposes of cultural preservation and thus, the federal
> government may exempt NAC members from statutes prohibiting peyote
> possession without extending the exemption to Peyote Way's membership.

Id. at 1216.  Based largely on the analysis provided in *Peyote Way*, the House Report expresses

confidence "that the granting of a statutory religious exemption for the sacramental use of peyote

solely by American Indians presents no equal protection or establishment clause problems."  1994

U.S.C.C.A.N. at 2411.

The legislative background of AIRFAA thus reflects that in enacting the statute, Congress

relied on the principles outlined in *Morton*.  The Plaintiffs do not appear to dispute this, stating in

their Reply brief that "AIRFA may well be based on *Morton v. Mancari*, 417 U.S. 535 (1974)."

(Plaintiffs' Reply (Doc. No. 21) at 42-43.)  Rather, the Plaintiffs focus their Equal Protection

challenge on the federal regulatory exemption contained in 21 C.F.R. § 1307.31.  The Plaintiffs

argue that the federal Government's trust relationship toward Indian tribes cannot justify the

special treatment granted to NAC members through the regulation, because not all NAC members

are Indians.

A number of courts addressing the constitutionality of the regulatory peyote exemption have considered questions about the ethnic composition of the Native American Church.  For example, *United States v. Boyll*, 774 F.Supp. 1333 (D.N.M. 1991), a case arising in this District, involved a non-Indian member of a NAC congregation in Taos who was prosecuted for unlawfully importing and possessing peyote.  The *Boyll* court held an evidentiary hearing and made findings of fact which included the observation that "[t]he vast majority of Native American Church congregations . . . maintains an 'open door' policy and does not exclude persons on the basis of their race."  Id. at 1336.  The *Boyll* court concluded that "[t]he plain language of the federal peyote exemption applies to all members of the Native American Church, regardless of race," and that to interpret the exemption to apply only to Indians in the NAC would produce an unlawful racial classification in violation of First Amendment and Equal Protection guarantees. Id. at 1338-39.

The Fifth Circuit likewise undertook an examination of the ethnic makeup of the NAC in the *Peyote Way* case, discussed above.  The *Peyote Way* court stated, "We must look to the evidence to determine whether NAC membership presupposes tribal affiliation and Native American ancestry, and thus effects a political classification under *Morton*."  922 F.2d at 1215. Unlike the *Boyll* court, however, the *Peyote Way* court found "that the record conclusively demonstrates that NAC membership is limited to Native American members of federally recognized tribes who have at least 25% Native American ancestry, and therefore represents a political classification."  Id. at 1216.

In this case, the parties presented evidence on the issue of the ethnic composition of the

Native American Church during the hearing on the Plaintiffs' Motion for Preliminary Injunction. However, this Court is reluctant to conduct the type of complex anthropological and theological inquiry that would be required to draw a definitive conclusion regarding whether non-Indians can truly be members of the NAC. The divergence in different courts' interpretations of the meaning of "the Native American Church," as used in the federal regulatory peyote exemption, reflects ambiguity in the term. The term appears to lend itself to more than one reasonable construction. On one hand, because significant organizations such as the Native American Church of North America explicitly restrict membership to people with one-quarter Indian blood, the term "Native American Church" could be read as referring to an institution composed solely of Indians. On the other hand, given that some local peyotist congregations may welcome non-Indian members, the term "Native American Church" may be interpreted more broadly.

The Supreme Court has commented that "[i]t is well established 'that an agency's construction of its own regulations is entitled to substantial deference.'" *Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 150 (1991), quoting *Lyng v. Payne*, 476 U.S. 926, 939 (1986). Where "'the meaning of [regulatory] language is not free from doubt,' the reviewing court should give effect to the agency's interpretation so long as it is 'reasonable,' *Ehlert v. United States*, 402 U.S. 99, 105, 91 S.Ct. 1319, 1323, 28 L.Ed.2d 625 (1971), that is, so long as the interpretation 'sensibly conforms to the purpose and wording of the regulations.'" *Martin*, 499 U.S. at 150-151, quoting *Northern Indiana Pub. Serv. Co. v. Porter County Chapter of Izaak Walton League of America, Inc.*, 423 U.S. 12, 15 (1975). Here, this Court believes that the meaning of the language of 21 C.F.R. § 1307.31 is not free from doubt.

There are a number of indications that the DEA, the agency which promulgated 21 C.F.R.

§ 1307.31, interprets the term "Native American Church" to imply that the benefitted church

members are Indian.  These indications are not limited to the federal government's apparent

prosecution of non-Indian members of the Native American Church for possessing peyote.  See,

e.g., *Boyll*, 774 F.Supp. at 1335.  ("The United States adopts a racially restrictive reading of 21

C.F.R. § 1307.31, arguing that the protection contained therein applies only to members of the

Native American Church who are American Indians.")  For example, when the House

Subcommittee on Native American Affairs held hearings on AIRFAA in 1994, the DEA provided

a statement for the record.  Gene R. Haislip, Deputy Assistant Administrator of the DEA's Office

of Diversion Control, remarked that:

> Almost 25 years ago when Congress began hearings pertaining to the
> Controlled Substances Act (CSA) they decided that the traditional, historic use of
> peyote by members of the Native American Church (NAC) as a sacrament in
> traditional religious ceremonies warranted a specific exemption.  Congress
> determined, to be consistent with past Federal practice, this exemption should be
> specified in regulation rather than in law.  Consequently, an exception was created
> for the NAC to use peyote for religious purposes.  *Although the NAC is not
> defined in the subject regulations, the members of this church are required to be
> Native American.*

1994 U.S.C.C.A.N. at 2415 (emphasis added).

The legislative history of AIRFAA suggests that there is greater conformity between the

statutory and regulatory peyote exemptions than the Plaintiffs contend.  In introducing the

legislation that was passed as AIRFAA, Representative Bill Richardson stated that the proposed

law would "make statutory the protection now provided by Federal regulation and the laws of 28

States for the religious use of peyote by Indian practitioners."  140 Cong. Rec. E686-03, 1994

WL 132859.  At the time that Congress considered AIRFAA, the DEA also seemed to hold the

view that the new law would be a statutory version of the existing regulation.  In the statement

submitted to the House Subcommittee on Native American Affairs, Gene Haislip expressed

qualified support for the proposed legislation, noting that "[a]lthough we at DEA feel that the

regulation that has been in place for almost 25 years has worked well, we would prefer a statutory

exemption over an administrative exemption."  1994 U.S.C.C.A.N. at 2416.  If the DEA

interpreted the use of the term "Native American Church" to apply to both non-Indian and Indian

church members, the enactment of the statutory exemption–  which clearly extends only to

members of Indian tribes–  would have marked a significant departure from the regulatory policy.

Instead, the legislative background of AIRFAA indicates that the statute and regulation were

contemplated to have similar reaches.[2]

In their Trial Memorandum (Doc. No. 70), the Plaintiffs question whether *Morton* remains

good law, given the Supreme Court's increasing reluctance to sanction classifications based on

race and ethnicity.  For example, in *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995), a

---

[2]    Because this Court reads the more recent statutory exemption for peyote and the
older regulatory exemption for peyote to conform with each other, it has focused on the
legislative history of the statute.  However, the Court believes that the Plaintiffs' implication that
the regulatory exemption had nothing to do with Indians' unique status under the law, and
stemmed only from general concerns about religious freedom, is hyperbolic.  Concerns about the
preservation of Indian culture and concerns about religious freedom are not mutually exclusive.
References to promoting Indians' religious freedom, in the history of the regulation, do not
indicate, as the Plaintiffs suggest, that Indian culture was never considered by Congress or the
agencies that promulgated the peyote regulation.
    Prior to the enactment of the CSA, for example, a representative from the Bureau of
Narcotics and Dangerous Drugs testified before Congress.  Congressman Satterfield asked him
about "the Native American Church involving Indians in the west who use and have for centuries
used peyote in connection with religious services."  Drug Abuse Control Amendments of 1970,
Hearings before the Subcommittee on Public Health & Welfare of the Committee on Interstate
and Foreign Commerce, House of Representatives, 91st Cong. 2d Sess. 117-18 (1970)), quoted
in *Native American Church of New York v. United States*, 468 F.Supp. 1247, 1250 (S.D.N.Y.
1979).  See also *United States v. Warner*, 595 F.Supp. 595, 598 (D.N.D. 1984).  But see *Boyll*,
774 F.Supp. at 1339; *Native American Church of New York*, 468 F.Supp. at 1251.

case addressing affirmative action, the Supreme Court stated that "[a]ny preference based on racial or ethnic criteria must necessarily receive a most searching examination."  515 U.S. at 223, quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 273 (1986).  This Court recognizes that the *Morton* doctrine has been the subject of a great deal of scholarly criticism, from a number of different ideological perspectives.  See, e.g., L. Scott Gould, *Mixing Bodies and Beliefs:  The Predicament of Tribes*, 101 Colum. L. Rev. 702 (2001).  This Court also acknowledges that the strength of *Morton* may have been undercut in certain respects by recent court decisions.

For example, in *Williams v. Babbitt*, 115 F.3d 657 (9th Cir. 1997), the Ninth Circuit expressed doubt about whether *Morton* could justify a reading of the Reindeer Industry Act which restricted participation in the Alaskan reindeer trade to natives.  The *Williams* court stated that "[w]hile *Mancari* is not necessarily limited to statutes that give special treatment to Indians on Indian land, we do read it as shielding only those statutes that affect uniquely Indian interests." Id. at 665.  Although "[l]egislation that relates to Indian land, tribal status, self-government or culture passes *Mancari* 's rational relation test," the policy that the *Williams* court was examining did not concern these areas.  Id. at 664, citing *United States v. Antelope*, 430 U.S. 641, 646 (1977).  Reindeer are not indigenous to Alaska, the Court stressed, and "[t]he Act in no way relates to native land, tribal or communal status, or culture."  Id. at 664.

However, this Court notes, first, that the Supreme Court's opinion in *Rice v. Cayetano*,

528 U.S. 495, 499 (2000) seems to assume the continued validity of *Morton*.[3]   It refers to the

*Morton* exception as "limited," but the *Rice* court lists *Morton*, as well as other cases, as

establishing the proposition that "Congress may fulfill its treaty obligations and its responsibilities

to the Indian tribes by enacting legislation dedicated the their circumstances and needs."  Id. at

519-20.  The *Rice* Court's treatment of *Morton* principles suggests that *Morton* retains some

vitality.  This Court believes that the application of *Morton* to the special treatment at issue in this

case– the federal peyote exemption– is not controversial, because the treatment is directed at

tribal Indians and because the treatment concerns the preservation of Native American culture–  a

"uniquely Indian interest."

The Plaintiffs also challenge whether the trust relationship between the federal government

and Indian tribes can support the extension of special treatment for Indians into the religious

sphere.  Some authorities have suggested that Indian tribes' distinct status as political bodies

cannot justify special treatment for Indian religious practices.  See, e.g., *Olsen v. Drug*

*Enforcement Administration*, 878 F.2d 1458, 1469 (D.C.Cir. 1989) (Buckley, J., dissenting).

This Court finds persuasive, however, the reasoning of the federal courts which have found

*Morton* principles to be applicable in the area of religion.  In *Rupert v. Director, U.S. Fish and*

---

[3]        In *Rice*, the Supreme Court invalidated on Fifteenth Amendment grounds a
provision in the Hawaiian state constitution addressing the election of the trustees to the Office of
Hawaiian Affairs (OHA).  The OHA was a state agency charged with administering funds for the
benefit of people with aboriginal Hawaiian ancestry.  The Hawaiian constitution limited the right
to vote for OHA trustees to those citizens of Hawaii who were descended from the aboriginal
people who inhabited the Hawaiian Islands in 1778.  The Supreme Court declined to answer the
question of  "whether Congress may treat the native Hawaiians as it does the Indian tribes." *Rice*,
528 U.S. at 518.  Instead, the Court held that, even under *Morton*, Congress could not "authorize
a State to establish a voting scheme that limits the electorate for its public officials to a class of
tribal Indians, to the exclusion of all non-Indian citizens," because such a scheme would violate
the Fifteenth Amendment.  Id. at 520-521.

*Wildlife Service*, 957 F.2d 32, 34-35 (1992), the First Circuit offered this explanation for

employing a rational basis test to evaluate the constitutionality of an exemption, under the Bald

Eagle Protection Act, 16 U.S.C. § 668, for Indian tribes' religious use of eagle feathers:

> In a series of equal protection cases involving laws attacked as treating Native Americans in ways that created *racial* classifications, the Supreme Court has "repeatedly held that the peculiar semisovereign and constitutionally recognized status of Indians justifies special treatment on their behalf when *rationally related* to the Government's 'unique obligation toward the Indians.'" *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 673 n. 20, 99 S.Ct. 3055, 3068 n. 20, 61 L.Ed.2d 823 (1979) (emphasis added and citation omitted). *See also United States v. Antelope*, 430 U.S. 641, 645-46, 97 S.Ct. 1395, 1398, 51 L.Ed.2d 701 (1977) (upholding federal jurisdiction over crimes committed by Native Americans on reservations); *Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 479-81, 96 S.Ct. 1634, 1644-45, 48 L.Ed.2d 96 (1976) (striking down state's attempt to tax property and sales on reservation); *Morton v. Mancari,* 417 U.S. at 554, 94 S.Ct. at 2484-85 (upholding statute and regulation that gave preference to Native Americans in hiring and promotions at Bureau of Indian Affairs.)
>
> The principles affirmed in these cases "point . . . broadly to the conclusion that federal regulation of Indian affairs is not based upon impermissible classifications," *United States v. Antelope*, 430 U.S. 641, 646, 97 S.Ct. 1395, 1399, 51 L.Ed.2d 701 (1977)), and we therefore see no reason not to use the "rational relationship" analysis here, where the government has treated Native Americans differently from others in a manner that arguably creates a *religious* classification.

See also *Peyote Way Church of Go*d, 922 F.2d at 1216; *United States v. Rush*, 738 F.2d 497, 513

(1st Cir. 1984)*; McBride v. Shawnee County, Kansas Court Services*, 71 F.Supp.2d 1098, 1102

(1999); *United States v. Warner*, 595 F.Supp. 595, 601 (D.N.D. 1984).

Courts have offered convincing rationales for finding that the federal trust responsibility

encompasses the protection of the ceremonial peyote use by Indians.  For example, in *United*

*States v. Warner*, the District of North Dakota wrote that "it is clear from legislative history [of

the American Indian Religious Freedom Act, 42 U.S.C. § 1996] that religion is an integral part of

the Indian culture and use of peyote is necessary to the survival of Indian religion.  [Citations omitted.]  The United States is following the policy of preserving the Indians' dependent nation and culture by granting an exemption to Indians for the use of peyote in the religious ceremonies of the NAC."  595 F.Supp. at 601.

The District of Kansas, discussing a state-law peyote exemption, observed that "[s]upporting the Native American religion allows Native Americans to bond spiritually and encourages a sense of community, which is essential to tribal self-government."  *McBride v. Shawnee County, Kansas Court Services*, 71 F.Supp.2d at 1103.  "Even if . . . the goal of tribal self-government is not advanced," the *McBride* court continued, the peyote exemption helps to accomplish another purpose of the trust doctrine–  "cultural integrity."  Id.

The Plaintiffs also present a related argument that seems to stem from the Establishment Clause of the First Amendment.  They argue that given the centrality of peyote to the practices of the NAC, the federal government is imposing a race-based requirement on membership in the NAC by limiting the peyote exemption to tribal Indians.  The *Boyll* court expressed this concern when it dismissed an indictment charging a non-Indian for possession of peyote.  The *Boyll* court declared that "[t]o exclude individuals of a particular race from being members of a recognized religious faith is offensive to the very heart of the First Amendment," and that "there can be no more excessive entanglement of Government with religion than the Government's attempt to impose a racial restriction to membership in a religious organization."  774 F.Supp. at 1340, citing *Walz v. Tax Comm'n of New York*, 397 U.S. 664, 668-69 (1970).

This Court notes that *Boyll* did not include an examination of the peyote exemption in the context of *Morton*.  Against the backdrop of *Morton*, this Court believes that the implementation

of the federal peyote exemption can be characterized other than as the imposition of racial

restrictions onto the NAC by the government.  The federal government may honor a particular

obligation to accommodate the traditional ceremonial use of peyote among Indian tribes, without

taking on an equivalent obligation to facilitate non-Indian's use of peyote.  As the Fifth Circuit has

explained:

> The unique guardian-ward relationship between the federal government and Native American tribes precludes the degree of separation of church and state ordinarily required by the First Amendment.  The federal government cannot at once fulfill its constitutional role as protective of tribal Native Americans and apply conventional separatist understandings of the establishment clause to that same relationship.

Peyote Way, 922 F.2d at 1217.  This Court also observes that the *Boyll* opinion preceded

Congress's enactment of AIRFAA in 1994.  AIRFAA clarified that the peyote exemption is

rooted in the trust relationship between Indian tribes and the federal government.  42 U.S.C. §

1996a.[4]  This Court has been unable to locate any federal court opinions decided *after* the

enactment of AIRFAA which have found the federal peyote exemption to extend to non-Indians.

        In addition to arguing that for purposes of an Equal Protection analysis, the UDV and the

NAC are not similarly situated because of the unique legal status of tribal Indians, the

Government stresses that the UDV and the NAC use different substances in their religious

ceremonies.  In a number of cases in which religious groups have attempted to receive religious-

use exemptions for marijuana, courts have compared the public health and safety risks posed by

the ceremonial use of marijuana to the risks presented by the ceremonial use of peyote.

        In *McBride*, members of the Rastafarian religion who had been convicted on marijuana

charges in state court applied for federal habeas corpus relief on the grounds that it was

unconstitutional for the state of Kansas to permit the religious use of peyote in the NAC, but not

---

        [4]     Plaintiffs cite *Morrison v. Garraghty*, 239 F.3d 648 (4th Cir. 2001) in their Reply
brief.  *Morrison* involved an inmate at a state prison in Virginia.  For safety reasons, prison
officials limited inmates' possession of personal property.  However, on an individual basis, an
inmate could request an exemption from prison property regulations in order to possess personal
property required for religious practices.  The plaintiff, a non-Indian inmate, practiced "Native
American Spirituality," and adhered to tenets similar to those held in tribal Indian religions.  The
plaintiff sued prison officials when they adopted a policy that inmates requesting items used in
tribal Indian religious practices had to demonstrate Native American ancestry.  The Fourth Circuit
held that this policy violated the plaintiff's Equal Protection rights.  The policy represented an
improper racial classification which falsely assumed that "an inmate's sincerity of religious beliefs
in Native American spirituality can be defined solely by his race or heritage."  Id. at 658.
        This Court does not believe that *Morrison* has significant bearing on the question of
whether the federal government, acting in its trust responsibility, can allow a peyote exemption
which extends only to tribal Indians.  The prison officials did not ground their requirement that
practitioners of Indian religions demonstrate Indian heritage in the trust doctrine described in
*Morton*.  Nor could they have.  The prison policy at issue in *Morrison* was not aimed at
promoting Indian culture, but rather was part of a larger administrative scheme through which
members of any religion were required to apply for exemptions for the possession of otherwise-
prohibited personal property.  In the present case, in contrast, Congress has explicitly invoked the
trust doctrine in explaining the basis for the federal peyote exemption, and case law supports this
position.

the religious use of marijuana in the Rastafarian church.  In denying the habeas petition, the court commented, first, that "[t]he two religions are not similarly situated because the circumstances surrounding their drug use is drastically different."  71 F.Supp. at 1101.  While NAC members ingest peyote only at carefully-planned road meetings, the use of marijuana in the Rastafarian religion is uncontrolled.  The *McBride* court also emphasized that "[p]eyote and marijuana are not abused at the same rate, and their abuse has a substantially different effect on society."  Id.  Illicit drug trafficking in peyote is minimal relative to trafficking in marijuana, the court noted.

In *Olsen v. Drug Enforcement Administration*, 878 F.2d 1458 (D.C. Cir. 1989), the District of Columbia Circuit reviewed the DEA's denial of a petition for an exemption allowing the Ethiopian Zion Coptic Church (EZCC) to use marijuana, a sacrament in the religion. Upholding the DEA's ruling, the Olsen court held that "the vast difference in demand for marijuana on one hand and peyote on the other warranted the DEA's response to Olsen's petition."  Id. at 1463-64.  The court further stated that although it based its "decision on the immensity of the marijuana control problem in the United States," there were other significant distinctions between the ceremonial use of peyote in the NAC and the ceremonial use of marijuana in the EZCC.  Id. at 1464.  In the NAC, peyote use takes place in a "precisely circumscribed ritual," and "use of peyote outside the ritual is sacrilegious," while the EZCC "teaches that marijuana is properly smoked 'continually all day.'"  Id.

The First Circuit also considered a case involving members of the EZCC.  *United States v. Rush*, 738 F.2d 497 (1st Cir. 1984).  Several members of the church were convicted on marijuana charges, and one of the bases on which they appealed their convictions was that they were "entitled as a matter of equal protection to a religious exemption from the marijuana laws on the

21

same terms as the peyote exemption granted the Native American Church."  Id. at 513. The First

Circuit rejected this claim, pointing out that "[m]arijuana is not covered by the peyote

exemption."  Id.

      As these cases suggest, differences between various drugs are relevant to the question of

whether Equal Protection principles support the provision of religious-use exemptions for groups

other than the NAC that use controlled substances as sacraments.  The process of determining

whether the UDV is similarly situated with the NAC may properly include a comparison of the

controlled substances that each of the churches uses.  The Plaintiffs maintain that "the NAC has

some attributes that would make it a less favorable candidate for permission to use a perception-

altering substance in religious ceremonies."  In fact, according to the Plaintiffs, "the likelihood of

diversion of peyote from NAC ceremonies to impermissible uses is greater than any likelihood

that such diversion would take place with the UDV's ceremonial use of Hoasca."  (Memorandum

in Support of Motion for Preliminary Injunction (Doc. No. 11) at 25.)

      During the hearing on the Plaintiffs' motion for preliminary injunction, the parties

presented extensive evidence on the issues of the health risks associated with the ceremonial

consumption of hoasca and the potential for the diversion of hoasca to non-ceremonial use.  This

Court will address these factual questions in more detail in its opinions on the other grounds on

which the Plaintiffs base their motion for preliminary injunction.  At this time, the Court will point

to one characteristic of peyote use in the NAC which distinguishes it from hoasca use in the UDV

and which renders the two churches dissimilarly situated for purposes of an Equal Protection

analysis.  Peyote has a demonstrated track record of religious use in the United States, while

hoasca does not.  When Congress enacted AIRFAA in 1994, it was able to look to the track

record that the NAC had established with respect to ceremonial peyote use.  The "Background

and Need" section of the House Report on AIRFAA stated that, since 1971,

> Native American Church use of peyote as a religious sacrament has had the limited
> protection of Federal regulation.  Officials of the Drug Enforcement
> Administration of the Department of Justice testified at House hearings in 1993
> and 1994 that the religious use of peyote by Indians has nothing to do with the
> vast and violent traffic in illegal narcotics that plagues this country.  The DEA
> further testified that it is unaware of the diversion of peyote to any illicit market.
> The NAC has a good, cooperative relationship with the DEA in insuring that
> peyote is lawfully harvested and distributed solely for American Indian religious
> use.

1994 U.S.C.C.A.N. at 2406.  A regulatory peyote exemption has been in place from the inception

of the Controlled Substances Act, and Congress was able to rely on reports of the real-world

effects of the regulatory exemption when it enacted AIRFAA.  Peyote is the only controlled

substance that is the subject of a federal religious-use exemption, because no other controlled

substance has established this type of history.  This is not to say that the religious-use exemption

scheme is frozen in time.  After all, the political branches of the government may determine that a

church using a drug other than peyote has a demonstrated history of limited, appropriate use over

time that would entitle it to an exemption from the Controlled Substances Act.  However, the

UDV is not similarly situated to the NAC such that the federal courts must step in to declare that

the government violates Equal Protection principles by allowing an exemption only for the use of

peyote in the NAC.

###    C.    CONCLUSION

This Court thus concludes that the Plaintiffs' Motion for Preliminary Injunction should be

denied as to their Equal Protection claim.  This Court notes, however, that Plaintiffs' counsel

represented at the hearing that, following discovery, the Plaintiffs may wish to pursue a claim that

the government has impermissibly targeted the UDV in particular for prosecution.  This
Memorandum Opinion and Order does not preclude that selective prosecution claim, to the extent
that such a claim would depend on an Equal Protection analysis.

      IT IS THEREFORE ORDERED THAT:

1)      The Motion of the Native American Church of Oklahoma, the Native American Church of
North America, and the Native American Church of the Kiowa Tribe of the State of Oklahoma to
file an *Amicus Curiae* Brief in Opposition to Plaintiffs' Application for a Preliminary Injunction is
denied;

2)      The Plaintiffs' Motion for Preliminary Injunction is denied with respect to their Equal
Protection claim.

                                        _____
                              CHIEF UNITED STATES DISTRICT JUDGE