**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**



CLERK

O CENTRO ESPIRITA BENEFICIENTE
UNIAO DO VEGETAL (a.k.a. Uniao do
Vegetal) (USA) ("UDV-USA"), a New Mexico
Corporation on its own behalf and on behalf
of all its members in the United States,
JEFFREY BRONFMAN, individually and as
President of UDV-USA, CHRISTINA
BARRETO, individually and as Secretary of
UDV-USA, FERNANDO BARRETO,
individually and as Treasurer of UDV-USA,
CHRISTINE BERMAN, MITCHEL
BERMAN, JUSSARA de ALMEIDA DIAS,
PATRICIA DOMINGO, DAVID
LENDERTS, DAVID MARTIN, MARIA
EUGENIA PELAEZ, BRYAN REA, DON
ST. JOHN, CARMEN TUCKER, and
SOLAR LAW, individually and as members
of UDV-USA,

                    Plaintiffs,

v.                                             CIV. No. 00-1647 JP/RLP

JOHN ASHCROFT, Attorney General of the
United States, DONNIE R. MARSHALL,
Administrator of the United States Drug
Enforcement Administration, PAUL H.
O'NEILL, Secretary of the Department of
Treasury of the United States, DAVID
IGLESIAS, United States Attorney for the
District of New Mexico, and JOHN
O'TOOLE, Resident Special Agent in
Charge of the United States Customs Service
Office of Criminal Investigation in
Albuquerque, New Mexico, all in their
official capacities,

                    Defendants.

## MEMORANDUM OPINION AND ORDER

The Plaintiffs' Motion for Preliminary Injunction (Doc. No. 10), filed December 22, 2000, raised the following issues:[1]

1.  Whether the federal government infringed Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, made applicable to federal statutes by the Due Process Clause of the Fifth Amendment, by selectively enforcing the Controlled Substances Act (CSA) against Plaintiffs. In a Memorandum Opinion and Order filed February 25, 2002, this Court ruled that the Defendants did not violate Plaintiffs' rights under the Equal Protection Clause.

---

[1]    This Court recognizes that in addition to the claims discussed in this Memorandum Opinion and Order, the Plaintiffs' Complaint and Motion for Preliminary Injunction included a claim under the Administrative Procedure Act (APA), 5 U.S.C. § 701-706. The APA grants courts the authority to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . contrary to constitutional right, . . . [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). As the Government observes, the Plaintiffs' APA claim is derivative– it hinges on the success of the Plaintiffs' analyses of their other claims. The main significance of the APA claim at this stage of litigation seems to relate to the type of relief that the Plaintiffs seek. The Plaintiffs maintained in their brief in support of their Motion for Preliminary Injunction that the APA empowers this Court to set aside the Government's decision that the Plaintiffs are subject to prosecution for possessing hoasca and to order the Government to return the seized hoasca to the UDV.

The Plaintiffs' Complaint and Motion for Preliminary Injunction also raised claims under the Fourth and Fifth Amendments to the United States Constitution. Under the Fourth Amendment, the Plaintiffs argue that the Government lacked a legal basis to seize the hoasca belonging to the Plaintiffs, and under the Fifth Amendment, the Plaintiffs argue that they were deprived of their hoasca without due process of law. The Plaintiffs rely on their Fourth and Fifth Amendment theories to maintain that they are entitled to the return of the hoasca. The Court believes that, like the APA claim, these claims are derivative of the claims asserted by the Plaintiffs that are discussed at great length in this Memorandum Opinion and Order.

Because the Plaintiffs' APA, Fourth Amendment, and Fifth Amendment claims primarily concern questions about the type of relief the Plaintiffs seek, the Court will defer ruling on these claims at this time.

2

2. Whether, as Plaintiffs contend, several canons of statutory construction instruct that the CSA's treatment of dimethyltryptamine (DMT) as a controlled substance does not extend also to include hoasca as a controlled substance. The Court rejects this argument and holds that the plain language of CSA chosen by Congress clearly covers hoasca as a controlled substance.

3. Whether by interpreting CSA to prohibit the Plaintiffs' use of hoasca, the Defendants have violated Plaintiffs' rights under the Free Exercise Clause of the First Amendment to the United States Constitution by restricting Plaintiffs' religious practices, which focus on the use of hoasca. The Court concludes that the Defendants have not infringed Plaintiffs' rights under the First Amendment because Congress drafted and promulgated CSA as a neutral law of general applicability and the burden it puts on Plaintiffs' practices does not violate the First Amendment.

4. Whether doctrines of international law direct that Defendants, as representatives of the United States government, should permit the Plaintiffs' ceremonial use of hoasca. The Court rules that international law principles do not override Congress' clear application of the CSA to any use of hoasca in the United States.

5. Whether the Defendants have met the heavy burden, imposed by Congress on the government through passage of the Religious Freedom Restoration Act (RFRA), to prove that the CSA's restriction on Plaintiffs' religious practices regarding use of hoasca furthers a compelling governmental interest through the least restrictive means. The Court begins with the observation that Defendants, at this stage of

this action, have explicitly conceded that Plaintiffs have established a prima facie

case under RFRA, and the Court concludes that, on the basis of the evidence

presented thus far, the government has failed to meet its high burden of proof,

entitling Plaintiffs to a preliminary injunction based on RFRA.

I.    BACKGROUND

This case centers on a tea, called hoasca, brewed from two plants native to the Amazon

River Basin in South America. The consumption of hoasca plays a central role in the religious

ceremonies of the O Centro Espirita Beneficiente Uniao do Vegetal (UDV).[2] Founded in Brazil

in 1961, the UDV church blends Christian theology with traditional indigenous religious beliefs.

Church doctrine instructs that hoasca is a sacrament, and UDV members ingest the tea during

church services. About 8,000 people belong to the UDV in Brazil. In 1993, the UDV officially

established a branch of the church in the United States. The United States branch of the UDV,

headquartered in Santa Fe, New Mexico, has about 130 members.

The plants used to make hoasca do not grow in this country, and prior to 1999, UDV

leaders in the United States imported the tea from Brazil for use in church ceremonies. On May

21, 1999, the United States Customs Service seized a substantial quantity of hoasca from the

UDV in the United States. The federal government takes the position that the Controlled

Substances Act (CSA), 21 U.S.C. § 801, *et seq.*, prohibits the possession and use of hoasca. One

of the plant components of the tea contains dimethyltryptamine (DMT), a hallucinogenic

chemical. Under the CSA, DMT is a "Schedule I" controlled substance and hence subject to

---

[2]      The term "hoasca" refers to the specific tea preparation used in the UDV.
"Ayahuasca" is a broader term that refers to a category of South American teas containing DMT
and beta-carbolines. Some witnesses quoted in this Memorandum Opinion and Order use the
terms "hoasca" and "ayahuasca" interchangeably.

strict controls. Although the United States has not filed any criminal charges stemming from UDV officials' possession of hoasca, the government has threatened prosecution for future possession of the tea. In light of the government's interpretation of the CSA's application to hoasca, the UDV has ceased using the tea in the United States.

The Plaintiffs in the present action are the United States branch of the UDV, as well as several church leaders and members in the United States. On November 21, 2000, the Plaintiffs filed a Complaint for Declaratory and Injunctive Relief (Doc. No. 1), alleging violations of the Religious Freedom Restoration Act, the First Amendment to the United States Constitution, Equal Protection principles, the Fourth Amendment, the Fifth Amendment, the Administrative Procedure Act, and international laws and treaties. In addition, the Complaint asserts that the CSA does not apply to hoasca. On December 22, 2000, the Plaintiffs filed a Motion for Preliminary Injunction (Doc. No. 10). This Court held a hearing on the Plaintiffs' motion October 22 through November 2, 2001, during which the parties presented evidence and arguments on a number of issues.

As previously noted, on February 25, 2002, the Court entered a Memorandum Opinion and Order denying the Plaintiffs' Motion for Preliminary Injunction as to their Equal Protection claim. This Memorandum Opinion and Order addresses the other grounds on which the Plaintiffs base their Motion for Preliminary Injunction.

II.     STANDARD OF REVIEW

Under Tenth Circuit law, "[a] movant is entitled to a preliminary injunction if he can establish the following: (1) a substantial likelihood of success on the merits of the case; (2) irreparable injury to the movant if the preliminary injunction is denied; (3) the threatened injury

5

to the movant outweighs the injury to the other party under the preliminary injunction; and (4) the injunction is not adverse to the public interest." *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001). This Memorandum Opinion and Order focuses on the Plaintiffs' likelihood of success on the merits of their First Amendment, RFRA, statutory construction, and international law claims.

This Court recognizes that "[i]f the party seeking the preliminary injunction can establish the last three factors . . . then the first factor becomes less strict--i.e., instead of showing a substantial likelihood of success, the party need only prove that there are 'questions going to the merits ... so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation.'" *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246-1247 (10th Cir. 2001), quoting *Federal Lands Legal Consortium v. United States*, 195 F.3d 1190, 1194 (10th Cir. 1999). However, given the breadth of the parties' briefing in this case, and the extensiveness of the arguments and evidence presented at the hearing, it seems appropriate to consider the substance of the Plaintiffs' claims at this time. The Court's decisions in this Memorandum Opinion and Order will not foreclose the parties from presenting additional evidence at a trial on the merits. For example, this Court understands that the Government may wish to contest at a later time whether the Plaintiffs have established a prima facie case under RFRA, and that the Plaintiffs may wish to develop a selective prosecution argument.

III.   DISCUSSION

A.    FIRST AMENDMENT CLAIM

The First Amendment to the United States Constitution states that "Congress shall make

no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." The Supreme Court has observed that "[i]n addressing the constitutional protection for free exercise of religion, [its] cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993), citing *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). In contrast, a law that is not neutral and is not generally applicable "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Lukumi*, 508 U.S. at 531-32.

While an evaluation of a free exercise claim typically begins by considering whether the plaintiffs have shown that a governmental action substantially burdens their religious practices, *Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680, 699 (1989), the Court need not address that preliminary issue in this case. The Government does not contest, at this stage of litigation, that its interpretation of the CSA which prohibits ceremonial hoasca use substantially burdens the Plaintiffs' exercise of their religion. Therefore, this Court turns to the question of whether the CSA is a neutral law of general applicability.

The Plaintiffs argue that the CSA "cannot be characterized as a neutral law of general applicability," because the statute "provides a wide variety of exceptions, exemptions and licenses permitting the use of controlled substances in non-religious settings." Reply, at 31. As support for their argument that the CSA is neither neutral nor generally applicable, the Plaintiffs point to the exemptions set forth in the statute for certain uses of controlled substances. For example, 21 U.S.C. § 872(e) provides that the Attorney General "may authorize the possession,

distribution, and dispensing of controlled substances by persons engaged in research." Elsewhere in the CSA, 21 U.S.C. §§ 822 and 823 outline procedures for the Attorney General to use in registering entities that engage in the manufacture and distribution of controlled substances for medical, scientific, research, and industrial purposes.

As the Government observes, the Plaintiffs' analysis seems to deviate from Supreme Court and Tenth Circuit precedent regarding whether controlled substances laws are neutral and generally applicable. In *Smith*, the Supreme Court considered an Oregon drug statute which prohibited the possession of peyote, among other substances, and which contained no exception for the religious use of controlled substances. The plaintiffs in *Smith* had been fired from their jobs for consuming peyote in a ceremonial setting, and the state denied their applications for employment benefits on the basis that the plaintiffs' dismissal stemmed from their use of a controlled substance. The plaintiffs maintained that Oregon had violated their free exercise rights by enforcing the statutory prohibition against peyote to restrict the plaintiffs' religious use of the substance.

Rejecting the *Smith* plaintiffs' argument, the Supreme Court stated that its "decisions have consistently held that the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" Id. at 879, quoting *United States v. Lee*, 455 U.S. 252, 263, n.3 (1982) (Stevens, J., concurring in judgment). The Government stresses that the Oregon law upheld in *Smith* provides exemptions for the use of controlled substances similar to those outlined in the federal Controlled Substances Act. O.R.S. § 475.125. Thus, according to the Government, "*Smith* itself effectively answers

8

Plaintiffs' claim that the medical, scientific, industrial, and research exemptions contained in the Controlled Substances Act render the Act non-neutral and not generally applicable." Response, at 39.

The Tenth Circuit relied on *Smith* in order to reach its decision in *United States v. Meyers*, 95 F.3d 1475 (1996). In *Meyers*, a criminal defendant charged with marijuana offenses under the federal Controlled Substances Act alleged that his adherence to the "Church of Marijuana" required him to distribute the drug. The Tenth Circuit declined to accept Mr. Meyers's argument that the CSA's prohibition of marijuana distribution violated his First Amendment rights. The court held that "Meyers' challenge fails for the same reasons as the respondents challenge in *Smith* failed, i.e., the right to free exercise of religion under the Free Exercise Clause of the First Amendment does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law incidentally affects religious practice." Id. at 1481. The comments of the *Meyers* court reflect an assumption that the CSA is a neutral, generally applicable law within the meaning of *Smith*. The court stated, for example, that "when, *as here*, the challenge is to a valid neutral law of general applicability, the law need not be justified by a compelling governmental interest." Id., citing *Lukumi Babalu Aye*, 508 U.S. at 521 (emphasis added).

Given the opinions in *Smith* and *Meyers*, this Court believes that it has little leeway to accept the Plaintiffs' argument that the CSA is not a neutral, generally applicable law. However, the Plaintiffs contend that this case is distinguishable from *Smith* and *Meyers*. The Plaintiffs maintain that *Smith* and *Meyers* are distinct from the present case in that the courts in *Smith* and *Meyers* were not considering the issue of whether exemptions for scientific research and other

uses would render a drug law non-neutral or not generally applicable. In *Smith* and *Meyers*, the parties raising First Amendment challenges to controlled substance laws were not contesting the neutrality or general applicability of those laws. Instead, they were claiming that otherwise-valid laws that incidentally burden the practice of a person's religion could violate that individual's free exercise rights. See *Smith*, 494 U.S. at 878 (Observing that the plaintiffs "contend that their religious motivation for using peyote places them beyond the reach of a criminal law that is not specifically directed at their religious practice, and that is concededly constitutional as applied to those who use the drug for other reasons"); *Meyers*, 95 F.3d at 1481 (Taking note of criminal defendant's suggestion that even a neutral, generally applicable law must be justified by a compelling government interest if it imposes a burden on religious conduct.)

This Court will therefore consider whether the CSA is a neutral, generally applicable law in light of the exceptions that it provides for research and other uses. The United States Supreme Court examined the concepts of neutrality and general applicability in *Lukumi*, 508 U.S. 520. In *Lukumi*, a church affiliated with the Santeria religion challenged several ordinances that had been enacted by the Hialeah, Florida city council. Animal sacrifice plays a significant role in the practice of Santeria. When the plaintiff church announced plans to open a house of worship in Hialeah, the city council passed ordinances banning the ritual killing of animals but permitting the killing of animals in many other contexts.

The Supreme Court concluded that Hialeah's regulatory scheme was neither neutral nor generally applicable. The ordinances failed the neutrality test because, taken together, they amounted to a "religious gerrymander." Id. at 535, quoting *Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 696 (1970) (Harlan, J., concurring). The city council had essentially

10

prohibited the killing of animals for religious reasons while exempting from prohibition almost all non-religious killing. The Hialeah ordinances were not generally applicable, because they were underinclusive with regard to the laws' purported goals, ultimately "pursu[ing] the city's governmental interests only against conduct motivated by religious belief." In reaching its decision, the *Lukumi* court provided helpful guidelines for analyzing the concepts of neutrality and general applicability. This Court will draw on these guidelines in assessing the Plaintiffs' position.

### 1. NEUTRALITY

Under *Lukumi*, in order to establish that a law is not neutral, a plaintiff must show "that the object or purpose of [the] law is the suppression of religion or religious conduct." Id. at 533. The *Lukumi* court explained that "the minimum requirement of neutrality is that a law not discriminate on its face," but that "[f]acial neutrality is not determinative." Id. at 533-34. Because "[t]he Free Exercise Clause protects against governmental hostility which is masked, as well as overt," courts should look beyond the surface for indications that the purpose of a law is to suppress religion. Id. at 534. The court observed that "the effect of a law in its real operation is strong evidence of its object." Id. at 535.

The Plaintiffs in the present case do not appear to contend that, on its face, the CSA targets the religious use of drugs. Rather, the Plaintiffs seem to argue that a comparison between the statute's treatment of secular uses, as opposed to its treatment of religious uses, supports the inference that the CSA's purpose is to limit the religious use of controlled substances. The Plaintiffs maintain that "the CSA is not neutral as between secular and religious interests," because the law exempts the secular use of controlled substances in medical, scientific,

industrial, and research settings, but bans almost all religious uses of controlled substances.[3]

The Plaintiffs' failure to take into account the full spectrum of potential uses for drugs undercuts their argument, however. For example, the Plaintiffs ignore a very important category of secular drug use– recreational drug use. This Court imagines that there are a number of individuals in the United States who may wish to use a given controlled substance in a setting that is neither scientific nor ceremonial in a religious context. The CSA restricts the freedom of recreational users, as well religious users, to consume controlled substances. This Court cannot reasonably infer from the way that the CSA operates that the purpose of the law is to target religious ceremonial drug use. This case therefore presents much different circumstances from *Lukumi*, where the Supreme Court found, upon examining the operation of the challenged city ordinances, that "[i]t is a necessary conclusion that almost the only conduct subject to [the ordinances] is the religious exercise of Santeria church members." Id. at 535.

## 2. GENERAL APPLICABILITY

Discussing the requirement of general applicability, the *Lukumi* court observed that "[a]ll laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice." Id. at 542. The "government . . . cannot in a selective manner impose burdens only on conduct motivated by religious belief." Id. at 543. The ordinances at issue in *Lukumi* were so deficient that the court declined to "define

---

[3] The Plaintiffs also argue that the CSA is not neutral between religions, because the law provides an exemption for the Native American Church's ceremonial use of peyote. The Court has already addressed this issue at length, in the context of the Plaintiffs' claims under the Equal Protection clause and the Establishment Clause. In its Memorandum Opinion and Order entered February 25, 2002, the Court found that the federal government's peyote exemption policy does not constitute impermissible favoritism toward the Native American Church.

with precision the standard used to evaluate whether a prohibition is of general application." Id. However, the *Lukumi* court made clear that a law is not generally applicable if it was purportedly adopted to protect certain interests, yet "fail[s] to prohibit nonreligious conduct that endangers these interests in a similar or greater degree than [the banned religious conduct] does." Id.

In *Lukumi*, for example, the city of Hialeah claimed that one of the goals of the contested ordinances was to prevent cruelty to animals. The Supreme Court noted, though, that "[m]any types of animal deaths or kills for nonreligious reasons are either not prohibited or approved by express provision." Id. at 543. Hunting, fishing, rodent extermination, and the euthanasia of stray animals all continued to be legal. The *Lukumi* court concluded that "[d]espite the city's proffered interest in preventing cruelty to animals, the ordinances are drafted with care to forbid few killings but those occasioned by religious sacrifice." Id. The Court found that the ordinances were similarly underinclusive with respect to the city's claimed goal of protecting public health.

The Third Circuit examined the general applicability requirement in an opinion cited by both the Plaintiffs and the Government. In *Fraternal Order of Police v. City of Newark*, 170 F.3d 359 (1999), a Newark Police Department policy required police officers to shave their beards. The police department allowed exceptions to the shaving policy for officers who had medical reasons for not shaving and for undercover officers. Two police officers challenged the departmental policy on the ground that they are Sunni Muslims and their religion prohibits them from shaving.

The Third Circuit found that while the exemption for undercover officers did not diminish the general applicability of the beard policy, the medical exemption did. The

13

Department had adopted the policy to promote a uniform appearance among its officers. The Third Circuit pointed out that "the undercover exception . . . does not undermine the Department's interest in uniformity because undercover officers 'obviously are not held out to the public as law enforcement person[nel].'" Id. at 366 (citing reply brief.) In contrast, "the medical exemption raises concern because it indicates that the Department has made a value judgment that secular (i.e., medical) motivations for wearing a beard are important enough to overcome its general interest in uniformity but that religious motivations are not." Id. at 366.

Like the Third Circuit, the District of Nebraska found that a governmental policy failed to meet the general applicability standard elucidated in *Lukumi*. *Rader v. Johnston*, 924 F.Supp. 1540 (D. Neb. 1996) concerned a University of Nebraska-Kearney rule requiring freshmen to live in dormitories on campus. University officials represented that the goals of the policy were to promote diversity and tolerance, encourage academic achievement, and, for financial reasons, to make sure that there were enough students living on campus to fill the dorms. The plaintiff, a devout Christian, requested an exemption from the on-campus housing policy, so that he could live instead in an off-campus Christian housing facility. The plaintiff maintained that the lifestyle in the dorms, where many students drank alcohol and had parties, would interfere with the practice of his religion. When the university denied the plaintiff's application for an exemption, he brought a claim under the Free Exercise clause.

In reaching its decision, the District of Nebraska took note of the many categories of freshmen exempt from the housing rule. The policy enumerated exceptions for married students, students with parents living nearby, part-time students, and students who were older than nineteen at the start of the school year. In addition, university officials granted a significant

14

number of exceptions to students applying for waivers based on a variety of special circumstances. Evidence showed that in practice, the university applied the housing rule to only 1,600 of 2,500 freshmen. The District of Nebraska cited the fact that "[o]ver one third of the freshman students . . . are not required to comply with the parietal rule" in determining that "the parietal rule cannot be viewed as generally applicable to all freshman students." Id. at 1553. The court stressed that "although exceptions are granted by the defendants for a variety of non-religious reasons, they are not granted for religious reasons." Id. at 1553.

In this case, the Court will follow the approach outlined in *Lukumi*. In order to evaluate the general applicability of the CSA, this Court will inquire into whether the statute is substantially underinclusive as to its purported aims– whether the CSA "fail[s] to prohibit nonreligious conduct that endangers" governmental interests "in a similar or greater degree than" the religious ceremonial consumption of controlled substances does. In their memorandum in support of the motion for preliminary injunction, the Plaintiffs emphasize that through the CSA's registration scheme for drugs used in medical, scientific, industrial, and research settings, huge amounts of controlled substances are produced and distributed. However, this Court believes, as does the Government, that the *Lukumi* framework requires the Plaintiffs to demonstrate more than that the CSA includes significant exceptions for certain secular uses of controlled substances. Rather, the Plaintiffs must show that the research and scientific exceptions to the CSA jeopardize the same interests that the government uses to justify the restrictions on religious conduct imposed by the CSA.

The Court concludes in this case that the secular exceptions specified in the CSA do not implicate the purpose of the law. The Government has suggested that in enacting the CSA,

15

"Congress's primary target was a secular one: the recreational use of controlled substances."

Reply at 37, citing H.R. Rep. No. 91-1444, 91st Cong., 2d Sess., reprinted in 1970 U.S.C.C.A.N. 4566. This Court agrees that the CSA reflects Congressional concern about the risks to public health and safety associated using controlled substances. Included among the findings at the beginning of the CSA is the statement that "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. § 801(2).

As the Third Circuit explained in the *City of Newark* case, "the Free Exercise Clause does not require the government to apply its laws to activities that it does not have an interest in preventing." 170 F.2d at 366. Here, allowing certain uses of drugs in controlled scientific, research, and medical environments does not run counter to the government's interest in promoting public health. The unregulated consumption of drugs in ceremonial settings may present risks of adverse health effects and illegal diversion in a way that the research exceptions do not. See, e.g., Hrg. Tr. at 864, Testimony of Sander Genser (Discussing why controlled research settings ensure relative safety.) This Court concludes that the CSA meets the standard for general applicability, because the law generally applies to the uses of controlled substances that endanger public health.

While the Plaintiffs' initial argument in favor of their free exercise claim focused on the research exemptions set forth in the CSA, the Plaintiffs' reply brief and trial brief present a different contention-- that although some plants growing within the United States contain DMT, "the government has singled out hoasca for suppression and has singled out the adherents of the UDV for threat of criminal prosecution." Reply, at 34. According to the Plaintiffs, "the

Department of Justice, DEA and Customs have made the administrative decision to remain aloof from any thorny decisions regarding the possession and abuse of DMT-containing plants that grow in this country and has chosen, instead, to limit its enforcement efforts to religious use of DMT-containing plants." Supplemental Trial Memorandum, at 5. The Plaintiffs seems to draw on an Equal Protection theory, arguing that even if the CSA is impartial, the Government is applying it in a way that discriminates against the Plaintiffs on the basis of religion. (See, e.g., *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312 (1976), stating that "equal protection analysis requires strict scrutiny of a legislative classification . . . when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class.")

During the hearing, the Plaintiffs presented evidence showing that certain plants growing in this country, including phalaris grass, contain DMT. The Plaintiffs' evidence included a document showing that the United States Department of Agriculture even recommends using one kind of phalaris for erosion control. The Plaintiffs appear to argue that if people are allowed to grow phalaris grass for nonreligious reasons, while the UDV's supply of hoasca is confiscated, this Court should conclude that the federal government must be discriminating against the Plaintiffs on the basis of religion. The Court does not believe that the evidence about phalaris would necessarily lead to that conclusion. Individuals with phalaris grass in their lawns may possess DMT in some sense. However, if there are no indications that the people with phalaris lawns are *consuming* the grass, law enforcement might legitimately choose not to prosecute, for reasons other than that the grass is being used for the secular purpose of having a lawn. Federal law enforcement entities might prioritize focusing on the UDV's hoasca use not because the use

17

is religious, but instead because UDV members make much more extensive use of hoasca by personally ingesting it than a person with a phalaris lawn makes of the grass. Before their tea was confiscated, UDV officials regularly distributed the tea to church members for consumption.

Some evidence presented at the hearing suggested that non-religious consumption of plants containing DMT does take place in the United States. This evidence included materials taken from the internet– advertisements for plants containing DMT and testimonials from people claiming to have used teas similar to hoasca. While such evidence might eventually contribute to support an argument that the UDV was selectively prosecuted on the basis of religion, this evidence, standing alone, is insufficient to create an inference that selective prosecution in fact occurred. As the Government observes, the use of DMT reported on the internet differs in scale from the UDV's use, and the authorities may have chosen to target the UDV for reasons other than religion. The Government notes that "[t]he possibility that an internet account of a single dose may be accurate and could be reliably traced to the perpetrator cannot compare to the actual interception of 3,000 doses of an illegal substance being imported for distribution." Trial Memorandum, at 13.

In its February 25, 2002 Memorandum Opinion and Order addressing the Plaintiffs' Equal Protection claim, the Court noted that Plaintiffs' counsel have represented that following discovery, the Plaintiffs may pursue a claim that the government has impermissibly targeted the UDV in particular for prosecution. By finding that the Plaintiffs' evidence is not sufficient at this time to support a preliminary injunction based on a selective prosecution theory, the Court does not intend to foreclose further efforts by the Plaintiffs to develop that theory.

B.    PLAINTIFFS' ARGUMENT THAT THE CSA DOES NOT EXTEND TO HOASCA

This Court has thus far assumed, in considering the Plaintiffs' claims under the United States Constitution, that the CSA's ban on DMT applies to hoasca. The Plaintiffs argue, however, that "[e]ven if the Defendants were not violating Plaintiffs' rights under RFRA and the Free Exercise and the Equal Protection clauses, their actions are nonetheless illegal because hoasca is not a controlled substance" under the CSA. The Plaintiffs acknowledge that "[o]ne of the plants that comprise Hoasca, *psychotria viridis*, is naturally composed, in very small part, of DMT." The Plaintiffs also recognize that DMT is scheduled as a controlled substance under the CSA. They maintain, though, that the CSA prohibits only synthetic DMT, and not the DMT occurring naturally in plants. The Plaintiffs premise this argument on the proposition that the language of the CSA is ambiguous as applied to DMT in a natural state.

As the United States Supreme Court has made clear, "[t]he starting point for . . . interpretation of a statute is always its language." *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989). Thus this Court must first look to the language of the CSA in order to evaluate the Plaintiffs' arguments. The CSA divides controlled substances into five schedules, classified according to Congressional determinations regarding each drug's potential for abuse and each drug's accepted medical uses.[4] The CSA places a number of hallucinogenic drugs into Schedule I, the most strictly regulated category. Schedule I(c) provides that "[u]nless specifically excepted or unless listed in another schedule, any material, compound, mixture, or

---

[4]    A drug's placement in Schedule I indicates that the substance "has a high potential for abuse," that it "has no currently accepted medical use in treatment in the United States," and that "[t]here is a lack of accepted safety for use of the drug . . . under medical supervision." 21 U.S.C. § 812(b)(1).

preparation, which contains any quantity of the following hallucinogenic substances" falls within the Schedule I category. Among the hallucinogens listed in Schedule I(c) is dimethyltryptamine (DMT).

This Court agrees with the Government that the language of the CSA clearly covers hoasca. After all, the Plaintiffs do not dispute that one of the plant components of hoasca contains DMT. The Court is constrained to conclude that hoasca tea thus constitutes a "material, compound, mixture, or preparation which contains any quantity" of DMT, within the plain meaning of the statute.

However, the Plaintiffs offer a number of theories of statutory construction to support their argument that the CSA should not be interpreted to apply to plants that contain DMT and to substances derived from those plants. For example, the Plaintiffs stress that Congress is presumed to avoid superfluous drafting. See, e.g., *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995). The Plaintiffs observe that the CSA contains a number of instances where Congress expressly banned both a given chemical and the plant in which that chemical is naturally found. Based on this, the Plaintiffs declare that because Congress listed only a chemical substance, DMT, it did not intend that plants containing that substance would also be prohibited. Otherwise, Congress would have engaged in superfluous drafting elsewhere in the CSA by, for example, explicitly scheduling both peyote (a plant) and mescaline (a chemical substance.)

The Plaintiffs have also drawn on the following principles to argue that the CSA should not be interpreted to ban hoasca: 1) the canon that courts should not construe statutory provisions to contradict other parts of a statutory scheme, see e.g., *United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988); 2) the principle of "*Expressio unius est*

20

*exclusio alterius*", see e.g., *Leatherman v. Tarrant County Narcotics Intelligence &*

*Coordination Unit*, 507 U.S. 163, 168 (1993); 3) the rule of lenity, see e.g. *United States v.*

*Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221-22 (1952); and 4) the principle that courts

should construe statutes to avoid constitutional problems, see e.g., *NLRB v. Catholic Bishop of*

*Chicago*, 440 U.S. 490, 500 (1979).

The Plaintiffs have presented interesting arguments under all of these theories, and their

arguments may well have been persuasive if the statute at issue were any less clear. As the

Government points out, however, most of the principles discussed by the Plaintiffs become

relevant only if the statutory language is ambiguous. The Supreme Court has noted that:

> In any event, canons of construction are no more than rules of thumb that help
> courts determine the meaning of legislation, and in interpreting a statute a court
> should always turn first to one, cardinal canon before all others. We have stated
> time and again that courts must presume that a legislature says in a statute what it
> means and means in a statute what it says there. See, e.g., *United States v. Ron
> Pair Enterprises, Inc.*, 489 U.S. 235, 241-242, 109 S.Ct. 1026, 1030-1031, 103
> L.Ed.2d 290 (1989); *United States v. Goldenberg*, 168 U.S. 95, 102-103, 18 S.Ct.
> 3, 4, 42 L.Ed. 394 (1897); *Oneale v. Thornton*, 6 Cranch 53, 68, 3 L.Ed. 150
> (1810). When the words of a statute are unambiguous, then, this first canon is also
> the last: "judicial inquiry is complete." *Rubin v. United States*, 449 U.S. 424, 430,
> 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981); see also *Ron Pair Enterprises, supra*,
> 489 U.S., at 241, 109 S.Ct., at 1030.

*Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). More recently, the Supreme

Court has explained that a court's "first step 'is to determine whether the language at issue has a

plain and unambiguous meaning with regard to the particular dispute in the case,'" and that

"[t]he inquiry ceases 'if the statutory language is unambiguous and the statutory scheme is

coherent and consistent.'" *Barnhart v. Sigmon Coal Company, Inc.*, 534 U.S. 438 (2002),

quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997).

Granted, a court should not read a statute literally if a literal construction would "lead to

21

irreconcilable inconsistencies or clearly absurd results that Congress could not have intended."

*Resolution Trust Corp. v. Westgate Partners, Ltd.*, 937 F.2d 526, 531 (10th Cir. 1991).

However, this Court does not believe that interpreting the CSA to prohibit hoasca use results in absurdity or creates an internally-contradictory statute. The Plaintiffs observe that many plants and animals, including humans, contain DMT; and the Plaintiffs imply that because the CSA cannot be read to ban humans, that the statute must apply only to synthetic DMT. Simply because banning humans would be absurd does not mean that banning any non-synthetic DMT found elsewhere would be absurd. Courts confronted with potentially absurd statutory applications are to consider "alternative interpretations consistent with the legislative purpose." *Oxy USA, Inc. v. Babbitt*, 268 F.3d 1001, 1012 (10th Cir. 2001), quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). In this case, interpreting the CSA to apply to the ingestion of a tea containing a hallucinogenic chemical seems reasonable, even if interpreting the CSA to apply to the human body does not.

In addition, the Plaintiffs have failed to establish that interpreting the CSA to apply to hoasca would contradict other provisions of the statute. The Plaintiffs have not pointed to any contradictions that directly concern the CSA's treatment of DMT and substances containing DMT. It is not as if the statute places DMT in one schedule and products made with DMT in another schedule, for example. Rather, the Plaintiffs' arguments rely on an analysis of the CSA's approach to other drugs.

The Plaintiffs argue that construing the CSA's prohibition on DMT to apply to hoasca creates a contradiction in the federal peyote exemption scheme. The CSA schedules both peyote, a cactus button, and mescaline, the hallucinogenic chemical found in peyote, but the

22

federal regulatory exemption refers only to peyote, and not to mescaline. The Plaintiffs maintain that "[i]f the listing of a substance encompasses all plants that contain the substance, then the exemption for peyote alone is meaningless: the [Native American Church] would violate the CSA at each of its ceremonies by using a plant that contains 'mescaline.'" Memorandum in Support of Motion for Preliminary Injunction, at 33. The Government has effectively countered the Plaintiffs' argument by pointing out that a member of the Native American Church would not violate the CSA by using peyote, even if peyote contains mescaline, because the federal regulatory exemption explicitly permits church members to use peyote.

Because the plain language of the CSA clearly indicates that the statute's prohibition on DMT extends to hoasca, and because the application of the statute does not result in absurdity or in internal contradictions, this Court concludes that hoasca is an illegal substance under the CSA.

### C.      PLAINTIFFS' CLAIMS UNDER INTERNATIONAL LAW OF COMITY

This Court's conclusion that the language of the CSA is unambiguous, with respect to the statute's application to the use of hoasca by the UDV, resolves another of the Plaintiffs' claims. The Plaintiffs contend that the international law doctrine of comity suggests that the government should not interfere with the UDV's religious consumption of hoasca. Comity is "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *In the Matter of The Colorado Corp. v. Lam*, 531 F.2d 463, 468 (10th Cir. 1976), quoting *Hilton v. Guyot*, 159 U.S. 113 (1895). The United States Supreme Court has observed that "[c]omity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases

23

touching the laws and interests of other sovereign states." *Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa*, 482 U.S. 522, 543 n. 27 (1987).

The Plaintiffs stress that courts have recognized a "canon of statutory construction that requires courts, whenever possible, to construe federal statutes to ensure their application will not violate international law." *Commodity Futures Trading Commission v. Nahas*, 738 F.2d 487, 493 (D.C. Cir. 1984), citing *Murray v. The Schooner Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 200 (1804) ("[A]n act of congress ought never to be construed to violate the law of nations, if any other possible construction remains.") See also, e.g., *Grunfelder v. Heckler*, 748 F.2d 503, 509 (9th Cir. 1984) ("Absent an expression of congressional intent to the contrary, considerations of courtesy and mutuality require our courts to construe domestic legislation in a way that minimizes interference with the purpose or effect of foreign law.")

The Plaintiffs argue that allowing the Government to prohibit the UDV's ceremonial use of hoasca would conflict with Brazilian law and with a number of international treaties.[5] As Dr. Brito testified during the evidentiary hearing, Brazil permits members of the UDV to consume hoasca for religious reasons. The Plaintiffs also emphasize that international agreements to which the United States is a party, such as the United Nations International Covenant on Civil and Political Rights, pledge support for freedom of religious beliefs and practices. Moreover,

---

[5] The Plaintiffs do not appear to argue that any treaty explicitly or directly requires that the United States refrain from prohibiting the religious use of hoasca. Rather, the Plaintiffs seem to contend that the Government's interpretation of the CSA to apply even to the sacramental consumption of hoasca is inconsistent with general principles of international religious freedom that are reflected in treaties to which the United States is a signatory. Therefore, this Court has not conducted an inquiry into the issue of whether, for example, a later-enacted treaty would trump the ban on DMT contained in the CSA.

24

Plaintiffs direct attention to the International Religious Freedom Act, 22 U.S.C. § 6401-6481, enacted in 1998, which, Plaintiffs say, further reflects Congressional commitment to the promotion of religious freedom throughout the world.[6] According to the Plaintiffs, permitting the ceremonial use of hoasca would "not only show comity to, and enhance our relations with, [Brazil], but will also demonstrate our government's willingness to give appropriate respect to a multi-cultural international community generally." Memorandum in Support of Motion for Preliminary Injunction, at 44.

Even assuming that principles of international law would favor construing an *ambiguous* controlled substances statute to allow the religious use of hoasca, this Court believes that the CSA does not leave room for the interpretation the Plaintiffs request. As the United States Court of Appeals for the District of Columbia Circuit eloquently stated in *Nahas*, "[f]ederal courts must give effect to a valid, unambiguous congressional mandate, even if such effect would conflict with another nation's laws or violate international law." 738 F.2d at 495. The sources cited by the Plaintiffs for the proposition that a domestic law should not be interpreted to conflict with international law, such as the *Murray* and *Grunfelder* cases, 6 U.S. 64 and 748 F.2d at 509, assume that the domestic law lends itself to more than one interpretation. In this case, the Court has found that, under the plain language of the CSA, the statute's ban on DMT clearly extends to hoasca. Comity is not an "absolute obligation," *Colorado Corp.*, 531 F.2d at 468, quoting *Hilton*, 159 U.S., and this Court cannot rely on the comity principle to disregard a clear statement from Congress on a matter of domestic law.

---

[6]     However, as the Plaintiffs acknowledge, Congress passed this statute to address threats to religious freedom occurring in countries other than the United States.

D.    RELIGIOUS FREEDOM RESTORATION ACT CLAIM

In Section III(A) above, this Court evaluated the Plaintiffs' Free Exercise claim in light of the Supreme Court's holding in *Smith* that "the right to free exercise of religion does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability," even if that law incidentally burdens the practice of religion.  *United States v. Meyers*, 95 F.3d 1475, 1480 (10th Cir. 1996), citing *Smith*, 494 U.S. 872.  Because this Court concluded that the CSA was neutral and generally applicable, the Court found that the Plaintiffs were not entitled to a preliminary injunction on their First Amendment claim.

However, the Plaintiffs also raise a religious freedom claim that has a statutory, rather than Constitutional, basis.  Following the Supreme Court's decision in *Smith*, Congress enacted the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb.  In the "Congressional findings and declaration of purposes" section of the statute, Congress criticized the Supreme Court's holding in *Smith* and stated that RFRA was intended "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)."  RFRA provides that:

> Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person–
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb-1(b).[7]

In order to state a *prima facie* claim under RFRA, a plaintiff must show "(1) a substantial burden imposed by the federal government on a (2) sincere (3) exercise of religion." *Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001). If the plaintiff meets "the threshold requirements by a preponderance of the evidence, the burden shifts to the government to demonstrate that the challenged regulation furthers a compelling state interest in the least restrictive manner." *Meyers*, 95 F.3d at 1482. In this case, the Government did not dispute, for purposes of the Plaintiffs' motion for preliminary injunction, that the Plaintiffs had established a *prima facie* case under RFRA. Stated differently, the government conceded, at this point in the course of the case, that the CSA imposes a substantial burden on Plaintiffs' sincere exercise of religion. Hence, the hearing began with the Government shouldering the weighty load thrust upon it by Congress in passing RFRA.

### 1. COMPELLING GOVERNMENTAL INTERESTS

The Government asserts that it "has at least three compelling interests in prohibiting the importation and use of DMT-containing substances, all of which are implicated by the UDV's religious use of ayahuasca." Response, at 15. The Government has alleged a compelling interest in 1) adhering to the 1971 Convention on psychotropic substances; 2) preventing the health and safety risks posed by hoasca; and 3) preventing the diversion of hoasca to non-religious use.

Before turning to a specific analysis of whether the Government has met its burden of

---

[7]     In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Supreme Court declared RFRA unconstitutional as applied to state governments. However, the Tenth Circuit has held that "RFRA as applied to the federal government is severable from the portion of RFRA declared unconstitutional in *Flores*, and independently remains applicable to federal officials." 242 F.3d 950, 960 (10th Cir. 2001).

establishing a compelling interest, this Court notes that there are two significant distinctions between the present case and many other cases in which individuals have challenged drug laws on religious freedom grounds. First, as observed above, the Government concedes for purposes of this motion that the UDV is a religion, that the Plaintiffs sincerely believe in the tenets of the UDV religion, and that the application of the CSA to the UDV's ceremonial use of hoasca substantially burdens the Plaintiffs' practice of their religion. In contrast, courts in other RFRA cases concerning drugs have sometimes found that the plaintiff's religious beliefs do not constitute religious beliefs, or that the plaintiff does not sincerely hold the beliefs, or that the government's action does not actually substantially burden the plaintiff's religious practice.

*United States v. Meyers*, 95 F.3d 1475 (10th Cir. 1996) involved a criminal defendant who moved under RFRA to dismiss the marijuana charges brought against him. Mr. Meyers "testified that he is the founder and Reverend of the Church of Marijuana and that it is his sincere belief that his religion commands him to use, possess, grow and distribute marijuana for the good of mankind and the planet earth." Id. at 1479. The Tenth Circuit considered whether Mr. Meyers's convictions were "religious beliefs," or whether the convictions instead amounted to "a philosophy or way of life." Id. at 1482. The Tenth Circuit adopted the district court's finding that, in light of the secular nature of Mr. Meyers's views on the medical, therapeutic, and social benefits of marijuana, "Meyers' beliefs more accurately espouse a philosophy and/or way of life rather than a 'religion.'" Id. at 1484.

In *United States v. Bauer*, 84 F.3d 1549, a Ninth Circuit case, three criminal defendants sought to rely on RFRA in defending against a number of marijuana charges. The defendants were adherents to the Rastafarian religion, in which marijuana is a sacrament. The *Bauer* court

28

emphasized that the availability of RFRA as a defense to the various marijuana charges hinged on whether each particular criminal provision burdened the practice of Rastafarianism. The Ninth Circuit found that the district court had erred in prohibiting the defendants from using RFRA as a defense to simple possession charges. Id. at 1559. However, "[a]s to the counts relating to conspiracy to distribute, possession with intent to distribute, and money laundering, the religious freedom of the defendants was not invaded" because "[n]othing before [the court] suggests that Rastafarianism would require this conduct." Id. In a more recent Ninth Circuit case, the court cited *Bauer* in holding that a criminal defendant could not draw on RFRA to defend against charges brought under a Guam statute prohibiting the importation of controlled substances. *Guam v. Guerrero*, 290 F.3d 1210 (9th Cir. 2002). The *Guerrero* court noted that it was "satisfied that Rastafarianism does not require *importation* of a controlled substance." Id. at 1223.

There is a second major distinction between the present case and the cases involving claims that the principles of religious freedom reflected in the Free Exercise Clause and RFRA should be interpreted as permitting the sacramental use of marijuana. This distinction stems from the significant differences in the characteristics of the drugs at issue. Affirming a trial court's denial of a criminal defendants' request to rely in RFRA as a defense to marijuana charges, the Eighth Circuit stated "that the government has a compelling state interest in controlling the use of marijuana." *United States v. Brown*, 72 F.3d 134 (8th Cir. 1995) (table). As support for this observation, the *Brown* court cited a number of First Amendment opinions which had emphasized problems associated with marijuana in particular. See, e.g., *United States v. Greene*, 892 F.2d 453, 456-57 (6th Cir. 1989) ("Every federal court that has considered this

issue has accepted Congress' determination that marijuana poses a real threat to individual health and social welfare and had upheld criminal penalties for possession and distribution even where such penalties may infringe to some extent on the free exercise of religion."); *United States v. Middleton*, 690 F.2d 820, 825 (11th Cir. 1982), quoting *Leary v. United States*, 383 F.2d 851, 860-61 (5th Cir. 1967) ("It would be difficult to imagine the harm which would result if the criminal statutes against marihuana were nullified as to those who claim the right to possess and traffic in this drug for religious purposes.")

The parties in this case have presented a great deal of evidence on the issue of whether the United States has a compelling interest in prohibiting the UDV's religious use of hoasca. Of course, regardless of what this evidence might suggest regarding the dangers associated with hoasca, the Court cannot ignore that the legislative branch of the government elected to place materials containing DMT in Schedule I of the CSA, reflecting findings that substances containing DMT have "a high potential for abuse," and "no currently accepted medical use in treatment in the United States," and that "[t]here is a lack of accepted safety for use of [DMT] under medical supervision." 21 U.S.C. § 812(b)(1). Discussing another statute concerning controlled substances, the Supreme Court once noted, "[w]hen Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation, even assuming, arguendo, that judges with more exposure to the problem might make wiser choices." *Marshall v. United States*, 414 U.S. 417, 427 (1974). More recently, the Supreme Court's opinion in *United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 493 (2001) suggested that courts should accord a great deal of deference to Congress's classification scheme in the CSA.

30

The Government argues that "Congress has made an affirmative statutory declaration that materials containing DMT . . . are unsafe." Response, at 27-28. If this Court were employing a more relaxed standard to review the application of the CSA to the UDV's use of hoasca, it would be very reluctant to question this Congressional finding concerning DMT. However, the Plaintiffs are relying on RFRA, a more recent legislative enactment by Congress, to challenge the extension of the CSA's ban on DMT to the UDV's religious consumption of hoasca. Under RFRA, Congress mandated that a court may not limit its inquiry to general observations about the operation of a statute. Rather, "a court is to consider whether the '*application* of the burden' to the claimant 'is in furtherance of a compelling governmental interest' and 'is the least restrictive means of furthering that compelling governmental interest.' 42 U.S.C. § 2000bb-1(b) (emphasis added)." *Kikumura*, 242 F.3d at 962. In *Kikumura*, a case in which a federal prisoner was challenging a decision made by prison officials, the Tenth Circuit Court of Appeals noted that "under RFRA, a court does not consider the prison regulation in its general application, but rather considers whether there is a compelling government reason, advanced in the least restrictive means, to apply the prison regulation to the individual claimant." Id.

RFRA requires that the Government "demonstrate[]" its compelling interest and its use of the least restrictive means to accomplish that interest. In enacting RFRA, Congress explicitly stated that "the term 'demonstrates' means meets the burdens of going forward with the evidence and of persuasion." 42 U.S.C. § 2000bb-2. This Court concludes that the Government has fallen short of meeting its difficult burdens, which Congress requires. The Government has not shown that applying the CSA's prohibition on DMT to the UDV's use of hoasca furthers a compelling

31

interest.[8]  This Court cannot find, based on the evidence presented by the parties, that the

Government has proven that hoasca poses a serious health risk to the members of the UDV who

drink the tea in a ceremonial setting.  Further, the Government has not shown that permitting

members of the UDV to consume hoasca would lead to significant diversion of the substance to

non-religious use.  The Court bases its determinations on the following facts.

a.      HEALTH RISKS TO MEMBERS OF THE UDV

The consumption of hoasca tea plays a central role in the practice of the UDV religion.

Decl. of Jeffrey Bronfman, Exh. A. to Pltf. Mot. for Prelim. Inj., at 13.  Hoacsa is a sacrament in

the UDV.  Church doctrine instructs that members can fully perceive and understand God only

by drinking the tea.  Pltf. Exh. 21, Decl. of David Lenderts, at 4.  UDV members drink hoasca

only during regular religious services, held on the first and third Saturdays of every month and

on ten annual holidays.  Decl. of Bronfman, at 8.  A church leader called a "directing mestre"

generally conducts the service.  Id. at 9.  Ceremonies start at 8 p.m. and last for about four hours.

Id. at 8-10.  The mestre begins the service by distributing measured glasses of tea to each

participant.  Id. at 10.  Activities during UDV services include the recitation of church law by

selected congregants, the singing of sacred chants by the mestre, question-and-answer exchanges

between the mestre and participants, and a period of religious teaching led by the mestre.  Id. at

---

[8]      The Tenth Circuit has very recently observed that "[w]hether something qualifies
as a compelling interest is a question of law." *United States v. Hardman*, No. 99-4210, 2002 WL
1790584, at *8 (10th Cir. Aug. 5, 2002), citing *Citizens Concerned About Our Children v.
School Bd.*, 193 F.3d 1285, 1292 (11th Cir. 1999); *Concrete Works of Colo., Inc. v. City and
County of Denver*, 36 F.3d 1513, 1522 (10th Cir. 1994).  However, in this case, there does not
seem to be a dispute between the parties over whether, in the abstract, the federal government
has a compelling interest in protecting the health and safety of people in the United States.
Rather, the parties have focused their arguments on the issue of whether the Government has met
its very heavy burden of showing that applying the CSA to the UDV's consumption of hoasca
*furthers* the Government's stated interests.

10.

Hoasca is brewed from two plants indigenous to the Amazon River Basin–

*Banisteriopsis caapi* and *Psychotria viridis*. Pltf. Exh. 11, Decl. of Charles Grob, at 7.

*Psychotria* contains dimethyltryptamine (DMT), a hallucinogenic chemical. Id. By itself,

*psychotria* does not trigger an altered state of consciousness when taken orally, because

monoamine oxidase (MAO) enzymes in the digestive system inactivate the DMT *psychotria*

contains. Id. However, *banisteriopsis* contains harmala alkaloids, known as beta-carbolines,

that inhibit MAO's and prevent the inactivation of DMT. Id.; Deft. Exh. ZZ, Rpt. of Sander

Genser, at 6. Ingesting the combination of *psychotria* and *banisteriopsis* allows DMT to reach

levels in the brain sufficient to produce a significantly altered state of consciousness. Deft. Exh.

ZZ, Rpt. of Genser, at 6.

Scientists have devoted little research to the physical and psychological effects of

ceremonial hoasca consumption. Id. The lack of knowledge about hoasca, relative to many

other substances, forms the core of the dispute between the parties in this case. The Plaintiffs'

experts and the Government's experts have offered differing interpretations of preliminary data,

conflicting views on the value of comparisons between hoasca and other hallucinogenic drugs,

and contrasting evaluations of whether certain findings signify risks associated with hoasca use.

Ultimately, the Plaintiffs contend that evidence does not exist, to a reasonable degree of

scientific certainty, to conclude that the UDV's religious use of hoasca carries any significant

health risk. See, e.g., Hrg. Tr. at 207-08, testimony of Grob. The Government, in contrast,

maintains that existing evidence suggests that the ingestion of hoasca poses substantial health

concerns. See, e.g., Deft. Exh. ZZ, Rpt. of Genser, at 5.

33

During the evidentiary hearing, the Plaintiffs presented the testimony of Dr. Charles Grob, Professor of Psychiatry at the University of California, Los Angeles. In 1993, Dr. Grob led a team of researchers in conducting a study of the effects of hoasca use on UDV members in Brazil. The study compared fifteen long-term members of the UDV, who had drunk hoasca for several years, with fifteen control subjects who had never used hoasca. Pltf. Exh. 11, Decl. of Grob, at 9-10. The researchers administered personality tests, psychiatric interviews, neuropsychological tests, and physical examinations to all of the subjects in the study. In addition, the subjects in the experiment group completed a hallucinogen rating scale questionnaire after they had participated in an hoasca ceremony. Researchers also conducted life story interviews with the members of the experimental group. Id.

The investigators reported their findings in a number of articles published in scientific journals. While acknowledging that the study was only preliminary, the researchers' overall assessment of the safety of hoasca use in the UDV was positive. Discussing the study, Dr. Grob stated that, despite its limitations, "our investigation did identify that in a group of randomly collected male subjects who had consumed ayahuasca for many years, entirely within the context of a very tightly organized syncretic church, there had been no injurious effects caused by their use of ayahuasca. On the contrary, our research team was consistently impressed with the very high functional status of the ayahuasca subjects." Pltf. Exh. 12, 2nd Decl. of Grob, at 1. Of particular interest to the researchers was that in the life story interviews, many of the experimental subjects reported that they had engaged in self-destructive behavior before joining the UDV and that their experiences in the UDV had allowed them to lead responsible, meaningful lives. Pltf. Exh. 11, Decl. of Grob, at 12-13.

The Government has criticized the Plaintiffs' reliance on the 1993 hoasca study to show

the safety of hoasca use. From a methodological standpoint, the Government's experts maintain,

the hoasca study has many limitations. For example, the study employed a small sample size,

the study included only male subjects, and the study provided no baseline data that researchers

could use to compare information about subjects before and after participation in the hoasca

rituals of the UDV. Deft. Exh. JJJ, Rpt. of Alexander Walker, at 6-8; Deft. Exh. ZZ, Rpt. of

Genser at 6; Hrg. Tr. at 867-68, testimony of Genser; Hrg. Tr. at 743, testimony of Lorne

Dawson.

The Government has also questioned whether long-time members of the UDV can be

considered representative of UDV members in general. Dr. Alexander Walker, a Professor of

Epidemiology at the Harvard School of Public Health, has expressed the view that selection bias

undermined the value of the results generated through the hoasca study:

> According to Dr. Grob and his coinvestigators, UDV adherents abstain from
> alcohol and other intoxicating substances, they maintain high standards of
> responsibility to family and society, they are diligent, and they are respectful of
> their church's leadership. In selecting long-term members of the UDV as their
> study group, the Hoasca Project team necessarily included persons who were able
> to conform to the church's precepts over extended periods. There was no similar
> requirement for stable, long-term, willing church attendance in the comparison
> group. By itself, this one omission ensured that the *hoasca*-consuming group
> would have a favorable psychological profile.

Deft. Exh. JJJ, Rpt. of Walker at 6. Dr. Lorne Dawson, the Government's expert on religion,

testified that restricting the sample to long-term, committed church members also creates

methodological concerns because of problems that generally accompany the collection of

conversion accounts in the sociology of religion. Dr. Dawson explained that:

[C]onversion accounts, for example, almost always involve some kind of a somewhat exaggerated statement of what their preconversion life was like in terms of the sinfulness, perhaps, of their life or the ways in which they engaged in harmful behavior or abused substances, as in this case. There is a tendency to exaggerate how bad one's life was before they joined the group. Then too, perhaps they also exaggerate how good life is now that they have joined the group or been involved with the group.

Hrg. tr. at 745-46. Dr. Dawson stated that a superior sample would include people who have belonged to the church for a short time and people who have left the church under a range of circumstances, in addition to long-time church members. Id. at 746-47.

In addition to pointing out the methodological limitations of the 1993 hoasca study, the Government has articulated a number of concerns regarding the UDV's ceremonial consumption of hoasca. Dr. Sander Genser,[9] one of the Government's experts, stated in his report that "existing studies have raised flags regarding potential negative physical and psychological effects" of hoasca. Deft. Exh. ZZ, Rpt. of Genser, at 8. Some concerns derive from potential dangers associated with DMT, hoasca's main psychoactive component. For example, Dr. Genser has cited a study in which Dr. Rick Strassman administered intravenous DMT to test subjects. Two subjects experienced such a high rise in blood pressure that Dr. Strassman determined that researchers should not include individuals with a history of hypertension in studies of DMT. Id. Another of the subjects in Dr. Strassman's study suffered a recurrence of depression. Id.

According to Dr. Genser, concerns about the safety of hoasca stem not just from information known about other forms of DMT, but also from information known about other

---

[9]     Dr. Genser is the Chief of the Medical Consequences Unit of the Center on AIDS and Other Medical Consequences of Drug Abuse at the National Institute on Drug Abuse, National Institutes of Health.

types of hallucinogenic substances. Id. Dr. Genser has listed a broad range of adverse

neuropsychological effects that have been linked to hallucinogen use. For instance, Dr. Genser

has described some dangers associated with lysergic acid diethylamide (LSD), another

hallucinogenic substance that shares pharmacological properties with DMT. Id. at 8-10

Particularly in individuals with pre-existing psychopathology, LSD may produce prolonged

psychotic reactions. Id. at 9. Users of LSD may also be at risk for developing persisting

perpetual disorder, known as "flashbacks," in which individuals reexperience the effects of LSD

at times when they are not actually under the influence of the drug. Id. at 9-10.

The Plaintiffs dispute that evidence concerning intravenous DMT and evidence about

hallucinogens other than DMT represent strong indications that the UDV's ceremonial hoasca

use carries significant risk. With respect to the studies of intravenous DMT, the Plaintiffs'

experts have emphasized that differences in the method of the administration of DMT translate

into important differences in how the drug is experienced. Intravenous DMT has a much more

rapid onset, and its effects are of much shorter duration, than hoasca taken orally. Dr. David

Nichols, Professor of Medicinal Chemistry and Molecular Pharmacology at Purdue University,

has observed that "[o]rally ingested hoasca produces a less intense, more manageable, and

inherently psychologically safer altered state of consciousness." Pltf. Exh. 24, Decl. of Nichols,

at 7; see also Pltf. Exh. 12, 2nd Decl. of Grob, at 2. Further, Dr. Nichols has questioned whether

Strassman's study suggests that even intravenous DMT causes hypertension. At the evidentiary

hearing, Dr. Nichols testified that "if you look at the pharmacology of DMT, there aren't

serotonin site receptors in the heart and cardiovascular system that would normally produce life-

threatening cardiovascular changes," and that in the case of the hypertension reported by

37

Strassman, "one could argue that that response was related to the stress of the high dose." Hrg. Tr. at 1145.

Regarding the Government's evidence about the risks presented by other hallucinogens, such as LSD, the Plaintiffs have noted the lack of evidence connecting hoasca use with flashbacks. Dr. Grob has stated that "[m]y medical colleagues in the UDV inform me that they have never received a report of persisting perpetual disorder ("flashbacks") induced by ayahuasca," and that "I have also heard of no such report from any other source." Pltf. Exh. 12, 2nd Decl. of Grob, at 3. As to other negative neuropsychological effects identified with the use of hallucinogenic drugs, the Plaintiffs have pointed to distinctions between hoasca and other hallucinogens that may reduce the possibility that hoasca would induce adverse reactions. The Plaintiffs note, for example, that the duration is shorter and the intensity more mild for hoasca experiences, as compared to some other classic hallucinogens. Pltf. Exh. 12, 2nd Decl. of Grob, at 3.

Further, the Plaintiffs emphasize that the circumstances under which an individual takes a hallucinogenic drug, the "set and setting," are crucial in determining the kind of experience that the individual has. See, e.g., Hrg. Tr. at 1182-83, testimony of Nichols. Referring to the 1993 hoasca study, Dr. Grob has commented that "[i]t was the consistent observation by members of our research team that the UDV had constructed a ceremonial structure for their ritual use of hoasca that optimized safety and minimized the likelihood of adverse consequences." Pltf. Exh. 11, Decl. of Grob, at 5. The Plaintiffs call attention to the fact that the UDV employs a range of measures− from screening new church members for psychological instability to observing members for problems during church ceremonies− to protect the safety of individuals ingesting

hoasca. Id.

Along with evidence about DMT and other hallucinogens in general, the Government has presented evidence more specific to the hoasca ingested in the UDV. Both parties have devoted a substantial amount of attention to a potential danger acknowledged even by the Plaintiffs– adverse drug interactions. This danger stems from the presence of the component of hoasca contributed by *banisteriopsis*– beta carbolines. Deft. Exh. ZZ, Rpt. of Genser, at 11. Individuals who drink hoasca while on certain medications may be at increased risk for developing serotonin syndrome, a condition characterized by excessive levels of the neurotransmitter serotonin. For example, several types of antidepressants, such as Prozac, contain selective serotonin reuptake inhibitors (SSRI's). SSRI's trigger the release of serotonin or prevent its reuptake. Hrg. tr. at 253, testimony of Grob. Monoamine oxidase inhibitors interfere with the metabolization of serotinin, and as described above, hoasca has MAO-inhibiting effects. Pltf. Exh. 11, Decl. of Grob, at 6. Drinking hoasca while on an SSRI might create a dangerous interaction, because the MAOI's in hoasca would hinder the metabolization of the greater levels of serotonin made available through the use of the SSRI. In discussing the risk of serotonin syndrome, the Government's experts noted that "irreversible" MAO inibitors– those that "bind to an MAO molecule and destroy its function forever"– may interact harmfully with a number of medicines, as well as with a chemical found in some common foods. Govt. Exh. ZZ, Rpt. of Genser, at 12. Irreversible MAO inhibitors are often present in anti-depressant medications. Id.

Although the Plaintiffs concede that adverse drug interactions represent a risk connected with hoasca use, they dispute that the risk is so substantial as to require the Government to prohibit the religious consumption of the tea. The Plaintiffs' experts have cited the following

39

reasons for arguing that the Government has overstated the danger of adverse drug interactions involving hoasca. First, the Plaintiffs maintain that hoasca does not contain *irreversible* MAO inhibitors, the type associated with the most severe drug interactions. Dr. Grob has written that that "[u]nlike pharmaceutical MAOI's . . . the MAOI effect in ayahuasca is relatively mild, with comparatively lesser degrees of risk for dangerous interactions." Pltf. Exh. 12, 2nd Decl. of Grob, at 2. Dr. Grob has indicated that in the cases of reactions between ayahuasca and SSRI's with which he is familiar, "the duration of the event was relatively brief when compared to more severe cases of serotonin syndrome caused by combinations of SSRIs and pharmaceutical irreversible MAOIs." Id. Similarly, Dr. Nichols testified for the Plaintiffs that "the possibility of physiological consequences with the reversible MAO inhibitors is much reduced when compared with the irreversible." Hrg. tr. at 1219.

Second, the Plaintiffs have placed great emphasis on the attention that UDV leadership has paid to the danger of adverse drug interactions. Dr. Grob and his colleague, Dr. J.C. Callaway, first identified the potential for negative interactions between hoasca and SSRI's in a scientific article published in 1998. Pltf. Exh. 12, 2nd Decl. of Grob, at 2; Callaway, J.C. & Grob, C.S. (1998). Ayahuasca Preparations and Serotonin Reuptake Inhibitors: A Potential Combination of Severe Adverse Interaction. *J. Psychoactive Drugs, 30.* Deft. Exh. KK. Dr. Grob has testified that the UDV has been receptive to concerns about adverse drug reactions. He wrote in his second declaration that "[f]ollowing discussions of our concerns with physicians of the UDV, all prospective participants in ceremonial hoasca sessions have been carefully interviewed to rule out the presence of ancillary medication that might induce adverse interactions with hoasca." Pltf. Exh. 12, 2nd Decl. of Grob, at 6. See also Hrg. tr. at 254.

Finally, the Plaintiffs have attempted to downplay the risk of adverse reactions posed by hoasca use, contending that serotonin syndrome is quite rare and is not experienced by all individuals who ingest hoasca while taking SSRI's. Hrg. tr. at 442-46, testimony of Glaucus Brito. The Plaintiffs have portrayed the risk of serotonin syndrome associated with hoasca as falling within the normal spectrum of concerns with drug interaction. They point out that Government expert Dr. Genser stated, during the hearing, that he would be more troubled by a person drinking grapefruit juice while taking a contraindicated drug than by a UDV member taking hoasca in a ceremonial context. Hrg. tr. at 964.

The Government has identified other indications that the UDV's hoasca use is not as safe as the Plaintiffs claim. Data collected by DEMEC, the medical-scientific department of the Brazilian UDV, raises particular concern. Since 1996, DEMEC has gathered reports of cases of psychological problems experienced by church members from the three most heavily populated regions of Brazil. Hrg. tr. at 425-26, testimony of Brito. The organization's records include retrospective reports of cases that had occurred in the five years prior to 1996. Id. at 425. The DEMEC documents disclose that there have been 24 incidents of psychosis among users of hoasca in church ceremonies. Dr. Glaucus Brito, the director of DEMEC, testified that "[o]ut of these 24 cases, we have one in which the tea acts as a trigger with no prior occurrences, and then we have seven in which the tea acted as a resharpening mechanism for . . . a prior mental condition that was not identified, but it was identified during the course of the investigation by the psychiatrist." Hrg. tr. at 424-25. Dr. Brito went on to explain that "out of these 24, there were 11 in which there was no relationship whatsoever between the event and the use of the tea." Id. at 425.

41

Dr. Genser has stated that the information contained in the DEMEC reports reinforces his belief that hoasca use in the UDV presents a significant risk of psychotic incidents. Dr. Genser testified that among the range of possible physical and psychological effects that could be associated with hoasca use, "psychosis is definitely of most concern," in terms of both severity and likelihood. Hrg. tr. at 960-61. Even if the percentage of psychotic episodes reported among UDV members was on the low end of the average range for the general Brazilian population, he explained:

> I would still be concerned because from all of the descriptions I have read, Dr. Brito's deposition, the UDV, the DEMEC documents, Mr. Bronfman's deposition, the UDV screens out a certain number of people with vulnerabilities to psychosis and provides an environment that tends to encourage healthier behaviors and healthier life-styles and provides a level of social connectedness for the individual that— it's generally greater than the average member of the general population. All of those factors would, I believe, tend to lower the expected incidence of psychosis a good bit below that in the general population. So the fact that the incidence of psychosis is still within range of the general population, in combination with the fact that a number of those incidents reported are attributed to the hoasca really strengthened my concern about the hoasca.

Hrg. tr. at 862-63. Dr. Genser also stated that he would expect that cases of psychosis would be underreported to the DEMEC monitoring system. Hrg. tr. at 861.

The Plaintiffs deny that available evidence suggests that hoasca use is likely to cause severe psychotic events. Discussing the DEMEC documents, Dr. Grob commented that many of the reported psychiatric problems "were relatively transient in nature and resolved." Hrg. tr. at 251-52. In the "few cases of very serious mental illness," the individuals "appeared to have . . . long-standing problems insofar as their mental function." Id. at 252. Dr. Grob doubted whether hoasca was a "key precipitant" in several of the reported episodes— "in many of these cases the hoasca seemed to be just coincidental to it." Id. In addition, Dr. Grob noted that "given how

42

many people participate and how many years they have been trying to collect such data," the reports represent "a very small number of cases." Id. at 252-53.

The Plaintiffs presented the testimony of Dr. Brito in support of their argument that the rate of reported psychosis among UDV members in Brazil does not exceed the rate of psychosis in the general population. About one percent of the world's population is believed to be schizophrenic. Hrg. tr. at 439. The DEMEC records were generated from observations of about 1,400 to 1,500 individuals participating in UDV ceremonies. Id. at 438. If 13 of these people experienced psychotic episodes linked in some way to hoasca, this would represent only .9 percent of the observed participants. Id. Dr. Brito stressed that the figure of .9 percent is based on conservative methods of calculation. Id. at 439-440. If the 1,400 people observed were drinking the tea twice a month during the years for which data was collected, calculating the number of psychotic events per number of hoasca exposures would result in a smaller percentage. Id.

The Government argues that research on UDV members suggests that hoasca may have negative physical effects as well as negative psychological effects. During the 1993 hoasca study, investigators found that eight of the fifteen subjects in the test group had cardiac irregularities, while only one subject in the control group had such irregularities. Hrg. tr. 504-05, testimony of Brito. The Plaintiffs counter that cardiac alterations detected are not necessarily linked with heart disease. For example, four of the eight test subjects had bradychardia, or slow heartbeat, a condition that is associated with young athletes as well as people with certain types of heart disease. Hrg. tr. at 504, testimony of Brito; Hrg. tr. at 878-79, testimony of Genser.

In discussing his concerns about hoasca use in his expert report, Dr. Genser cited a recent

43

study conducted by Jordi Riba. J. Riba, et al. (2001). Subjective Effects and Tolerability of the South American Beverage Ayahuasca in Healthy Volunteers. *Psychopharmacology, 154*, 85-95. Deft. Exh. BBB. The researchers administered encapsulated ayahuasca, in increasing doses, to six volunteers. Riba and his colleagues reported that "one volunteer experienced an intensely dysphoric reaction with transient disorientation and anxiety at the medium dose and voluntarily withdrew from the study." Id. The Plaintiffs have questioned the applicability of the Riba study to an evaluation of the risks presented by the UDV's ceremonial consumption of hoasca. The Plaintiffs have observed that the concentrations of DMT and beta-carbolines in the ayahuasca capsules administered by Riba were stronger than the concentrations in the hoasca seized from the UDV. See Hrg. tr. at 871. The Plaintiffs also emphasize that the Riba study did not take place within a religious context, and that the anxiety experienced by the one test subject was only transient in nature. Id. at 875-76.

In considering the evidence submitted by the parties, this Court has been struck by the closeness of the questions of fact presented in this case. The Court has no doubt that in other contexts, the risks that the Government has identified would be sufficient to support a decision against allowing individuals to consume hoasca pending further study of the substance. Indeed, even the scientific experts testifying on behalf of the Plaintiffs appear to recognize the need for additional research into the health consequences of ceremonial hoasca use.

However, in this case, the Plaintiffs have raised a claim under a powerful statute passed by Congress specifically to override a ruling by the Supreme Court of the United States. The Government concedes, at this stage, that application of the CSA to the UDV's use of hoasca imposes a substantial burden on the practice of the Plaintiffs' religion. By passing RFRA,

44

Congress required the Government to justify this imposition with a showing of a compelling government interest. As to the subject of health risks, the evidence presented by the parties is, essentially, in equipoise. This Court cannot find, in light of the closeness of the evidence, that the Government has successfully carried its onerous burden on the issue of health risks to UDV members.

b.    POTENTIAL FOR DIVERSION TO NON-RELIGIOUS USE

The Government alleges that it has a compelling interest not just in protecting the physical and psychological health of the UDV members who wish to consume hoasca, but also in ensuring of the safety of individuals who might ingest hoasca in a non-ceremonial environment. If the UDV were allowed to use hoasca in its church services, the Government argues, the tea could be diverted to potentially harmful uses in non-religious, unsupervised settings. In contrast, the Plaintiffs take the position-- as articulated by their expert witness, Dr. Mark Kleiman-- that "[t]here is no currently available evidence to suggest that such [diversionary] effects, were they to occur, would be large." Pltf. Exh. 16, decl. of Kleiman, at ¶ 29.

The Government's analysis hinges on the factual premise that the hoasca used by the UDV would be vulnerable to diversion. To help establish this premise, the Government presented the expert opinions of Terrance Woodworth, Deputy Director of the Drug Enforcement Administration's Office of Diversion Control. Mr. Woodworth identified "several factors that are relevant to the assessment of a controlled substance's potential for diversion," including "the existence of an illicit market for the substance, . . . the existence of 'marketing' or publicity about the substance, and the form of the substance." Deft. exh. ZZZ, Rpt. of Terrance

45

Woodworth, at 3. In addition, Mr. Woodworth stated, "[a] substance's potential for diversion is also affected by the opportunity for, and the cost of, diverting the substance, . . the level of control placed upon the substance, the form of the substance, and the degree to which the substance is in movement from place to place." Id. at 3-4.

The Government contends that the extent of the illicit market for hoasca would be determined, in large part, by whether hoasca has a significant potential for abuse. Dr. Donald Jasinski, one of the Government's expert witnesses, addressed this question from the pharmacological standpoint.[10] He expressed the opinion that the risk of abuse associated with hoasca is substantial. He supports his conclusion by pointing first to evidence about the reinforcing effects of DMT and hoasca. Positive reinforcing effects "are the transient alterations in mood, thinking, feeling, and perceptions produced by [a] drug," and these "effects include elevation in mood, pleasant thoughts, feelings of well being and relation, and perceptions that surroundings were more pleasant." Deft. Exh. VVV, Rpt. of Jasinski, at 7-8. These positive effects, called "euphoria," are the primary factors leading individuals to begin using, and to continue to use repeatedly, a drug of abuse. Id.

Dr. Jasinski noted that research on intravenous DMT indicates that the substance produces euphoric effects. In Strassman's study, the investigators "described the onset of psychological effects within two minutes with effects completely resolved within 30 minutes with transient anxiety common, replaced by euphoria." Deft. Exh. VVV, Rpt. of Jasinski, at 9. To the extent that preliminary research has been performed on ayahuasca, it appears that the substance induces effects similar to those created by DMT, "although the effects are slower in

---

[10]     Dr. Jasinski is a Professor of Medicine at the Johns Hopkins School of Medicine.

onset, milder in intensity, and longer in duration." The reported effects of ayahuasca "include

pleasant feelings and elevations in mood as well as dysphoric (i.e., anxiety-producing) changes."

Id.

Dr. Jasinski discussed not only the effects which suggest that hoasca would be subject to

abuse, but also some effects which might seem to limit hoasca abuse. In particular, hoasca

consumption often causes nausea and vomiting. While acknowledging that these effects may act

as a deterrent to some individuals, Dr. Jasinski observed that it is unclear how many users

experience nausea after taking hoasca. Hrg. tr. at 997. Further, Dr. Jasinksi pointed out,

negative effects of substances do not necessarily outweigh the positive effects to the extent that

potential users are completely deterred from taking the substances. Deft. Exh. VVV, Rpt. of

Jasinski, at 9-10. In the case of ayahuasca, indigenous people in South America have ingested

the substance for centuries despite its association with nausea and vomiting. Hrg. tr. at 999.

Dr. Jasinski stated that another source of evidence about the abuse potential of ayahuasca

is information known about LSD, a related drug. DMT produces pharmacological effects similar

to those produced by LSD. Although there are some differences between LSD and DMT, "[f]or

the purpose of assessing abuse potential . . . the similarities . . . outweigh the differences," and

"none of these differences necessarily detract from the abuse potential of DMT." Deft. Exh.

VVV, Rpt. of Jasinski, at 12. Dr. Jasinski believes that DMT's pharmacological similarity to

LSD, a drug recognized to have abuse potential, lends support to his opinion that ayahuasca has

susbtantial abuse potential.

While Dr. Jasinski focused on ayahuasca's abuse potential from a pharmacological

perspective, Mr. Woodworth testified about patterns of drug use in the United States that

47

indicate that ayahuasca carries a significant potential for abuse. During the evidentiary hearing Mr. Woodworth cited, for example, National Household Survey on Drug Abuse results showing that hallucinogen use in this country has risen substantially in recent years. Hrg. tr. at 1388; Deft. Exh. CCCC. Mr. Woodworth expressed the opinion that "[t]he existence of the well-documented increasing interest in and demand for hallucinogens greatly increases the potential for abuse– and consequently diversion– of any substance having hallucinogenic qualities." Deft. Exh. ZZZ, Rpt. of Woodworth, at 4.

Mr. Woodworth cited several reasons, in addition to hoasca's abuse potential, for believing that there would be a demand for hoasca in the illicit market. Advertisements for hoasca on the internet reflect growing interest in the drug, he testified. Hrg. tr. at 1392; Rpt. at 5; Exh. EEEE. Increased publicity will, in turn, generate even more interest. Rpt. at 5. Hoasca use in Europe, often a helpful indicator for determining the possibility of the diversion in the United States, has risen substantially in recent years. Id. Mr. Woodworth observed that hoasca's form– a tea– might contribute to the substance's draw. He reasons that "[d]rinking a cup of tea may appear more appealing to some abusers than chewing a dried plant material, as is the case with peyote, or shooting up, smoking, or snorting, as is done with many other substances of abuse." Id. at 5-6.

Mr. Woodworth attributes the relatively low level of ayahuasca abuse in the United States, at the present time, to the lack of availability of the plant components in this country. Id. at 6. Mr. Woodworth explained that if the UDV is permitted to import hoasca for their religious ceremonies, the greater physical presence of the substance in the United States will increase the likelihood of diversion and abuse. Id. Further, the international transportation process itself will

expose the tea to illicit diversion. Controlled substances shipped in international commerce are particularly vulnerable to diversion, whether through theft, loss, or fraud. Id. at 6-7. Controls imposed by the country of origin may help reduce the risk of diversion, Hrg. tr. at 1401, but in this case, the Brazilian government does not carefully regulate the UDV's production of ayahuasca. Hrg. tr. at 1403.

The Government has suggested that there are specific characteristics of the UDV that indicate that the hoasca shipped to the church would be prone to illegal diversion. For example, Mr. Woodworth noted at the evidentiary hearing that the federal government has established a cooperative, working relationship with the Native American Church in order to minimize the diversion of peyote. However, Mr. Woodworth doubts whether the government could build a similar relationship with the UDV:

> . . . based on their lack of candor with regard to what has been brought in for the last ten years. They have never contacted DEA. They have never attempted to get registered with DEA. They have never tried to have hoasca exempted from controlled status. And in the seizures, the documentation clearly was either disguised or mislabeled.

Hrg. tr. at 1424. The Government further supported this argument through the introduction of exhibits in the nature of UDV correspondence stressing the need for confidentiality about church sessions, and shipping forms in which UDV leaders in the United States listed hoasca as "herbal extract." See, e.g., Deft. Exhs. NNNNN and RRRRR.

The Plaintiffs dispute the fundamental premises of the Government's arguments on the diversion issue. They maintain, first, that hoasca does not carry the significant potential for abuse that the Government attributes to the substance. Dr. Kleiman, the Plaintiffs' expert, takes the position that demand for hoasca would be relatively low, because of negative side effects

associated with the substance and because of the availability of substitutes for hoasca.[11]  Hrg. tr. at 680.  Dr. Kleiman disagrees with Dr. Jasinski about the deterrent effect of hoasca's nauseant properties.  Dr. Kleiman has written that "[w]hile many drug abusers tolerate a variety of inconveniences and discomforts associated with the drugs they take and the ways in which they take them, it is not reported that drug abusers as a class, or users of hallucinogens in particular, enjoy nausea or vomiting."  Pltf. Exh. 16, Decl. of Kleiman, at ¶ 21.  Dr. Kleiman explained that individuals using hallucinogens may be even less inclined to tolerate nausea than users of other types of drugs, by observing:

> According to the research literature, hallucinogenic substances, including DMT, score much lower on scales measuring reinforcement, and have much less tendency to create dependency, than opiates, such as heroin.  That is, those exposed to hallucinogens once display far less motivation to experience second and subsequent doses than those exposed to opiates, and a far smaller proportion of them develop drug dependency as defined by accepted clinical criteria ("addiction").  This would suggest that a much smaller proportion of hallucinogen users than of opiate users would be so strongly driven to seek out the drug experience as to neglect the presence of side-effects.

Id. at ¶ 22.

Dr. Kleiman also stressed that individuals interested in experiencing the effects of oral DMT would not necessarily demand the particular tea preparation employed in UDV ceremonies.  Rather, "any preparation that included DMT and a sufficient quantity of any monoamine oxidase inhibitor would suffice."  Id. at ¶ 16.  Plants that contain DMT and plants that contain harmala alkaloids are available in the United States.  Id. at ¶ 18.  Some of the alternative preparations combining DMT and haramala alkaloids do not induce nausea in the way that hoasca does.  Dr. Kleiman thus believes that "the widespread availability of

---

[11]     Dr. Kleiman is a Professor of Policy Studies at the University of California, Los Angeles.

pharmacologically equivalent substitutes, some of them with fewer unwanted side-effects and less apparent legal risk, would greatly reduce the motivation to divert the sacramental material for purposes of drug abuse." Id. at ¶ 25.

Dr. Kleiman also mentioned other factors that would tend to prevent widespread diversion of hoasca from the UDV. First, the United States UDV is a very small church and would not be importing huge quantities of tea from Brazil– only about 3,000 doses per year. Dr. Kleiman commented that, "[e]ven if, by some happenstance, all 3,000 doses were diverted and you would ask me as a drug policy expert: Did a big disaster just happen or not, I would say no, not a very big disaster." Hrg. tr. at 696.

Second, the relative "thinness of the potential market" for hoasca would reduce the likelihood of diversion that might occur with widely-used drugs. Hrg. tr. at 697. A casual thief in possession of a pharmaceutical cocaine shipment would have little trouble locating a buyer. In contrast, an individual would probably need to have some specific knowledge about the extremely limited hoasca market in order to distribute the tea. According to Dr. Kleiman, the nature of the hoasca market may thus discourage potential diversion of the tea to illicit use. Hrg. tr. at 698-99.

Third, the bulky form of hoasca would deter diversion. The 3,000 doses of tea that the UDV might import per year would produce several hundred liters of liquid. Dr. Kleiman testified that there is an inverse relationship between the volume of a substance and its susceptibility to theft. During the evidentiary hearing, he stated that "[t]he ease of stealing goes up as the volume goes down. The larger the volume, the harder something is to steal." Hrg. tr. at 718.

51

Finally, Dr. Kleiman emphasized that the UDV has a strong motivation for keeping the hoasca supply from being diverted. The tea "is considered a sacrament within the UDV, and its use outside the ceremonial religious context of the church is considered by members of the UDV to be sacrilegious." Pltf. Exh. 16, Decl. of Kleiman, at ¶ 26. Dr. Kleiman believes that the UDV's interest, under church doctrine, in preventing hoasca from being used improperly would make it likely that the church would cooperate with governmental authorities to track down any tea that is diverted. Hrg. tr. at 703.

As on the issue of health risks to UDV members, the parties have presented virtually balanced evidence on the risk of diversion issue.[12] Again, this Court finds that the Government has failed to meet its difficult burden of showing a compelling interest in preventing the diversion of hoasca to illicit use.

c.     1971 CONVENTION ON PSYCHOTROPIC SUBSTANCES

Upon its initial review of the parties' briefs, the Court believed that the Government's strongest arguments for prohibiting the UDV's use of hoasca stemmed from concerns about the safety of drinking the tea in a religious setting and the problems that might emerge if hoasca were diverted to use in non-religious settings. For that reason, the Court asked the parties to present evidence on these two subjects during the hearing held in October and November, 2001. However, the Government has alleged a third compelling interest in addition to those addressed at the hearing. According to the Government, the United States must apply the CSA's ban on DMT to the UDV's use of hoasca in order to adhere "to an important international treaty obligation." Response, at 16.

---

[12] The Court notes that the specificity of Dr. Kleiman's analysis may even tip the scale slightly in favor of the Plaintiffs' position.

The United Nations Convention on Psychotropic Substances, represents an international effort "to prevent and combat abuse of [psychotropic] substances and the illicit traffic to which it gives rise." United Nations Convention on Psychotropic Substances, 1971, opened for signature February 21, 1971, 32 U.S.T. 543, 1019 U.N.T.S. 175, at Preamble. The treaty was opened for signature in 1971, entered into force in 1976, and was ratified by the United States in 1980. Decl. of Robert Dalton, Exh. B. to Deft. Response, at ¶ 3. More than 160 nations are party to the treaty, including Brazil. The treaty adopts a scheduling system for substances similar to that found in the CSA. DMT is listed in Schedule I, the category subject to the strictest controls. Article 7 provides that parties to the treaty "[p]rohibit all use" of Schedule I substances, "except for scientific and very limited medical purposes." Article 7(a). Parties must also "[p]rohibit export and import" except under very restrictive conditions. Article 7(f).

The Government asserts that the Convention on Psychotropic Substances requires the United States to ban the UDV's ceremonial consumption of hoasca. Article 3(1) of the treaty makes clear that "a preparation is subject to the same measures of control as the psychotropic substances which it contains." The treaty defines a preparation as "[a]ny solution or mixture, in whatever physical state, containing one or more psychotropic substances." Article 1(f)(i). The Government appears to contend that even if the treaty's prohibition on DMT did not include hoasca tea, the provisions regarding "preparations" clearly extend the treaty's coverage to hoasca.

The Government notes that the treaty permits exceptions for the religious use of drugs, but argues that those exceptions are not applicable to the UDV. Article 32(4) reads:

> A State on whose territory there are plants growing wild which contain psychotropic substances from among those in Schedule I and which are traditionally used by certain small, clearly determined groups in magical or religious rites, may, at the time of signature, ratification or accession, make reservations concerning these plants, in respect of the provisions of article 7, except for the provisions relating to international trade.

The United States could not have relied on this provision to justify permitting the religious use of hoasca because, among other reasons, the plant ingredients of hoasca are not indigenous to this country. The Government argues that the treaty's specific allowance for religious exceptions under particular circumstances implies that the treaty does not permit other exceptions for religious use of scheduled substances.

Abiding by the terms of the Convention on Psychotropic Substances is, the Government maintains, a compelling interest. In general, principles of international law instruct that nations must honor the obligations imposed through treaties. For example, the Vienna Convention on the Law of Treaties states that "[e]very treaty in force is binding upon the parties to it and must be performed by them in good faith." Decl. of Dalton, Exh. B. to Deft. Response, at ¶ 10. The Government takes the position that the United States has a particular interest in adhering to the Convention on Psychotropic Substances. The United States calls on the treaty to elicit cooperation from other nations in fighting international drug trafficking. According to the Government, breaching the obligations set forth in the Convention would undermine the United States' efforts to encourage other nations to comply with the agreement, and might interfere with the willingness of other nations to form treaties with the United States in the future. Id. at ¶ 12.

In responding to the Government's position, the Plaintiffs challenge whether the Convention on Psychotropic Substances actually applies to hoasca. The Plaintiffs point out that there are several indications that plants containing scheduled hallucinogenic substances are not

necessarily prohibited under the treaty. The Commentary on the Convention on Psychotropic

Substances, published by the United Nations in 1976, suggests that the listing of a chemical

component in the treaty does not imply that a plant containing that chemical is likewise banned.

For example, the Commentary notes that:

> Schedule I does not list any of the natural hallucinogenic materials in question, but only chemical substances which constitute the active principles contained in them. The inclusion in Schedule I of the active principle of a substance does not mean that the substance itself is also included therein if it is a substance clearly distinct from the substance constituting its active principle. Neither the crown (fruit, mescal button) of the Peyote cactus nor the roots of the plant Mimosa hostilis nor Psilocybe mushrooms themselves are included in Schedule I, but only their respective active principles, mescaline, DMT and psilocybine.

Commentary, at 387. Elsewhere, the Commentary states that "[p]lants as such are not, and– it is

submitted– are also not likely to be, listed in Schedule I, but only some products obtained from

plants." Id. at 385.

Under the interpretation of the Convention favored by the Plaintiffs, the treaty included a

provision allowing nations to reserve some religious uses of indigenous plants so that parties

could ensure that any scheduling of plants in the future would not interfere with certain religious

practices; the reservation provision was not inserted because plants are presently illegal under

the treaty. The Commentary provides support for this analysis, noting that because there is a

possibility "that the fruit of the Peyote cactus, the roots of Mimosa hostilis, Psilocybe

mushrooms or other hallucinogenic plant parts used in traditional magical or religious rites will

in the future be placed in Schedule I," that parties could "make a reservation assuring them the

right to permit the continuation of the traditional use in question." Id. at 387.

Certainly the United States Senate Committee on Foreign Relations, when it

recommended the ratification of the Convention, seemed to hold the view that plants were not

automatically covered through the listing of their chemical components. The Committee's report stated that:

> Since mescaline, a derivative of the peyote cactus, is included in Schedule I of the Convention, and since the inclusion of peyote itself as an hallucinogenic substance is possible in the future, the Committee accepted the Administration's recommendation that the instrument of ratification include a reservation with respect to peyote harvested and distributed for use by the Native American Church in its religious rites.

S. Exec. Rept. No. 96-29, Convention on Psychotropic Substances, 96th Cong., 2d. Sess., at 4 (1980).

In addition, the Plaintiffs provide examples of how, in operation, the treaty seems to reflect the understanding that the listing of a hallucinogenic chemical does not imply the listing of a plant containing that chemical. While the United States made a reservation for the use of peyote by the Native American Church within this country, under Article 32(4), it did not make a reservation to export peyote for use by religious groups in other countries. However, the United States apparently permits the exportation of peyote to Native American Church groups in Canada. See 37 Tex. Admin. Code §§ 13.81-87; Exh. T to Pltf. Reply (list of Canadian Native American Church organizations registered with the Texas Department of Public Safety.) Exportation of a Schedule I substance for other than scientific or medical purposes would appear to violate the Convention, in the absence of a reservation. The conduct of the parties to the Convention, concerning the export of peyote, therefore suggests that peyote is not a scheduled substance, although mescaline is.

The Plaintiffs present a very persuasive analysis as to why plants containing hallucinogenic chemicals are not necessarily covered within Schedule I of the Convention. As the Defendants have emphasized, though, and as this Court noted above, the treaty contains

special provisions regarding preparations: "a preparation is subject to the same measures of control as the psychotropic substance which it contains." Article 3(1). In applying the treaty to hoasca, it would be possible to conclude that even if Schedule I does not cover *psychotria viridis*– the plant component of hoasca that contains DMT– Schedule I does extend to hoasca tea under the treaty's "preparation" provision. To counter this proposition, the Plaintiffs have offered strong arguments concerning why, if the treaty does not extend to *psychotria viridis*, the treaty would not extend to a tea made from a combination of *psychotria viridis* and another plant.

First, the Plaintiffs rely on the statement in the Commentary to the Convention, quoted above, that "[t]he inclusion in Schedule I of the active principle of a substance does not mean that the substance itself is also included therein if it is a substance clearly distinct from the substance constituting its active principle." Commentary, at 387. The Plaintiffs maintain that hoasca is clearly distinct from DMT, just as *psychotria viridis* is, and that there are no indications that the tea-making process produces a chemical separation of DMT.

Second, the Plaintiffs point out that the Commentary appears to assume that infusions and beverages made from plants containing hallucinogenic substances do not fall within Schedule 1. In noting that "[n]either . . . the roots of the plant Mimosa hostilis nor Psilocybe mushrooms themselves are included in Schedule I, but only their respective active principles," the Commentary observes by footnote that "[a]n infusion of the roots is used" to consume Mimosa hostilis, and that "[b]everages . . . are used" to consume Psilocybe mushrooms. Commentary, at 387; nn. 1227-28.

Based on the analysis offered by the Plaintiffs, this Court finds that the 1971 Convention

on Psychotropic Substances does not apply to the hoasca tea used by the UDV.[13] Therefore, the United States' interest in adhering to the Convention does not, in this case, represent a compelling reason for extending the CSA's ban on DMT to the UDV's ceremonial hoasca use.

### 2. LEAST RESTRICTIVE MEANS

Under RFRA, the Government must establish not only that a burden placed on an individual's religious practice "is in furtherance of a compelling governmental interest," but also that the burden "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). In this case, the Court has concluded that the Government has failed to carry its heavy burden of showing a compelling government interest in protecting the health of UDV members using hoasca or in preventing the diversion of hoasca to illicit use. In addition, the Government has not demonstrated that prohibiting the UDV's ceremonial use of hoasca furthers an interest in adhering to the 1971 Convention on Psychotropic Substances, because the treaty does not appear to extend to hoasca. The Court thus does not reach the question of whether the Government has employed the least restrictive means of accomplishing its stated goals.

## IV. REMAINING REQUIREMENTS FOR PRELIMINARY INJUNCTION

The Court has found that the Plaintiffs have demonstrated a substantial likelihood of success as to their RFRA claim. As this Court noted in its discussion of the standard of review,

---

[13]     This Court acknowledges that its conclusion that the Convention on Psychotropic Substances does not extend to hoasca, without explanation, may appear to conflict with its interpretation of a similar provision in the CSA. However, the Convention significantly differs from the CSA in that the Convention introduces on its face, through the reservation provision, the proposition that plants may receive different treatment than chemical components. Given this, the Court felt it appropriate to turn to the Commentary, which makes clear that, unlike the CSA, the scheduling of a hallucinogenic chemical in the Convention does not imply the scheduling of a plant that contains that chemical.

parties seeking preliminary injunctions must show not only a substantial likelihood of success on the merits, but also that there will be "irreparable injury to the movant if the preliminary injunction is denied," that "the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction," and that "the injunction is not adverse to the public interest." *Kikumura*, 242 F.3d at 955.

With respect to the first of these other requirements, Tenth Circuit law indicates that the violations of the religious exercise rights protected under RFRA represent irreparable injuries. In *Kikumura*, the Tenth Circuit observed that "courts have held that a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA." Id. at 963. In support of this proposition the *Kikumura* court quoted the Second Circuit, which has held that "although the plaintiff's free exercise claim is statutory rather than constitutional, the denial of plaintiff's right to the free exercise of his religious beliefs is a harm that cannot be adequately compensated monetarily." *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).

The Tenth Circuit's emphasis on the harms presented by the violation of religious rights, reflected in the *Kikumura* case, also informs this Court's conclusions regarding whether the Plaintiffs have met the remaining two requirements for preliminary injunction. This Court acknowledges that the Government has presented a great deal of evidence suggesting that hoasca may pose health risks to UDV members and may be subject to diversion to non-religious use. However, in balancing the Government's concerns against the injury suffered by the Plaintiffs when they are unable to consume hoasca in their religious ceremonies, this Court concludes that, in light of the closeness of the parties' evidence regarding the safety of hoasca use and its potential for diversion, the scale tips in the Plaintiffs' favor. Likewise, this Court believes that

59

an assessment of whether a preliminary injunction would be adverse to the public interest must take into account the public's interest in the vindication of the religious freedoms protected under RFRA– a statute which Congress, as the representative of the public, enacted specifically to countermand a Supreme Court ruling. See, e.g., *Elam Constr., Inc. v. Regional Transp. Dist.,* 129 F.3d 1343, 1347 (10th Cir. 1997) (stating in the context of a Constitutional claim that "[t]he public interest . . . favors plaintiffs' assertion of their First Amendment rights.") This Court thus concludes that the Plaintiffs have satisfied the requirements for preliminary injunction as to their RFRA claim.

## V.    CONCLUSION

The Plaintiffs have failed to establish a likelihood of success on the merits of their claims under Equal Protection principles, the Free Exercise of the First Amendment to the United States Constitution, canons of statutory construction, and the international law of comity. However, the Court has concluded that the Plaintiffs are likely to succeed on the merits of their claim under RFRA. In addition, the Plaintiffs have satisfied the other requirements for preliminary injunction on the basis of their RFRA claim.

This Court has scheduled a hearing on August 19, 2002 to discuss with counsel issues concerning the nature and implementation of the preliminary injunctive relief to which the Plaintiffs are entitled. The Court will address the Plaintiffs' APA argument at that time, as well as the Plaintiffs' contention that the Fourth and Fifth Amendments to the United States Constitution require the Government to return to the UDV the hoasca confiscated by the Government.

IT IS THEREFORE ORDERED that:

1)    The Plaintiffs' Motion for Preliminary Injunction (Doc. No. 10) is denied as to:

a)   Their claim under the First Amendment to the United States Constitution;

b)   Their claim that the CSA does not apply to hoasca;

c)   Their claim that principles of international law require that the Government permit the UDV's hoasca use; and

d)   Their claim under the Equal Protection Clause of the Fourteenth Amendment, made applicable to federal statutes by the Due Process Clause of the Fifth Amendment.

2)   The Plaintiffs' Motion for Preliminary Injunction is granted as to their claim under the Religious Freedom Restoration Act;

3)   A hearing on the form of preliminary injunction is set for August 19, 2002 at 1:30 p.m.

CHIEF UNITED STATES DISTRICT JUDGE