# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

_____

O CENTRO ESPIRITA BENEFICIENTE
UNIAO DO VEGETAL, et al.,

         Plaintiffs,

v.                                        CIV. No. 00-1647 JAP/RLP

MICHAEL B MUKASEY, et al.,

         Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
## MOTION TO DISMISS AS TO COUNTS TWO, FOUR, AND FIVE

      This case involves a dispute between O Centro Espirita Beneficiente Uniao Do Vegetal (UDV), a Christian religious sect, and the federal government, regarding the applicability of the Controlled Substances Act (CSA) to UDV's sacramental use of hoasca tea. In 2002, the Court found that a ban on the importation and use of hoasca violates the Religious Freedom Restoration Act (RFRA). Accordingly, the Court entered a preliminary injunction permitting Plaintiffs to import the substances used to brew the tea under certain conditions. (Doc. No. 100.) On September 21, 2007, Plaintiffs filed their First Amended Complaint (Doc. No. 159), which Defendants have moved to dismiss in its entirety, for lack of subject matter jurisdiction and failure to state a claim (Doc. No. 166). Two earlier orders of this Court addressed Defendants' motion as to Count 1 (Doc. No. 193), and Counts 6–8 (Doc. No. 191).

      This Memorandum Opinion and Order grants Defendants' Motion to Dismiss as to the second, fourth, and fifth counts of the First Amended Complaint.

## I. STANDARD OF REVIEW

Defendants move to dismiss counts 2, 4, and 5 under Federal Rule of Civil Procedure 12(b)(6), which tests the legal sufficiency of the complaint. In deciding such a motion, the court is to assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff. *See Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). The complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007). In this case, the outcome turns not on the sufficiency of the facts pleaded, but on the justiciability and cognizability of the legal claims alleged by Plaintiffs.

## II. DISCUSSION

## A. COUNT 2: Controlled Substances Act Does Not Apply to Plaintiffs' Sacramental Use of Hoasca

In the second count, Plaintiffs contend that the CSA regulations do not apply to any sacramental use of controlled substances. First, Plaintiffs argue that the CSA and its regulations were intended to govern only commercial and scientific uses of controlled substances. (First Am. Compl. ¶ 85.) Plaintiffs point to regulations requiring registration of distributors and importers for medical, scientific, and industrial channels, and contend that the omission of "religious channels" shows that the CSA was never intended to apply to religious uses of controlled substances. (*Id.* ¶¶ 86–87.)

Defendants argue that the statute plainly applies to all uses of controlled substances, despite provisions addressing particular classes of use. The CSA requires registration of "every person who manufactures, distributes, dispenses, imports, or exports any controlled substance," unless that person has an exemption.[1] 21 C.F.R. § 1301.11; *see also* 21 U.S.C. § 822(a). The statutory and regulatory definitions of "importer" and "distributor" are not limited to persons

---

[1] Registrants "are authorized to possess, manufacture, distribute, or dispense such substances or chemicals . . . to the extent authorized by their registration and in conformity with the other provisions of . . . [T]itle [21]." 21 U.S.C. § 822(b). Registration is the threshold to the application of the laws regulating lawful use of controlled substances.

who import and distribute controlled substances only for a particular purpose.[2] There is no basis for reading these unambiguous and all-encompassing definitions to exclude those importing or distributing substances for religious purposes, as Plaintiffs advocate. The CSA regulations make one reference to religious use—the exemption of the Native American Church (NAC) from certain restrictions on the ceremonial use of peyote. *See* 21 C.F.R. § 1307.31. This exemption demonstrates that the CSA regulations do apply to religious drug use absent a specific allowance for that use.

Plaintiffs also argue that because "the courts have ordered the government to allow Plaintiffs to lawfully import and distribute hoasca," the Drug Enforcement Administration ("DEA") lacks the power to apply any CSA regulations to Plaintiffs. (Pls.' Response at 57.) Plaintiffs' argument assumes that if there is no compelling interest in banning hoasca, then *a fortiori*, there is no compelling interest in any regulation of hoasca's use. This argument misinterprets the law of this case. The Supreme Court affirmed this Court's finding that the government had not established a compelling interest in banning Plaintiffs' use of hoasca. *Gonzales v. O Centro Espirita Beneficiente Uniao Do Vegetal*, 546 U.S. 418 (2006). The decision cannot be read to exempt Plaintiffs from any and all regulation under the CSA, because the balancing of interests required by RFRA may be different for regulation of hoasca than for a ban on hoasca. Plaintiffs' response to the motion to dismiss seems to concede the point. Plaintiffs "recognize[] that the government may have a compelling interest in requiring certain conduct in relation to UDV's importation of hoasca" and that they are willing to consider these compelling needs. (Pls.' Response at 47.)

The Court concludes that there is no legal basis for Plaintiffs' contention that the CSA regulations do not apply to UDV's importation and use of hoasca. An exemption for religion in general cannot be fairly implied from the statute and regulations, and there is no judicial exemption specifically for UDV. Defendants' motion to dismiss Count 2 should therefore be

---

[2]The regulations define an "importer" as "every person who imports, or who acts as an import broker for importation of, controlled substances listed in any schedule." 21 C.F.R. § 1300.01(b)(16). Likewise, a "distributor" is any person who distributes a controlled substance, and 21 U.S.C. § 802(11) defines "distribute" as "to deliver (other than by administering or dispensing) a controlled substance or a listed chemical."

granted.

**B. COUNT 4: Controlled Substances Act Regulatory Scheme is Standardless in Violation of the Free Exercise Clause and RFRA**

Plaintiffs' fourth count asserts that the CSA regulatory scheme permits the DEA to exercise broad and standardless discretion to suspend or revoke Plaintiffs' registration to import and distribute hoasca, in violation of the First Amendment and RFRA. (First Am. Compl. ¶¶ 109–22.) Plaintiffs object to numerous regulatory provisions, including those that would allow the DEA to suspend or revoke UDV's registration to import hoasca, 21 C.F.R. §§ 1301.36–46, and to do so prior to a hearing if the DEA "finds that there is an imminent danger to the public health or safety." *Id.* § 1301.36(e). Upon suspension or revocation, UDV would also be required to deliver to the DEA the already imported hoasca.[3] *Id.* § 1301.36(f). Plaintiffs contend that these procedures "cannot lawfully govern a church that has obtained judicial protection of its right to practice its religion." (First Am. Compl. ¶ 115) Plaintiffs make two arguments in support of this claim. First, that RFRA requires judicial, not administrative, determinations about the scope of free religious exercise. Thus, allowing the DEA to suspend UDV's ability to import hoasca would "usurp judicial authority." (*Id.* ¶ 116.) Second, Plaintiffs argue that the suspension and revocation regulations grant the DEA "nearly unfettered administrative discretion," amounting to a standardless licensing scheme. (*Id.* ¶ 117.)

Defendants move to dismiss the fourth count on three grounds. First, they argue that the "standardless licensing" doctrine applies only to regulations that impair freedom of expression, not to those that may impair freedom of religion. Second, they argue that Plaintiffs cannot bring a facial challenge to the suspension and revocation regulations. Both of these arguments take as a premise that freedom of expression occupies a special place in the law, and that special types of suits which courts have entertained in the free speech arena cannot be extended to other First Amendment rights. Finally, Defendants defend against the claim on the merits by arguing that

---

[3] Plaintiffs incorrectly state that they would bear the burden of proof in a hearing to contest the suspension or revocation. In fact, 21 C.F.R. § 1301.44(e) places that burden on the agency.

the regulations pertaining to registration do in fact contain adequate standards to guide the
DEA's decisions in registration matters.

      As a preliminary matter, the Court finds that Plaintiffs' first argument lacks merit. RFRA
was prompted by Congress's disapproval of a judicial decision, *Employment Div. v. Smith*, 494
U.S. 872 (1990), rather than its perception that the executive branch was insufficiently protective
of religious freedom. RFRA does not establish the judiciary as the supreme arbiter of religious
freedom claims. It simply provides that "a person whose religious exercise has been burdened in
violation of [the law] may assert that violation as a claim or defense in a judicial proceeding and
obtain appropriate relief," 42 U.S.C. §§ 2000bb-1(c), and establishes the standard of review that
the court should apply when a plaintiff alleges a proper claim under RFRA.[4] *Id.* § 2000bb-1(b).
Plaintiffs misconstrue the "appropriate relief" granted by this Court in 2002. This Court held that
the government lacks a compelling interest in banning UDV's importation and use of hoasca. *O
Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*, 282 F. Supp. 2d 1236, 1266 (D.N.M.
2002). It did not hold that the DEA "does not have the authority to place conditions or limits on
Plaintiffs' right to freely exercise their religion," as Plaintiffs assert. (First Am. Compl. ¶ 116.)
For example, while the Court's ruling prevents the DEA from denying outright Plaintiffs'
registration as an importer, it would not necessarily prevent the DEA from suspending that
registration if UDV does not comply with the terms and conditions of the registration. *See* 21
U.S.C. § 824(a) (listing the grounds for suspension or revocation of registration). As the Court
has noted in a previous order, its 2002 ruling on Plaintiffs' RFRA claim does not amount to a

---

[4]A Senate Report issued in conjunction with the passage of RFRA states that the law
"creates a new statutory prohibition on governmental action" running parallel to the Free
Exercise Clause, but not purporting to legislate the standard of review under that clause. S. Rep.
No. 103-111, at 14 (1993). The report emphasizes that RFRA is not intended to affect other areas
of law, including Article III standing and Establishment Clause jurisprudence. *Id.* at 12-13.
Courts reviewing RFRA claims have rejected arguments that RFRA upends established law
other than the standard of review. *See, e.g.*, *St. John's United Church of Christ v. City of Chi.*,
502 F.3d 616, 629 (7th Cir. 2007) (holding that RFRA does not require judicial fact-finding);
*Francis v. Mineta*, 505 F.3d 266 (3rd Cir. 2007) (holding that a plaintiff's religious freedom
challenge to a workplace grooming standard must be brought under Title VII, not under RFRA,
and is subject to Title VII's exhaustion requirements); *Jackson v. Dist. of Columbia*, 254 F.3d
262 (D.C. Cir. 2001) (holding that prisoners must satisfy the exhaustion requirements in the
Prisoner Litigation Reform Act prior to challenging a prison policy under RFRA).

determination that the application of any and all CSA regulations violate RFRA. (*See* Order Denying Defendants' Motion to Dismiss Count 1 (Doc. No. 193), at 4 n.2.) A decision by the DEA that UDV's registration should be temporarily suspended would not necessarily "usurp judicial authority." If DEA does suspend UDV's registration, then UDV may be able to assert a RFRA or free exercise claim that its "religious exercise has been burdened."

The Court now considers Plaintiffs' argument that the requirement to register is, in itself, a violation of RFRA and the First Amendment, because it would subject Plaintiffs' religious practice to a "standardless licensing" scheme.

1. Overview of Standardless Licensing Doctrine

A standardless licensing claim asserts that the government has enacted a law giving a government official discretion to grant a permit or exemption affecting expression-related activity, but does not establish adequate standards to guide the exercise of that discretion. Such a challenge is necessarily facial, since the plaintiff is not challenging a particular licensing decision made in their case, but rather the requirement that their exercise of a fundamental right is subjected to an arbitrary process. Typically, courts disfavor facial challenges, which are subject to a rigorous standard: "the challenger must establish that no set of circumstances exists under which the Act would be valid."[5] *United States v. Salerno*, 481 U.S. 739, 745 (1987). However, the Supreme Court has held that, in limited circumstances, plaintiffs do not need to first apply for and be denied a permit or exemption in order to challenge the law. *Freedman v. Maryland*, 380 U.S. 51, 56 (1965). The two primary circumstances are where the law affecting

_____

[5]*Salerno* involved a due process challenge to the Bail Reform Act's authorization of pretrial detention if the arrestee is likely to commit future crimes. 481 U.S. at 744. The Supreme Court held that a facial challenge would be subject to the rigorous "no set of circumstances" test, and noted that it had "not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." *Id.* at 745. Of course, free religious exercise is a First Amendment right. However, for reasons discussed below, the Court finds that the standardless licensing doctrine does not apply to the right of free religious exercise.

expression is overbroad,[6] or subjects expression to a standardless licensing scheme.

In *Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988), the Supreme Court provided two reasons for allowing standardless licensing challenges in free expression cases. It expressed concern that "the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Id.* at 757. "Second, the absence of express standards makes it difficult to distinguish, 'as applied,' between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power." *Id.* at 758.

*Lakewood*'s rationale is specific to laws that infringe upon the freedom of expression. Indeed, *Lakewood*'s essential statement of the doctrine is that "[w]hen a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *Lakewood*, 486 U.S. at 755–56 (emphasis added); *see also id.* at 757 ("At the root of this long line of precedent is the time-tested knowledge that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship.") (emphasis added).

2. Standardless Licensing Claims Based on Free Exercise

Plaintiffs argue that existing case law does not foreclose a standardless licensing claim based on the impairment of the free exercise of religion. Plaintiffs cite to *Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969), in which the Supreme Court applied a standardless licensing analysis to a Birmingham, Alabama ordinance requiring permits for parades on city streets. The

---

[6] First Amendment overbreadth doctrine reflects the concern that "persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions by a statute susceptible of application to protected expression." *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 634 (1980). Based on "the sensitive nature of protected expression," the Supreme Court has "allowed persons to attack overly broad statutes even though the conduct of the person making the attack is clearly unprotected and could be proscribed by a law drawn with the requisite specificity." *New York v. Ferber*, 458 U.S. 747, 768 (1982).

Supreme Court invalidated the ordinance because it placed unconstitutional restrictions on the First Amendment right of peaceable assembly. *Id.* at 162–63. The ordinance conferred upon the city commission "virtually unbridled and absolute power to prohibit any parade, procession, or demonstration on the city's streets or public ways." *Id.* at 150 (quotation marks omitted). *Shuttlesworth* explicitly expanded the unbridled discretion or standardless licensing approach to First Amendment rights other than freedom of expression, noting that "the right to assemble peaceably to voice political protest is at least as basic as the right to exhibit a motion picture which may have some aesthetic value." *Id.* at 162 (Harlan, J., concurring) (*citing Freedman*, 380 U.S. at 58–61). However, *Shuttlesworth* cannot be read to signify that all First Amendment rights are covered by the standardless licensing doctrine. Freedom of assembly is closely related to freedom of expression in a way that free religious exercise is not. *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) ("The right of association is a basic constitutional freedom that is closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society.") In contrast, the religion clauses of the First Amendment do not involve rights fundamental to democratic participation, such as the freedoms of assembly, expression, press, and petition for redress. The concerns underlying the standardless licensing doctrine, such as the chilling effect, have not been held to apply to free exercise claims.[7] As one court of appeals noted in declining to extend the chilling effect doctrine to the right of substantive due process,

---

[7] One district court declined to extend the chilling effect doctrine to a case involving only free exercise interests. *See Nat'l Conf. of Catholic Bishops v. Bell*, 490 F. Supp. 734, 741 (D.D.C. 1980), *aff'd per curiam Nat'l Conf. of Catholic Bishops v. Smith*, 653 F.2d 535 (D.C. Cir. 1981). There, the district court faced a claim by the National Conference of Catholic Bishops that the Pregnancy Discrimination Act ("PDA") would require the Conference, as an employer, to provide sick leave and pay expenses on equal terms for elective abortions, which burdened the Conference's free exercise rights. *Id.* at 737. The district court held that it lacked subject matter jurisdiction, rejecting Plaintiff's argument that the PDA chilled Plaintiff's religious practice, thereby transforming the generalized threat of possible enforcement into a justiciable case or controversy. *Id.* The court noted that the "Supreme Court has narrowed the chilling effect doctrine and emphasized that the doctrine primarily concerns free speech or expression that is chilled by the existence of criminal statutes," and that it could not identify "any authority that the chilling effect doctrine has been extended to suits such as this one that raise First Amendment free exercise problems." *Id.* at 741 (*citing Broadrick v. Oklahoma*, 413 U.S. 601 (1973)).

"[e]xpressive conduct . . . is idiosyncratically sensitive to criminal sanctions and state regulation." *Coleman v. Dewitt*, 282 F.3d 908, 914 (6th Cir. 2002) (*citing New York v. Ferber*, 458 U.S. 747, 768–69 (1982)).

It is true that courts applying the standardless licensing doctrine often speak broadly in terms of "First Amendment" or "constitutional" freedoms. *See, e.g.*, *Shuttlesworth*, 394 U.S. at 150–51 ("the many decisions of this Court over the last 30 years, holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license . . ."); *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958) ("an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official . . . is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms"). However, the clear impression left by the set of cases applying the standardless licensing doctrine strongly suggests that the doctrine applies only to freedom of expression and closely related rights—the religion clauses are not included.

To be sure, several standardless licensing decisions involved free exercise claims. However, these cases are distinguishable because they involve religious activity with a nexus to expression,[8] or standardless determinations by government officials on matters of religious doctrine. Neither factor is present in this case.

In *Cantwell v. Connecticut*, 310 U.S. 296 (1940), several Jehovah's Witnesses had been convicted under a Connecticut statute that proscribed solicitation for "any alleged religious, charitable or philanthropic cause" unless the cause was approved by a state official. *Id.* at 301–02. The official could withhold his approval if he determined that the cause was not a religious one. *Id.* at 305. The Witnesses challenged the law as a constraint on their speech and

---

[8]Plaintiffs cite two district court cases that they contend support their argument that indeterminate standards are unacceptable when applied to constitutionally protected religious conduct. *See R.W.B. of Riverview, Inc. v. Stemple*, 111 F. Supp. 2d 748, 757 (S.D. W. Va. 2000) (challenging an ordinance limited nude dancing establishments based on the alleged impairment of the freedom of expression); *United States v. Rainbow Family*, 695 F. Supp. 294, 296 (E.D. Tex. 1988) (finding unconstitutional a law permitting Forest Service officials to deny a special use permit for meetings in a national forest based on a vague standard). However, since both of these cases involved challenges based on freedom of expression, they do not support Plaintiffs' argument that the standardless or unbridled discretion doctrine extends to other constitutional rights).

the practice of their religion. *Id.* at 300. The Supreme Court held that "censorship of religion . . . is a denial of liberty protected by the First Amendment" and that "[t]o condition the solicitation of aid for the perpetuation of religious views or systems upon a license, the grant of which rests in the exercise of a determination by state authority as to what is a religious cause, is to lay a forbidden burden upon the exercise of liberty protected by the Constitution." *Id.* at 305, 307.

    *Cantwell* could be read to strike down the statute based on its impairment of the freedom of religion, or on its impairment of the freedom of expression. The Ninth Circuit recently characterized *Cantwell* as holding that the Connecticut statute violated the Free Exercise Clause because it constituted a "censorship of religion." *Berger v. City of Seattle*, 512 F.3d 582, 594 (9th Cir. 2008). However, in *Employment Division v. Smith*, 494 U.S. 872 (1990), the Supreme Court emphasized the hybrid nature of the rights in *Cantwell*—the combination of the rights of free expression and free exercise—as the basis for applying a heightened form of scrutiny to the facially neutral law at issue in that case. *Id.* at 882 n.1 (noting that *Cantwell* "specifically adverted to the non-free-exercise principle involved"). Though the question in *Smith* was the level of scrutiny to apply to free exercise claims, rather than the type of challenge that can be brought based on the right to free exercise, the clear lesson of *Smith* is that the courts do not accommodate stand-alone free exercise claims to the same extent as a claim combining freedom of expression and religious practice. Therefore, the Court does not read *Cantwell* as permitting a standardless licensing claim in cases where plaintiffs allege only a violation of the constitutional right of free exercise.

    The Tenth and Eleventh Circuits have also struck down solicitation ordinances in response to challenges by religious groups that the ordinances gave unbridled discretion to administrative officials responsible for licensing. In *Espinosa v. Rusk*, 634 F.2d 477 (10th Cir. 1980), *aff'd without opinion*, 456 U.S. 951 (1982), the Tenth Circuit invalidated an ordinance requiring solicitation permits for secular purposes, but exempting religious groups that solicit "solely for 'evangelical, missionary or religious'" purposes. The city had indicated that it would require a permit for solicitation by a congregation of Seventh Day Adventists because some of the funds raised would be used for secular purposes. *Id.* at 479. The district court enjoined application of the ordinance to the church, and the court of appeals affirmed, finding that enforcement of the ordinance required administrative determination of which functions of the

church were religious and which were secular, just like in *Cantwell*. *Id.* at 481. UDV's case is

distinguishable from *Cantwell* and *Espinosa* in this regard. Plaintiffs' objection to the DEA's

decision-making process is not that it requires the DEA to make inquiries into Plaintiffs'

religious doctrine, but rather that it allows the DEA to evaluate whether a certain religious

practice is consistent with "the public interest and safety." (*See* Pls.' Response at 56 (*citing* 21

U.S.C. § 823(b)(5)).) The latter raises fewer First Amendment concerns than the type of inquiry

made in *Cantwell* and *Espinosa*. See *Weaver*, *Colo. Christian. Univ. v. Weaver*, No. 07-CV-

1247, 2008 WL 2815017, at 29 (10th Cir. July 23, 2008) (finding Establishment Clause concerns

with a regulation that requires government officials to make "intrusive judgments regarding

contested questions of religious belief or practice").

  The *Espinosa* court held that "[r]egulations . . . which restrict the exercise of *first*

*amendment rights* by requiring prior approval . . . face an unfavorable presumption in regard to

constitutional validity." *Id.* at 482 (emphasis added). Therefore, "[a]ny standard set forth must be

'susceptible of objective measurement,' and 'precision of regulation must be the touchstone.'"

*Id.* (citations omitted). As in *Cantwell*, the exact First Amendment right infringed is unstated.

The plaintiffs in *Espinosa* asserted only a free exercise claim, *id.* at 479, but the religious

exercise at issue implicated freedom of expression. The court cited recent decisions from other

circuits that had "considered the validity of solicitation ordinances in light of these constitutional

standards," *id.* at 482, and all of these cases involved religiously motivated expression subject to

licensing requirements, rather than religious practice with no nexus to expression.

  In *Church of Scientology Flag Service v. City of Clearwater*, 2 F.3d 1514 (11th Cir.

1993), the plaintiff church challenged the city's registration procedures for soliciting financial

contributions. The plaintiff alleged that the city clerk exercised excessive discretion, which

rendered the registration process an impermissible prior restraint of religion. *Id.* at 1547. The

court stated that "[a] system of licensing speech <u>or religious activity</u> may be upheld against First

Amendment challenge" if the scheme does "not delegate overly broad licensing discretion to a

government official." *Id.* (emphasis added). Despite this broad language, the Eleventh Circuit

evaluated the registration process as an impairment of the plaintiff's freedom of expression,

rather than religion. *Id.* at 1547–48. *Clearwater* is consistent with *Cantwell* and *Espinosa* in

recognizing a standardless licensing claim when an impairment of the freedom of expression is

presented alongside an impairment of free exercise.

In sum, standardless licensing cases are, without apparent exception, freedom of expression cases. These challenges may involve an element of religion—typically where the expression at issue is connected to religious activity, such as distributing religious pamphlets or soliciting donations for a church. In contrast, Plaintiffs' activity has no stated relation to expression. Though some of the case law suggests that a regulatory scheme lacking objective standards might be unconstitutional for the burden it imposes on religion, all of the cases known to the Court also involved burdens on speech, even if it happened to be religious speech. To recognize a standardless licensing claim in these circumstances would exceed the existing scope of the doctrine. The Supreme Court has frequently admonished that judicial doctrines developed in the speech context are narrow in scope. *Salerno*, 481 U.S. at 745; *Schall v. Martin*, 467 U.S. 253, 268 n.18 (1984); *New York v. Ferber*, 458 U.S. 747 (1982). The Court therefore concludes that UDV fails to state a claim under Count 4 based on the standardless licensing doctrine, and Defendants' Motion to Dismiss should be granted as to Count 4.

## C. COUNT 5: Regulation of Plaintiffs' Use of Hoasca Will Lead to Excessive Entanglement of Government and Religion in Violation of the Establishment Clause

In the fifth count, Plaintiffs allege that application of the CSA regulatory scheme to their sacramental use of hoasca would excessively entangle the government in Plaintiffs' religious practice in violation of the Establishment Clause. (First Am. Compl. ¶¶ 125–27.) In *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the Supreme Court identified "the three main evils against which the Establishment Clause was intended to protect: 'sponsorship, financial support, and active involvement of the sovereign in religious activity.'" *Id.* at 612 (*citing Walz v. Tax Comm'n*, 397 U.S. 664, 668 (1970)). Plaintiffs allege the third type of harm: active involvement of the government in their religious activity. *Lemon* then held that a law does not violate the Establishment Clause if it has a secular purpose, "its principal or primary effect [is] one that neither advances nor inhibits religion," and it does not foster excessive government

entanglement with religion.[9] *Id.*

In *Hernandez v. Commissioner*, 490 U.S. 680, 696–97 (1989), the Supreme Court upheld the denial of charitable contribution tax status to certain payments made by members to the Church of Scientology. The Supreme Court explained that "routine regulatory interaction which involves no inquiries into religious doctrine, no delegation of state power to a religious body, and no detailed monitoring and close administrative contact between secular and religious bodies, does not of itself violate the nonentanglement command." *Id.* (citations omitted).

Plaintiffs do not allege that regulation of their sacramental use of hoasca under the CSA would involve inquiries into religious doctrine. Instead, Plaintiffs are concerned with provisions that give the DEA regulatory powers that Plaintiffs find intrusive. For instance, Plaintiffs cite to regulations giving the DEA authority to inspect Plaintiffs' premises, records, and hoasca inventory with only an administrative search warrant. (First Am. Compl. ¶ 125 (*citing* 21 C.F.R. § 1316.03–12).) As a CSA registrant, UDV would also be required to keep specific inventory records and to submit statements of these records upon request. (*Id.* ¶ 126 (*citing* 21 C.F.R. §§ 1304 & 1312.17).) Finally, UDV observes that the DEA would have discretion to determine the method by which Plaintiffs disposed of unused hoasca, despite the fact that UDV religious doctrine requires Plaintiffs to dispose of hoasca by pouring it into the ground. (*Id.* ¶ 127 (*citing* 21 C.F.R. § 1307.21).) In their response to Defendants' motion to dismiss, Plaintiffs discuss an additional provision granting the DEA authority to register those who dispense controlled substances. (*See* Pls.' Response at 62–63.) Plaintiffs contend that this authority enables the DEA to exercise control over the religious leaders of the UDV church who distribute hoasca during ceremonies. (*Id.*)

Though "detailed monitoring and close administrative contact" can raise Establishment Clause concerns, the Supreme Court has recognized that "a regime of total separation" between

---

[9]More recently, the Supreme Court has described entanglement as one element of the "principal or primary effect" prong of the *Lemon* test. *See Zelman v. Simmons-Harris*, 536 U.S. 639, 668–69 (2002) (O'Connor, J., concurring) (noting that the Supreme Court had "folded the entanglement inquiry into the primary effect inquiry" because "both inquiries rely on the same evidence and the degree of entanglement  has implications for whether a statute advances or inhibits religion") (citations omitted).

church and state is "[n]either possible [n]or desirable" under the Establishment Clause. *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 760 (1973). Often the problem arises when the monitoring involves "core areas of faith." *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1170 n.7 (4th Cir. 1985) (holding that subjecting a church's decisions about employment of spiritual leaders to scrutiny under Title VII of the Civil Rights Act would amount to excessive entanglement because of the protracted legal processes and impermissibility of substituting secular policy judgments about equal opportunity in employment for the church's religious criteria.) The Tenth Circuit has recently described the entanglement doctrine in this way. In *Colorado Christian University v. Weaver*, No. 07-CV-1247, 2008 WL 2815017 (10th Cir. July 23, 2008), the Tenth Circuit invalidated Colorado's refusal to provide scholarship aid to students attending schools deemed "pervasively sectarian," because making this determination about a school required an "unconstitutionally intrusive scrutiny of religious belief and practice." For example, one of the state's factors was whether the school's curriculum included "required courses in religion or theology that tend to indoctrinate or proselytize." *Id.* at *2. The court noted that in order to decide whether a course would indoctrinate students, "the Commission had to decide how religious beliefs are derived and to discern the boundary between religious faith and academic theological beliefs," an unconstitutional intrusion.[10] *Id.* at *11.

    At other times, courts have recognized that even regulation of a religious organization's secular functions can be so excessive as to violate the Establishment Clause. In *Church of Scientology Flag Service v. City of Clearwater*, 2 F.3d 1514 (11th Cir. 1993), the Eleventh Circuit found that the city imposed financial recordkeeping and reporting requirements on religious organizations that were overly intrusive. The ordinance at issue applied only to religious and charitable organizations and required the plaintiff church "to divulge its entire

---

    [10]No such intrusion or inquiry is present in Plaintiffs' allegations. UDV's complaint is not that the DEA's inquiries and inspections would inquire into the relationship between UDV's actions and its religious tenets. *See Nat'l Labor Relations Bd. v. Catholic Bishop of Chi.*, 440 U.S. 490, 502 (1979) (finding an Establishment Clause problem based on the possibility that the NLRB might need to inquire "into the good faith of the position asserted by clergy-administrators and its relationship to the school's religious mission"). The DEA's inquiries would involve only assessment of whether UDV's conduct was consistent with secular regulations.

budget and all its operations on a continuing basis to a large group of governmental and non-governmental persons." *Id.* at 1535. The court contrasted Supreme Court decisions upholding recordkeeping and disclosure obligations "that were narrowly drawn to specific regulatory objectives." *Id.* The court found that, in contrast, the Clearwater ordinance "involves executive and judicial authorities in every aspect of the church's activities" and violated the command that "neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa." *Id.* at 1536 (*quoting Everson v. Bd. of Educ.*, 330 U.S. 1, 16 (1947)).

The cases cited above demonstrate that the analysis of whether an administrative scheme amounts to excessive entanglement is highly specific to the scheme at hand. This analysis cannot be done when the set of regulations that would apply to the UDV is unsettled. Plaintiffs are currently permitted to import and use hoasca consistent with the terms of the preliminary injunction (Doc. No. 100), which also prohibits Defendants from imposing additional or different restrictions on Plaintiffs. Plaintiffs ask the Court to assume that in the future, the DEA will enforce against Plaintiffs all of the CSA regulations applicable to registered importers, distributors, and dispensers. Defendants have conceded that many of these regulations are facially applicable to Plaintiffs, but also that the DEA may be amenable to granting UDV a waiver from certain of these regulations under the authority in 21 C.F.R. § 1307.03.[11] (*See* Defs.' Reply at 12; Motion Hearing Tr. 42:23–24, April 9, 2008.)

As Defendants aptly state the problem, Plaintiffs' "anticipatory grievances" about how intrusive a particular regulation will be requires the Court to evaluate "a fully speculative course of events that could be resolved in the DEA's administrative process." (Defs.' Reply at 27–28.) This situation illustrates one of the concerns underlying the doctrine of prudential ripeness—fitness of the issue for judicial resolution. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). Fitness involves both whether the issue is purely legal and whether the agency action

---

[11]Section 1307.03 states that "[a]ny person may apply for an exception to the application of any provision of this chapter by filing a written request stating the reasons for such exception." *See also* 21 U.S.C. § 822(d) ("[T]he Attorney General may, by regulation, waive the requirement for registration of certain manufacturers, distributors, or dispensers if he finds it consistent with the public health and safety.").

is final. *Id.* at 149–52. Both of these factors suggest that Plaintiffs' entanglement claim is unripe. Courts have found that Establishment Clause claims are fact-specific, and particularly so with regard to issues of entanglement. The absence of a determinative agency decision about which CSA regulations will apply to UDV is a major cause of the lack of factual development at this time, and also a concern in its own right.[12]

In *Wheeler v. Barrera*, 417 U.S. 402 (1974), the Supreme Court declined to decide whether the Establishment Clause prohibited the state of Missouri from dispatching public school teachers paid with federal funds to parochial schools to teach remedial courses for low-income students. *Id.* at 426–27. Since the state board of education had not entered an order "requiring on-the-premises parochial school instruction," and the state could comply with federal law without doing so, the Supreme Court held that the claim was unripe. *Id.* at 419. The Supreme Court also noted that "even if . . . the state and local agencies do exercise their discretion in favor of such instruction, the range of possibilities is a broad one and the First Amendment implications may vary according to the precise contours of the plan that is formulated." *Id.* at 426. Because the Establishment Clause claim "require[d] a careful evaluation of the facts of the particular case," the Supreme Court held that it would be inappropriate to decide the case before the state had finalized a specific plan. *Id.* Though excessive entanglement and aid to parochial schools are two different facets of the Establishment Clause, the Court finds *Wheeler* instructive in this case.

One court of appeals has addressed the ripeness of an excessive entanglement claim. In *Grutka v. Barbour*, 549 F.2d 5 (7th Cir. 1977), the Bishop of the Catholic Diocese of Gary, Indiana, sought to enjoin the National Labor Relations Board (NLRB) from conducting certain proceedings on behalf of lay teachers at diocesan schools, arguing that NLRB jurisdiction would amount to excessive entanglement between the government and the church. The Seventh Circuit

---

[12]In *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158 (1967), the Supreme Court cautioned against judicial involvement where the harm was contingent upon uncertain or speculative future administrative action. This concern echoes that expressed in *Abbott Labs* that an important purpose of the ripeness doctrine is "to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs.*, 387 U.S. at 148–49.

found that the district court lacked jurisdiction because statutory law required parties to exhaust administrative remedies before the NLRB. *Id.* at 7. The court acknowledged an exception to the exhaustion requirement where the exercise of NLRB jurisdiction would be unconstitutional as a matter of law. *Id.* at 8. However, the court held that the entanglement question presented was not purely legal, rather: "[T]he nature and scope of the state entanglement attacked can only be measured against a factual record delineating the character of entanglement which assertedly arises from the state intrusion." *Id.*

The First Circuit's decision in *Surinach v. Pesquera De Busquets*, 604 F.2d 73 (1st Cir. 1979), which Plaintiffs cite, is at odds with the prudential approach announced in *Wheeler*. In *Surinach*, the Puerto Rican government subpoenaed the financial records of a school operated by the Roman Catholic Church as part of a law intended to identify and address the causes of inflation. The school objected to the request on First Amendment grounds, and the First Circuit concluded that judicial review was proper. The court held that because of the sensitivity of First Amendment religious freedoms,  it was permissible for the court to "act in a predictive posture" and improper for the court to "step aside and await a course of events which promises to raise serious constitutional problems." *Id.* at 75–76. The court of appeals rejected the district court's conclusion that the regulations to be imposed on the church as a result of the government's anti-inflation initiative were merely speculative, *id.* at 75, and held that it was appropriate to consider future harms that might arise from the request for financial information.

*Surinach* diverges from the usual ripeness analysis by considering harms that were only contingent. This approach may reflect the fact that the challenge was as-applied rather than facial, in that the school was seeking to enjoin a subpoena requiring it to produce detailed financial records. While the First Circuit was willing to engage in some speculation about the likely use of these financial data, the fact that the information disclosure regulations would apply to the church was not at all speculative. In contrast, the Plaintiffs in this case cannot say which regulations will apply to them because they have not utilized the available administrative process to contest the applicability of these regulations.

The other prong of the *Abbott Labs* ripeness test is the hardship to the parties of withholding judicial review. This prong is concerned with "whether the challenged action creates a direct and immediate dilemma for the parties." *See, e.g.*, *New Mexicans for Bill Richardson v.*

*Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995). Harm includes "the heightened uncertainty and resulting behavior modification that may result from delayed resolution," as well as traditional types of harm recognized by the courts. *See Neb. Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1038 (8th Cir. 2000) (*citing Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733–34 (1998)). However, because the Court has concluded that the issue is not fit for judicial review, it is not necessary to evaluate hardship in this instance. While *Abbott Labs* itself did not state that both prongs must be satisfied in order for a claim to be ripe, this has become the predominant view. *See, e.g.*, *Ernst & Young v. Depositors Econ. Protection Corp.*, 45 F.3d 530, 535 (1st Cir. 1995); *Neb. Pub. Power Dist.*, 234 F.3d at 1038. "[T]o resolve an issue lacking factual development simply to avoid a threatened harm would be to favor expedition over just resolution." *Neb. Pub. Power Dist.*, 234 F.3d at 1039. Premature resolution would also run afoul of the "fundamental and long-standing principle of judicial restraint [which] requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988).

The Court concludes that until the DEA has made a final determination of which CSA regulations will apply to Plaintiffs, the entanglement claim is unripe. Ripeness is a component of the Article III requirement that limits judicial review to "cases or controversies." U.S. Const., art. III, sec. 2; *see, e.g.*, *U.S. West Inc. v. Tristani*, 182 F.3d 1202, 1208 (10th Cir. 1999). Therefore, the Court concludes that Count 5 of the First Amended Complaint should be dismissed for lack of jurisdiction.

IT IS THEREFORE ORDERED that:

1. Defendants' Motion to Dismiss (Doc. No. 166) is **GRANTED** as to Counts 2, 4, and 5 of Plaintiffs' First Amended Complaint;

2. Counts 2 and 4 of Plaintiffs' First Amendment Complaint are dismissed with prejudice for failure to state valid claims upon which relief can be granted; and

3. Count 5 of Plaintiffs' First Amended Complaint is dismissed without prejudice because the Court lacks jurisdiction over the Count 5 claim.

_____

SENIOR UNITED STATES DISTRICT JUDGE

19